**No. 25-2023**

**In the United States Court of Appeals for the Seventh Circuit**
_____

RONALD T. ALLGOOD
*Plaintiff-Appellant*,


v.


ST. CROIX COUNTY, WISCONSIN, ET AL.,

*Defendants-Appellees*.
_____



**On Appeal from the United States
District Court for the Western District of Wisconsin
No. 3:23-cv-00885-wmc
Hon. Willaim M. Conley**
_____

**PLAINTIFF-APPELLANT'S INITIAL APPELLATE BREIF**

Frederick B. Melms
frederick@melmslaw.com
Melms Law
219 S. Main Street
Eagle River, WI 54521
(715) 525-9839

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2023

Short Caption: Ronald Allgood v. St. Croix County, Wisconsin, et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Ronald T. Allgood

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Melms Law

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Frederick Melms      Date: 10/6/2025

Attorney's Printed Name: Frederick Melms

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✓    **No** ☐

Address: 219 S. Main St., Eagle River, WI 54521

Phone Number: 715-892-3023      Fax Number:

E-Mail Address: frederick@melmslaw.com

Table of Contents

CORPORATE DISCLOSURE STATEMENT ..................................................................... 2
TABLE OF AUTHORITIES ...................................................................................... 3
JURISDICTIONAL STATEMENT ............................................................................. 5
STATEMENT OF THE ISSUES PRESENTEd ............................................................. 6
1.       Whether the district court erred in concluding that the law was not clearly established that officers cannot use significant force, including a K-9 bite, against a suspect who is not actively resisting or who has been subdued?
 2.        Whether the district court erred in granting summary judgment on Plaintiff's failure to intervene claims when evidence suggests officers had a realistic opportunity to prevent the continued use of excessive force?

Statement of the Case ............................................................................................ 6
Factual Background ............................................................................................... 6
Procedural History ................................................................................................ 9
Summary of the Argument ................................................................................... 10
ARGUMENT ......................................................................................................... 11
THE DISTRICT COURT ERRED IN FINDING APPELLEES WERE ENTITLED TO QUALIFIED IMMUNITY ......................................................................................................... 12
         a. STANDARD OF REVIEW ...................................................................... 12
       b. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT WHEN THE LAW WAS CLEARLY ESTABLISHED THAT OFFICERS CANNOT USE SIGNIFICANT FORCE AGAINST A SUSPECT WHO IS NOT ACTIVELY RESISTING OR WHO HAS BEEN SUBDUED .................................. 12
         c. BECKER AND ALICEA WERE CLOSELY ANALOGOUS TO THE FACTS CONSIDERED BY THE DISTRICT COURT ON APPELLEE'S MOTION FOR SUMMARY JUDGMENT ................................... 14
         d. THE FORCE USED BY APPELLEES ON ALLGOOD WAS PLAINLY EXCESSIVE ................. 17
       e.  THE DISTRICT COURT ERRED IN DISMISSING ALLGOOD'S FAILURE TO INTERVENE CLAIMS ............................................................................................................. 18
Conclusion ........................................................................................................... 20
Certificate of Compliance ................................................................................... 21
Required appendix ............................................................................................... 22
Index to the required Appendix .......................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

## *US SUPREME COURT CASES*

*Graham v. Connor,*
        490 U.S. 386; 109 S. Ct. 1865; 104 L. Ed. 2d 443 (1989)............................................ 12, 16

*Mullenix v. Luna,*
        577 U.S. 7; 136 S. Ct. 305; 193 L. Ed. 2d 255 (2015)........................................................ 18

*United States v. Lanier,*
    520 U.S. 259; 117 S. Ct. 1219; 137 L. Ed. 2d 432 (1997).................................................. 18

**FEDERAL CASES**

*Abbott v. Sangamon Cty,*
    705 F.3d 706 (7th Cir. 2013) ........................................................................................... 16

*Abdullahi v. City of Madison,*
    423 F.3d 763 (7th Cir. 2005) ........................................................................................... 20

*Alicea v. Thomas,*
    815 F.3d 283 (7th Cir. 2016) ..................................................................................... 13, 16

*Becker v. Elfreich,*
    821 F.3d 920 (7th Cir. 2016) ...................................................................... 13, 16, 16, 18

*Chan v. Wodnicki,*
    123 F.3d 1005 (7th Cir. 1997) ......................................................................................... 18

*Cibulka v. City of Madison,*
    992 F.3d 633 (7th Cir. 2021) ..................................................................................... 13, 17

*Cyrus v. Town of Mukwonago,*
    624 F.3d 856 (7th Cir. 2010) ........................................................................................... 18

*Doxtator v. O'Brien,*
    39 F.4th 852 (7th Cir. 2022) ........................................................................................... 19

*Estate of Escobedo v. Bender,*
    600 F.3d 770 (7th Cir. 2010) ........................................................................................... 12

*Howell v. Smith,*
    853 F.3d 892 (7th Cir. 2017) ........................................................................................... 18

*Johnson v. Scott,*
    576 F.3d 658 (7th Cir. 2009) ........................................................................................... 12

*McGee v. Parsano,*
    55 F.4th 563 (7th Cir. 2022) ........................................................................................... 16

*Miller v. Gonzalez in Alicea,*
    815 F.3d 289 ..................................................................................................................... 17

*Miller v. Gonzalez,*
    761 F.3d 822 ..................................................................................................................... 17

No. 3:23-cv-00885 ............................................................................................................ 1

*Pryor v. Corrigan*,
    124 F.4th 475 (7th Cir. 2024) ........................................................................... 13

*Santaella v. Metro. Life Ins. Co.*,
    123 F.3d 456 (7th Cir. 1997) ............................................................................. 6

*Smith v. Ball State Univ.*,
    295 F.3d 763 ...................................................................................................... 18

*Smith v. Finkley*,
    10 F.4th 725 (7th Cir. 2021) ............................................................................. 13

*Sound of Music Co. v. 3M*,
    477 F.3d 910 (7th Cir. 2007) ............................................................................. 12

*Stilwell v. Am. Gen. Life Ins. Co.*,
    555 F.3d 572 (7th Cir. 2009) ............................................................................... 6

*Weinmann v. McClone*,
    787 F.3d 444 (7th Cir. 2015) ........................................................................... 13

**FEDERAL STATUTES**

Title 28 U.S.C.
    § 1291 .................................................................................................................. 6
    § 1331 .................................................................................................................. 6
    § 1367 .................................................................................................................. 6

Title 42 U.S.C.
    § 1983 .............................................................................................................. 6, 9

## JURISDICTIONAL STATEMENT

### a. The District Court's Jurisdiction.

Plaintiff- Appellant Ronald T. Allgood brought his claims against Defendants-Appellees

under the First, Fourth, and Fourteenth Amendments to the United States Constitution, pursuant

to 42 U.S.C. § 1983. Accordingly, the district court had federal question jurisdiction over Allgood's action pursuant to 28 U.S.C. §§ 1331 and 1367.

This appeal is taken from the U.S. District Court for the Western District of Wisconsin's May 14, 2025, Opinion and Order by the Honorable Judge William D. Conley (Dist. Ct. Dkt. No. 68) which granted Defendants' motion for summary judgment (Dist. Ct. Dkt. No. 37), and the May 14, 2025, judgment the district court entered in favor of the Defendants (Dist. Ct. Dkt. No. 69).

**b. THIS COURT'S JURISDICTION**

The district court's Opinion and Order (Dist. Ct. Dkt. No. 68) granting Apellees' motion for summary judgment merged into the May 14, 2025, final judgment, (Dist. Ct. Dkt. No. 69) entered judgment in favor of Defendants (Dist. Ct. Dkt. No. 69) and is immediately appealable. See *Stilwell v. Am. Gen. Life Ins. Co*., 555 F.3d 572, 576 (7th Cir. 2009*); Santaella v. Metro. Life Ins. Co*., 123 F.3d 456, 461 (7th Cir. 1997). Allgood filed his notice of appeal within time limits on June 13, 2025. Therefore, the court of appeals has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED

1. Whether the district court erred in concluding that the law was not clearly established that officers cannot use significant force, including a K-9 bite, against a suspect who is not actively resisting or who has been subdued?

2. Whether the district court erred in granting summary judgment on Plaintiff's failure to intervene claims when evidence suggests officers had a realistic opportunity to prevent the continued use of excessive force?

## STATEMENT OF THE CASE

## 1. Factual Background

Plaintiff-Appellant Ronald T. Allgood was a 60-year-old man on November 7, 2023, when five of the Defendant-Appellees held him down on the ground and used a dog to torture him into submission. Appellant was smaller than all five of the Appellee officers from the St. Croix County Sheriff's Office who responded to Appellants address to serve a bench warrant after Plaintiff missed court following his failure appear in St. Croix County Case No. 2022CF000683. (Dist Ct. Dkt 55) Appellant didn't appear at his initial appearance because he never received the summons. Accordingly, the presiding judge issued a bench warrant. Appellant was ultimately found not guilty in St. Croix County Case No. 2022CF000683.

After the bench warrant was issued Deputies from the St. Croix County Sheriff's Office arrived at Appellants home to execute a felony warrant. Defendant Deputies Durand and Fayerweather were the first on scene. They located Mr. Allgood in his front yard, informed him of the warrant, and made initial contact. (Dist. Ct. Dkt 55 ¶ 11). Mr. Allgood had never received notice of the warrant and was unaware it existed. (Dist. Ct. Dkt 55 ¶ 10). After questioning Durand about the warrant, Mr. Allgood went back inside his home. (Dist. Ct. Dkt 55 ¶ 10).

Durand then radioed to dispatch that Mr. Allgood had "barricaded" himself in his house and called for prearranged backup, who quickly arrived. (Dist. Ct. Dkt 55 ¶¶ 13-14). Mr. Allgood then reemerged to speak with Durand, who was inexplicably pointing a firearm at him. (Dist. Ct. Dkt 55 ¶ 15). At no point did any officer on scene suggest that Mr. Allgood had a weapon or was armed. (Dist. Ct. Dkt 55 ¶ 16).

Throughout the encounter, Mr. Allgood went in and out of his home several times but remained communicative with deputies. (Dist. Ct. Dkt 55 ¶ 17). By this time, Deputies Mangine, Benson, and Johnson had also arrived. (Dist. Ct. Dkt 47 ¶¶ 21-22). Mangine retrieved his K-9,

Ash, and approached the front door. He issued a single warning by shouting through the door, "I'm going to send the dog in, and you might be bit." (Dist. Ct. Dkt 55 ¶ 32).

Mr. Allgood then told Durand that he would exit through the garage. Durand relayed this to the other deputies. (Dist. Ct. Dkt 55 ¶ 17). Mr. Allgood emerged from the garage with his hands in the air, verbally surrendered, and announced, "I'm coming out, my hands are up. I have a cell phone." (Dist. Ct. Dkt 55 ¶ 19). He began walking calmly toward the police vehicles parked on his lawn, telling the deputies, "let's go." (Dist. Ct. Dkt 55 ¶ 20).

The first command given was from Fayerweather, who ordered Mr. Allgood to "step down," an order without any clear meaning. (Dist. Ct. Dkt 55 ¶ 21). Mr. Allgood continued walking calmly toward the vehicles, at which point Fayerweather pointed his taser and then suddenly charged and tackled him. (Dist. Ct. Dkt 55 ¶¶ 21-23). Mr. Allgood was not fleeing and posed no danger when this force was used. (Dist. Ct. Dkt 55 ¶¶ 24-25).

Mangine saw Mr. Allgood walking with his hands visible, verbally surrendering. (Dist. Ct. Dkt 55 ¶¶ 26-27). Despite this, Mangine and K-9 Ash jumped a fence to join the encounter. (Dist. Ct. Dkt 55 ¶ 26). As Fayerweather tackled Mr. Allgood, Mangine released K-9 Ash without issuing any additional warning. (Dist. Ct. Dkt 55 ¶¶ 28, 30). The dog immediately bit into Mr. Allgood's left calf and would not release. (Dist. Ct. Dkt 55 ¶ 34).

Once tackled, Mr. Allgood was straddled on the chest by Fayerweather, who repeatedly yelled, "give me my taser," despite the fact that Mr. Allgood never possessed it. (Dist. Ct. Dkt 55 ¶ 33). Additional deputies, including Durand, Johnson, Benson, Mangine, and Van Effen, piled on, securing Mr. Allgood's limbs while K-9 Ash remained clamped to his leg. (Dist. Ct. Dkt 55 ¶ 34). At this point, the 60-year-old Applellant was immobilized by at least six younger and larger officers. (Dist. Ct. Dkt 55 ¶ 34).

As Mr. Allgood pleaded for relief, Mangine stated, "Ash is not coming off until you stop resisting." (Dist. Ct. Dkt 55 ¶ 38). The pain was evident, yet Mr. Allgood had been fully restrained for more than 15 seconds, unable to move. (Dist. Ct. Dkt 55 ¶ 39). Deputies continued shouting "stop resisting" even though complete physical control had already been established. (Dist. Ct. Dkt 55 ¶ 39).

Mangine nonetheless maintained the dog's bite for nearly a full minute, claiming that Mr. Allgood showed "resistive tension" and suggesting that an early release might "invite further movement." (Dist. Ct. Dkt 54 pp. 3-5; Dkt 55 ¶ 41). Resistive tension, however, does not justify a prolonged dog bite, particularly once a suspect has been subdued by multiple officers. Mangine ultimately allowed the bite to continue for 52 seconds after Mr. Allgood had been fully restrained, including 20 seconds after stating he would not remove the dog until resistance stopped. (Dist. Ct. Dkt 55 ¶ 45).

Mr. Allgood was incapable of resisting throughout most of the attack. (Dkt 55 ¶ 51). The prolonged use of K-9 Ash was unnecessary, unreasonable, and amounted to gratuitous punishment. (Dkt 55 ¶ 52). When Mangine finally commanded the dog to release, it did so immediately. (Dkt 55 ¶ 52). This incident resulted in Mr. Allgood suffering severe lacerations and multiple surgeries and hospital stays.

## Procedural History

On December 23, 2023, Appellant filed suit under 42 U.S.C.S. § 1983, alleging that Defendants violated his Fourth and Fourteenth Amendment rights by using excessive force during his arrest and by failing to intervene to prevent that force on November 7, 2023. See generally (Dist. Ct. Doc. 1). Appellees moved for summary judgment on January 8, 2025. Appellant filed his opposition on February 25, 2025. On May 14, 2025, the district court granted

summary judgment in favor of Defendants on qualified immunity grounds, finding that there was no clearly established law that would have put the officers on notice that their conduct violated the Constitution under the specific facts of this case. Judgment was entered the same day.

## SUMMARY OF THE ARGUMENT

The judgment should be reversed because the district court's grant of summary judgment was erroneous. The force used on Mr. Allgood was excessive under existing case law and should have been evaluated by a jury, not resolved as a matter of law. The record, viewed in the light most favorable to Mr. Allgood, demonstrates that he was a 60-year-old man who verbally surrendered, emerged from his garage with his hands raised, and walked calmly toward officers to be taken into custody. He announced his compliance and posed no immediate threat. Despite these facts, he was suddenly tackled, forced to the ground, and pinned by several younger and larger officers. While immobilized, a police dog was released and permitted to bite into his leg for nearly a full minute. The bite was maintained long after he was fully restrained, causing severe injuries and significant pain.

Qualified immunity does not shield officers from conduct that is plainly unlawful under existing precedent or that a reasonable officer would understand to be unconstitutional. The doctrine is meant to give space for difficult, split-second judgments in uncertain circumstances, not to provide impunity for gratuitous force once a suspect has been subdued. A jury could reasonably conclude that the officers' actions here went far beyond what the Constitution permits. Mr. Allgood was unarmed, had surrendered, and was already controlled by multiple officers. Any justification for the use of significant force ended the moment he was on the ground and restrained. Continuing to allow a K-9 to maul him while six officers held him down was not a measure to secure compliance but an act of unnecessary violence.

The district court erred by treating these facts as if they could be resolved as a matter of law. The question of whether Mr. Allgood was resisting, threatening, or attempting to evade arrest is hotly contested. The record supports that he was at most passively resistant, if not entirely compliant, when force was applied. Those factual disputes belong to a jury. By resolving them in favor of the officers, the district court improperly stripped Mr. Allgood of his right to have a jury weigh credibility, assess the video evidence, and determine the reasonableness of the force used.

Moreover, the constitutional rule at issue was not novel or unclear. It has long been established that force must be proportionate to the threat presented at the time it is used and that significant force cannot continue once a suspect has been subdued. Reasonable officers on the scene would have known that holding down an unarmed man in his sixties while allowing a police dog to bite him for nearly a minute violated those principles. The claim that they lacked fair notice ignores both the clear constitutional standard and the obvious disproportionality of their actions.

Qualified immunity is meant to protect officers from liability when the boundaries of the law are uncertain. It does not apply when the conduct is so plainly excessive that no reasonable officer could believe it lawful. That is precisely the situation here. By granting summary judgment, the district court excused conduct that a jury could readily conclude was gratuitous and punitive. The doctrine of qualified immunity does not reach that far.

Because genuine issues of material fact remain and because the governing constitutional principles were clearly established, the district court erred in granting qualified immunity. This case presents classic fact questions that must be decided by a jury, not dismissed at summary

judgment. The judgment should be reversed, and the matter remanded for trial so that a jury may

determine whether the officers' actions violated Mr. Allgood's constitutional rights.

# ARGUMENT

1. **THE DISTRICT COURT ERRED IN FINDING APPELLEES WERE ENTITLED TO QUALIFIED IMMUNITY.**

   a. **STANDARD OF REVIEW.**

This court reviews a district court's grant of summary judgment *de novo. Sound of Music Co. v. 3M*, 477 F.3d 910, 914 (7th Cir. 2007). And it reviews decisions on qualified immunity while "viewing the facts in the light most favorable to the Plaintiff". See *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010). The question whether the use of force during an arrest is proper under the Fourth Amendment depends on the objective reasonableness of the officer's actions, judged on the basis of the conditions the officer faced. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). In order to assess objective reasonableness, the court must consider all the circumstances, including notably "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009)

   b. **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT WHEN THE LAW WAS CLEARLY ESTABLISHED THAT OFFICERS CANNOT USE SIGNIFICANT FORCE AGAINST A SUSPECT WHO IS NOT ACTIVELY RESISTING OR WHO HAS BEEN SUBDUED**

The district court erred in granting summary judgment for the Appellees on qualified immunity. Qualified immunity rests on two questions: "first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and

second, whether the federal right at issue was clearly established at the time of the alleged violation." *Pryor v. Corrigan*, 124 F.4th 475, 488 (7th Cir. 2024) (Citing *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). "If [a] plaintiff fails to prove either prong, "the defendant official is protected by qualified immunity." *Id.* (citing Smith, 10 F.4th at 737).

The district court based its ruling on the second prong of the qualified immunity analysis, concluding that the law was not clearly established that officers could not deploy a K-9 on Appellant for nearly a minute. (Dist. Ct. Doc. 68, pp. 13–16). In effect, the court found no historical precedent addressing the circumstances the Appellees confronted on November 7, 2023, but it's analysis was ultimately incorrect. "To overcome qualified immunity in an excessive-force case, the plaintiff must either (1) "identif[y] a 'closely analogous case that established a right to be free from the type of force the police officers used on him,'" or (2) show "that the force was so plainly excessive that, as an objective matter, the police officers [**12] would have been on notice that they were violating the Fourth Amendment." *Cibulka v. City of Madison,* 992 F.3d 633, 639 (7th Cir. 2021) (Citing *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015)). The district court erred because seventh circuit case law put the Appellees were on notice that their conduct was a violation of the Fourth Amendment because *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016), and *Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016), are closely analogous to the facts considered by district court. Moreover, the force used against Appellant was so plainly excessive that the officers were independently on notice that they were violating the Fourth Amendment.

    c. ***BECKER* AND *ALICEA* WERE CLOSELY ANALOGOUS TO THE FACTS CONSIDERED BY THE DISTRICT COURT ON APPELLEE'S MOTION FOR SUMMARY JUDGMENT**.

The District Court erred in finding that neither *Becker* nor in *Alicea* the specific facts at issue in the instant case, because both cases are closely analogous to the facts it considered on Appellee's motion for summary judgment. In *Becker*, this Court considered a similar situation to the one posed by Appellees motion. In that case, an officer with a K-9 partner used his K-9 partner to subdue a surrendering suspect. *Becker*, 821 F.3d at 928 and this court found that

> "Officer Elfreich discovered Becker had been descending the stairs to surrender with his hands above his head. Nonetheless, Officer Elfreich continued to allow the police dog to bite Becker, while pulling him down three steps and placing his knee on his back and handcuffing him. And Becker suffered serious bodily injury as a result of the dog bite. While it is unclear from the record whether Axel presented a substantial risk of serious risk bodily harm (and thus deadly force), the force was clearly at the more severe end of the force spectrum. A jury could reasonably find such force was excessive. Further, because it was clearly established at the time of Becker's arrest that no more than minimal force was permissible to arrest a non-resisting, or passively resisting, suspect, Officer Elfreich was not entitled to qualified immunity

> *Id*. At 930

The facts in instant case are very similar to those in *Becker*. On November 7, 2023, Appellant announced he was coming out his garage and then emerged from his garage with his hands visible to surrender to the arresting officers. (Cir. Ct. Dkt 19 p. 103:24-104:3; Dkt 40 - Ex. I 6:00-6:29). Appellee Fayerweather then inexplicably decided to charge Appellant and tackle him to the ground. (Cir Ct. Dkt 40 - Ex. J at 7:10 -0:7:24). Appellee Mangine witnessed Appellant walking away from his garage towards the law enforcement vehicles parked in his yard. (Cir Ct. Dkt 40 - Ex. J at 7:00 -:7:25). And then decided to release K-9 Ash, despite Appellant posing no apparent threat. (Cir. Ct. Dkt 40 - Ex. J at 7:00 -0:7:20; Dkt 40 - Ex. K at 1:28 -1:38) There was no reason for either Appellee Mangine or Appellant Fayerweather to believe that using significant force was necessary to effectuate Appellant's arrest. Mangine also failed to give Appellant any warning that he would release K-9 Ash after Appellant emerged from his garage. Mangine also failed to recall K-9 Ash

after Defendant Fayerweather took Appellant to the ground.  (Cir. Ct. Dkt 40 - Ex. K at 1:05 -1:38; Dkt 40 - Ex. J at 7:10 -0:7:30)

Appellees Durand, Johnson, Benson, Mangine, and Van Effen then piled onto Appellant, physically securing each of his limbs while K-9 Ash remained latched onto Appellant's left leg and Fayerweather continued to straddle his chest. This effectively immobilized Appellant, who was unarmed and 60 years old at the time of the incident.  Appellant was not only older, but also smaller than many, if not all, of the officers restraining him. (Cir. Ct. Dkt 40 - Ex. I at 6:48 -7:02; Dkt 40 - Ex. K at 1:38 -1:54; Dkt 40 - Ex. J at 7:30 -0:7:37; Dkt 40 - Ex. L at 1:50 -1:58)

As Appellant pleaded for Defendants to release K-9 Ash from his leg, Appellee Mangine responded, "Ash is not coming off until you stop resisting." The pain from the dog bite was visible on Appellant face. (Cir. Ct. Dkt 40 - Ex. K at 1:00 -2:10) By this point, Appellant had already been pinned to the ground with his limbs immobilized by six officers for over 15 seconds. During that time, Appellant had not moved and was no longer physically capable of resistance, but the officers continued to use significant force.  (Cir. Ct. Dkt 40 - Ex. K at 1:00 -2:10)

Mangine did not release K-9 Ash until 52 seconds after Appellant had been fully secured by himself and Durand, Fayerweather, Benson, Johnson, and Van Effen. Mangine also waited 20 seconds after stating that Ash would not be removed until Appellant stopped resisting. Appellant was fully restrained and secured by the six Defendants throughout most of the attack and was not physically capable of resisting. (Cir Dkt 40 - Ex. L at 1:50 -2:42; Dkt 40 - Ex. I at 6:50 -7:40; Dkt 40 - Ex. J at 7:30 -8:22).  Mangine's prolonged use of K-9 Ash was excessive, unnecessary, and unjustified and did not really assist in Appellant's arrest. Their participation did little more than needlessly torture Appellant.

Inexplicably, the District Court found that Appellant was actively resisting while Appellees were torturing him with K-9 ash, but the record does not reflect that.  (Cir. Ct. Dkt 40 - Ex. L at

1:50 -2:42; Dkt 40 - Ex. I at 6:50 -7:40; Dkt 40 - Ex. J at 7:30 -8:22; Dkt 68 p 16). And the decision does not reflect the district court considering the record in the light most favorable to Appellant, despite the requirement it do so. *McGee v. Parsano*, 55 F.4th 563, 566 (7th Cir. 2022). And the district court's claim that it considered the facts under the *McGee* standard. (Cir. Ct. Dkt 40 n1). The record actually reflected passive resistance at most. The record additionally demonstrated that Appellees continued to use significant force on a man they had subdued, who was no longer even capable of resisting.

This Court in *Becker* put the appellants on notice that "the case law clearly establishes that an officer cannot use more than minimal force" on a suspect who was passively resisting and that the use of dog is more than minimal amount of force officers can use on a passively resisting suspect. *Becker* 821 F.3d at 929. The *Becker* court additionally looked to *Abbott v. Sangamon Cty* which explained that "was well-established that "police officers cannot continue to use force once a suspect is subdued *Becker* 821 F.3d at 929 (citing *Abbott v. Sangamon Cty* ., 705 F.3d 706, 732 (7th Cir. 2013)). And ultimately found that Elfreich, was not entitled to qualified immunity for his use of excessive force by way of a K-9 partner.

Appellees had adequate notice that their conduct on November 7, 2023, violated Appellant's Fourth Amendment right to be free from excessive force, and the district court should not have granted Appellee's motion for summary judgement on qualified immunity grounds

*Alicea v. Thomas* is similarly instructive. In *Alicea* this court considered the use of force under *Graham v. Connor*, explaining that "[a]n officer's use of force is analyzed under the Fourth Amendment's objective reasonableness standard, and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Alicea, 815 F.3d at 288 (Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). " A

court examines the defendant's use of force in light of the following factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id. (*Citing *Graham,* 490 U.S. 386, 396). Additionally, this court cited to *Miller v. Gonzalez* in *Alicea* to explain that the "prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Alicea,* 815 F.3d at 289 (citing *Miller v. Gonzalez*, 761 F.3d 822, 829)

Even if Allgood was initially resisting, Appellee's continued use of the K-9 after Appellant was physically restrained by multiple officers was objectively unreasonable. This Court has recognized that willful refusal to obey a police officer's order constitutes "passive resistance" warranting only a minimal use of force. The record demonstrates that Appellant was at most passively resisting while he was pinned to the ground with his limbs immobilized by six law enforcement officers. During that period of immobility, K-9 Ash continued to bite him. (Cir Dkt 40 - Ex. L at 1:50 -2:42; Dkt 40 - Ex. I at 6:50 -7:40; Dkt 40 - Ex. J at 7:30 -8:22; Dkt 68 p 16). That force was excessive under *Alicea, Becker, Miller,* and *Gonzalez.* The District Court erred when it granted summary judgment to Appelles and this court must overturn the district court's decision.

### d. THE FORCE USED BY APPELLEES ON ALLGOOD WAS PLAINLY EXCESSIVE.

A Plaintiff may also overcome qualified immunity if they can show that the force used on them was so plainly excessive that police officers would have been on notice that they were violating the Fourth Amendment. *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021). In other words, if a Plaintiff can demonstrate that "a general constitutional rule already identified

in the decisional law ... appl[ies] with obvious clarity to the specific conduct in question," *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997). And it must be so clear that "a reasonable person necessarily would have recognized it as a violation of the law," (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (Quoting *Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir. 1997)). And the record in the instant case demonstrates the force was plainly excessive.

Under existing precedent "[f]orce is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force. . . . It's the totality of the circumstances, not the first forcible act, that determines objective reasonableness." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). Accordingly, once the 5 appellees and another office from the Town of Hammond Police Department had Appellant subdued, continuing to use significant force, like a K-9 bite, was plainly unconstitutional under the Fourt Amendment to the constitution. *See*, Becker, 821 F.3d 920 at 926.

The defendants may argue that they reasonably believed Allgood was actively resisting. However, this Court has held that even if officers reasonably misconstrue a suspect's actions as resistance, they are still limited to "the minimal use of force." Smith v. Ball State Univ., 295 F.3d 763. The continued use of a K-9 bite against a suspect who is already physically restrained by multiple officers goes well beyond minimal force and constitutes excessive force under clearly established law

Qualified immunity "protects actions in the hazy border between excessive and acceptable force." *Mullenix v. Luna*, 577 U.S. 7, 18, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015). It does not protect six officers from facing consequences for holding down a 60 year old man and

torturing him with police k-9.  This court should overturn the district court's grant of qualified immunity.

### e. THE DISTRICT COURT ERRED IN DISMISSING ALLGOOD'S FAILURE TO INTERVENE CLAIMS

The district court also erred in dismissing Allgood's failure to intervene claim.  The district court did not address the failure to intervene claim, because it found for appellees on qualified immunity but this Court has long recognized that "an officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022)

A "realistic opportunity to intervene" may exist whenever an officer could have "called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop." *Abdullahi v. City of Madison*, 423 F.3d 763, 774(7th Cir. 2005). Moreover, this Court has made clear that "whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Doxtator, 39 F.4th 852 at 864.

The record in this case demonstrated that that multiple officers were present while the K-9 continued to bite Allgood after he was physically restrained. These officers had a realistic opportunity to intervene by ordering Deputy Mangine to remove the K-9, but they failed to do

so. (Cir Dkt 40 - Ex. L at 1:20 -2:42; Dkt 40 - Ex. I at 6:30 -7:40; Dkt 40 - Ex. J at 7:00 -8:22). This Court has consistently held that "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so" can be held liable under § 1983, and this court should overturn the district court's order granting summary judgement for Appellees. See *Abdullahi*, 423 F.3d at 774.

## CONCLUSION

For the foregoing reasons, Appellant Ronald T. Allgood respectfully requests that this Court reverse the district court's grant of summary judgment and remand the case for trial.

Respectfully submitted,

Frederick Melms
Attorney for Appellant

By: Electronically signed by Frederick Melms
Frederick B. Melms
Bar no. 1093957
Melms Law
Frederick@melmslaw.com
219 S. Main St.
PO Box 81
Eagle River, WI 54521
715-892-3023

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rule 32 because, according to the word-count feature in Microsoft Word, the brief contains 5157 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and Circuit Rule 32 because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font for the body of the brief.

Electronically signed by Frederick Melms

Frederick B. Melms
Bar no. 1093957
Melms Law
Frederick@melmslaw.com
219 S. Main St.
P.O. Box 81
Eagle River, WI 53217
715-892-3023

No. 25-2023

In the United States Court of Appeals for the Seventh Circuit
_____

RONALD T. ALLGOOD
*Plaintiff-Appellant*,


v.


ST. CROIX COUNTY, WISCONSIN, ET AL.,

*Defendants-Appellees*.
_____


**On Appeal from the United States
District Court for the Western District of Wisconsin
No. 3:23-cv-00885-wmc
Hon. Willaim M. Conley**
_____
**REQUIRED SHORT APPENDIX**

Frederick B. Melms
frederick@melmslaw.com
Melms Law
219 S. Main Street
Eagle River, WI 54521
(715) 525-9839

**RULE 30 CERTIFICATE OF COMPLIANCE**

I hereby certify that all of the materials required by 7th Cir. R. 30(a) and 30(b) are included in the Required Short Appendix bound with the Brief of Plaintiff- Appellant Ronald T. Allgood Partnership and the Plaintiff- Appellant's Appendix.

**DATED this 6th day of October, 2025**

/s/ Electronically signed by Frederick Melms

Frederick B. Melms
Bar no. 1093957
Melms Law
Frederick@melmslaw.com
219 S. Main St.
P.O. Box 81
Eagle River, WI 53217
715-892-3023

# INDEX TO THE REQUIRED SHORT APPENDIX

Selected pages of October 21,  2024,Transcript of Ronald T. AllGood's , Dkt 19 Ronald T. Allgood v. St. Croix County Et Al. 3:23-cv-885 ......................................................................................................... 1

January 12,  2025, Declaration of Scott Knduson, Dkt 40 Ronald T. Allgood v. St. Croix County Et Al. 3:23-cv-885 ............................................................................................................................... 2

January 14,  2025, Defendant's Proposed Findings of Fact of Scott Knduson, Dkt 47 Allgood v. St. Croix County Et Al. 3:23-cv-885 .................................................................................................. 10

February 24,  2025, Plaintiff Ronald T. AllGood's Proposed Findings of Fact , Dkt 55 Ronald T. Allgood v. St. Croix County Et Al. 3:23-cv-885.......................................................................... 35

May 14, 2025, Order Granting Defendants' Motion for Summary Judgment, Dkt 68 Ronald T. Allgood v. St. Croix County Et Al. 3:23-cv-885 ...................................................................................... 88

May 14, 2025,  Judgment, Dkt 69 Ronald T. Allgood v. St. Croix County Et Al. 3:23-cv-885 ................ 89

101

1   got out there when it was coming up, when the
2   garage door was going up saying, I don't have
3   anything, my hands are up, just go to jail. I
4   said it multiple times. I don't hear that in
5   here.
6       MR. NICKITAS: Zach, are you frozen there,
7   or are you cueing up something else? You've
8   been quiet for about 60 seconds.
9       (Technical difficulties.)
10      (Off the record.)
11      MR. NICKITAS: I just wanted to add that
12  about 11:37 and some odd seconds I asked
13  Mr. Flood if he could hear, and it was the
14  first indicator that there may have been a
15  break in transmission, and it appears by 11:41
16  we've got it all corrected. And before that
17  apparent break, Mr. Allgood had answered the
18  question.
19      MR. FLOOD: I don't think I heard the
20  answer.
21      MR. NICKITAS: Can you go ahead and read
22  his answer back.
23      (The requested portion was read back by
24  the reporter.)
25      MR. NICKITAS: Zach, I'm satisfied. It's

102

1   about 11:43. It's your -- it's your depo.
2   BY MR. FLOOD:
3   Q. So, Mr. Allgood, at the time that you were --
4   you were brought to the ground during this
5   incident, do you recall whether you were
6   walking when you were initially brought to the
7   ground or were you standing in place?
8   A. I was walking.
9       MR. FLOOD: I'm going to pull back up
10  Exhibit 29, which is your Complaint. And the
11  video we will mark as Exhibit 30. I don't
12  think I mentioned that.
13      (Exhibit 30 marked for identification.)
14  BY MR. FLOOD:
15  Q. All right. So we have your Complaint pulled
16  back up. I'm going to go back down to
17  Paragraph 54, same paragraph that we were
18  talking about earlier, and I'm highlighting --
19      MR. NICKITAS: Rick, it should indicate
20  that I'm handing a copy of the -- of the
21  Complaint to the witness, and we're following
22  along on the screen and with the paper copy on
23  the -- the second sentence of Paragraph 54.
24      MR. FLOOD: Yes.
25  BY MR. FLOOD:

103

1   Q. The second sentence of Paragraph 54 of your
2   Complaint reads, Upon seeing and hearing
3   Plaintiff surrender, Fayerweather decided to
4   tackle the compliant 60-year-old man to the
5   ground. Am I understanding your allegation
6   correctly that you were surrendering at the
7   time you exited the garage?
8   A. I was surrendering.
9   Q. What was that?
10  A. I was surrendering. They -- they know that
11  from the front door. I told them I was going
12  through the garage, I'll be out the front.
13  Q. And by surrendering, are you referring to
14  walking in the direction of the police vehicle
15  and --
16  A. Correct.
17  Q. -- and saying something --
18  A. Correct.
19  Q. -- to the effect of --
20  A. Yep, yep.
21  Q. And those are the actions that you allege
22  Deputy Fayerweather saw and heard in this
23  paragraph of your Complaint?
24  A. He didn't hear me saying, I'm coming through
25  the garage, because I didn't even know he was

104

1   there. It was the other two officers that --
2   or three or whatever there was at the side of
3   the house.
4   Q. I think earlier you testified that when you
5   came out of the garage, you had a cell phone in
6   your right hand; is that correct?
7   A. Yeah, I had a cell phone. I believe it was in
8   the --
9   Q. Did you have any other objects in your hand
10  when --
11  A. No, sir. No.
12  Q. Do you recall when you came out of the garage
13  and prior -- prior to you being brought to the
14  ground, did Deputy Fayerweather have a weapon
15  aimed or trained on you?
16  A. I didn't know that he was even there, so I
17  never saw a weapon, never saw anything. I
18  never even seen him until I was tackled.
19  Q. Do you have -- do you have any knowledge
20  whether as Deputy Fayerweather began to bring
21  you to the ground, do you know whether he was
22  holding a weapon at that time?
23  A. I don't know what he had. I -- I don't know.
24  I never seen him.
25  Q. It is also true that you don't know whether --

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RONALD T. ALLGOOD,

      Plaintiff,

                        Case No:  23-CV-00885

v.

ST. CROIX COUNTY, ST CROIX COUNTY
SHERIFF'S OFFICE, VILLAGE OF HAMMOND
POLICE DEPARTMENT, VILLAGE OF HAMMOND,
CORY VAN EFFEN, DANIEL ORR, CHASE
DERAND, SCOTT KNUDSON, BRYCE FAYERWEATHER,
FREDERICK MANGINE, ERIC JOHNSON AND JOEL
BENSON,

      Defendants.

## DECLARATION OF SCOTT KNUDSON

STATE OF WISCONSIN    )
                      ) ss.
ST. CROIX COUNTY     )

      I, SCOTT KNUDSON, being first duly sworn upon oath, depose and state as follows:

1.      I am an adult resident of the state of Wisconsin and I make this declaration based on personal knowledge.

2.      I am currently employed by the St. Croix County Sheriff's Office as the St. Croix County Sheriff, and I have been so employed since 2017 when I was appointed to the position. I was most recently reelected to the position of Sheriff in 2022. Prior to my

appointment as Sheriff, I was employed by the St. Croix County Sheriff's Office in various law enforcement capacities since January 1, 1996.

3.      In my role as St. Croix County Sheriff, I am familiar with and regularly review St. Croix County Sheriff's Office policies and records kept in the ordinary course of business. These include St. Croix County Sheriff's Office policies, employee personnel files, and employee training materials and records.

4.      All of my statements in this Declaration refer or pertain to events, conditions, actions, policies, practices, or customs occurring in November 2022.

5.      Attached as **Exhibit A** is a true and correct copy of the St. Croix County Sheriff's Office's Use of Force policy that was in effect on November 7, 2022. This policy requires deputies to use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the deputy at the time of the event to accomplish a legitimate law enforcement purpose. It also includes a non-exhaustive list of factors that deputies should consider when determining whether to use force and the amount of force that is reasonable.

6.      Attached as **Exhibit B** is a true and correct copy of the St. Croix County Sheriff's Office's policy on Conducted Energy Devices (Tasers) that was in effect on November 7, 2022.

7.      Attached as **Exhibit C** is a true and correct copy of the St. Croix County Sheriff's Office's policy on Canine Deputies that was in effect on November 7, 2022. This policy requires that each K-9 team must be trained and certified to meet current nationally

recognized standards or other recognized and approved certification standards prior to assignment in the field, and each team must then be recertified annually.

8.      Attached as **Exhibit D** is a true and correct copy of the St. Croix County Sheriff's Office's policy on Training that was in effect on November 7, 2022.

9.      Attached as **Exhibit E** is a true and correct copy of the St. Croix County Sheriff's Office's policy on Standards of Conduct that was in effect on November 7, 2022.

10.     Attached as **Exhibit F** is a true and correct copy of the St. Croix County Sheriff's Office's policy on Outside Agency Assistance that was in effect on November 7, 2022.

11.     Attached as **Exhibit G** is a true and correct copy of all records of Deputy Mangine and K-9 Ash's deployments and apprehensions with the St. Croix County Sheriff's Office.

12.     As of November 7, 2022, Chase Durand, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson had each completed all training required by the Wisconsin Law Enforcement Standards Board to be a certified law enforcement officer. As of that date, I had also completed all training required by the Wisconsin Law Enforcement Standards Board.

13.     As of November 7, 2022, Fred Mangine and K-9 Ash were trained and certified to meet current nationally recognized standards, specifically the standards of the United States Police Canine Association. Attached as **Exhibit H** is a true and correct copy of all of Deputy Mangine's K-9 certifications.

14.     It is the common practice and procedure of the St. Croix County Sheriff's Office for deputies to request a K-9 handler to the scene, when a K-9 handler is available,

when effectuating arrests pursuant to a warrant for violent charges, felony-level charges, if the suspect has a known violent history, if the suspect has a history of using weapons, or where the history or other facts indicate the likelihood of an increased risk to officers' safety.

15.     It is the common practice and procedure of the St. Croix County Sheriff's Office that multiple deputies assist in serving an arrest warrant where the warrant is for violent charges, for anything related to resisting arrest, or making threats to law enforcement officers. We have multiple deputies assist in the execution of such warrants for officer safety, for the safety of the subject, and in an effort to minimize the level of force needed to effectuate the arrest. Law enforcement officers in the State of Wisconsin are trained on a continuum of force that begins simply with presence, meaning that depending on the circumstances, the presence of an officer may alone be sufficient to gain the compliance of a subject. Based on training and experience, and depending on the circumstances, the presence of multiple law enforcement officers may be sufficient to gain the compliance of a subject when the presence of a single officer would otherwise be insufficient.

16.     Within the St. Croix County Sheriff's Office, it is typical for deputies, including the sheriff, to contact other deputies upon learning about planned arrests or contacts in order to advise them of information that may be pertinent to the safety of responding deputies.

17.     When a St. Croix County Sheriff's Office deputy communicates with dispatch via his or her radio, all on-duty St. Croix County Sheriff's Office deputies can hear the

communications because all on-duty St. Croix County Sheriff's Office deputies are equipped with a radio on their person.

18.     On November 7, 2022, I learned via radio traffic that the Village of Hammond Police Department had requested the assistance of the St. Croix County Sheriff's Office in serving a felony arrest warrant on Ronald Allgood. Upon learning this, I contacted the sergeant on duty, Sergeant Chase Durand, to provide him with information about past law enforcement contacts with Mr. Allgood that I believed could be pertinent to the safety deputies responding to the Hammond Police Department's request. I contacted Sergeant Durand before he or any other St. Croix County deputies attempted to serve the warrant on Mr. Allgood.

19.     I advised Sergeant Durand of a past incident when St. Croix County Sheriff's Office deputies, including myself, attempted to take Mr. Allgood's son into custody in Mr. Allgood's presence. During that incident, I witnessed Mr. Allgood produce a knife and threaten deputies with it, including threatening to kill a K-9 deputy that was on the scene.

20.     While Deputy Mangine was en route to Allgood's residence on November 7, 2022, I used the St. Croix County Sheriff's Office's secondary radio channel to briefly relay to Deputy Mangine about my past experience with Mr. Allgood during which he produced a knife and threaten deputies with it, including threatening to kill a K-9 deputy that was on the scene. I believed that this information may be pertinent to the safety of responding deputies.

21.     It is the common practice and procedure of St. Croix County Sheriff's Office that when effectuating the arrest of a subject pursuant to a warrant, deputies do not typically park right in front of the subject's house. Parking in front of the subject's residence can alert the subject that deputies have arrived and escalate tensions. Instead, as part of our efforts to deescalate each situation, it is the practice of St. Croix County Sheriff's Office deputies to park their squad a short distance from a subject's residence and approach the residence on foot.

22.     St. Croix County Sheriff's Office deputies are trained that when an uncooperative subject retreats into a home or other building, it poses a significant threat to officer safety, because the subject may arm himself or otherwise obtain one or more objects that can be used as a weapon while outside of deputies' view.

23.     As a practical matter, based on my training and experience, deputies cannot confirm that a subject is unarmed until the subject is in custody and has been searched for weapons.

24.     St. Croix County Sheriff's Office deputies are trained that a resistive subject continues to pose a threat to officer safety until the subject is secured in handcuffs, because the subject still has the ability to kick, punch, bite, spit, break free from officers, and produce a concealed weapon if he or she is not secured in handcuffs.

25.     St. Croix County Sheriff's Office deputies are trained that a subject's height, weight, and age are three of the many factors they should consider when determining whether to use force and when determining the appropriate level of force to use. However, deputies are also trained that a subject's height, weight, and age, whether

alone or combined, are not necessarily an accurate predictor of whether the subject poses a threat to officer safety.

26.     Prior to Mr. Allgood's arrest on November 7, 2022, I did not have any conversations with Officer Van Effen or anyone else from the Village of Hammond Police Department about Ronald Allgood's warrant, criminal charges, or anything related to effectuating his arrest.

27.     Each of the St. Croix County Sheriff's Office deputies who responded to Mr. Allgood's residence on November 7, 2022, was wearing a department-issued body-worn camera.

28.     Attached as **Exhibit I** is the body-worn camera footage of the November 7, 2022, arrest of Mr. Allgood recorded by Sergeant Durand's body-worn camera.

29.     Attached as **Exhibit J** is the body-worn camera footage of the November 7, 2022, arrest of Mr. Allgood recorded by Deputy Fayerweather's body-worn camera.

30.     Attached as **Exhibit K** is the body-worn camera footage of the November 7, 2022, arrest of Mr. Allgood recorded by Deputy Mangine's body-worn camera.

31.     Attached as **Exhibit L** is the body-worn camera footage of the November 7, 2022, arrest of Mr. Allgood recorded by Deputy Johnson's body-worn camera.

32.     Attached as **Exhibit M** is the body-worn camera footage of the November 7, 2022, arrest of Mr. Allgood recorded by Deputy Benson's body-worn camera.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 12th day of January, 2025.

By: ___s/___ *Scott Knudson*___
SCOTT KNUDSON

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RONALD T. ALLGOOD,

      Plaintiff,

                                      Case No:  23-CV-00885

v.

ST. CROIX COUNTY, ST CROIX COUNTY
SHERIFF'S OFFICE, VILLAGE OF HAMMOND
POLICE DEPARTMENT, VILLAGE OF HAMMOND,
CORY VAN EFFEN, DANIEL ORR, CHASE
DERAND, SCOTT KNUDSON, BRYCE FAYERWEATHER,
FREDERICK MANGINE, ERIC JOHNSON AND JOEL
BENSON,

      Defendants.

---

**DEFENDANTS ST. CROIX COUNTY, ST. CROIX COUNTY SHERIFF'S OFFICE, CHASE DURAND, SCOTT KNUDSON, BRYCE FAYERWEATHER, FREDERICK MANGINE, ERIC JOHNSON, AND JOEL BENSON'S PROPOSED FINDINGS OF FACT IN SUPPORT OF SUMMARY JUDGMENT**

---

      Defendants, St. Croix County, St. Croix County Sheriff's Office, Chase Derand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson and Joel Benson, by their attorneys, Crivello, Nichols & Hall, S.C., hereby respectfully submit the following Proposed Findings of Fact in support of their motion for summary judgment:

1.     A criminal complaint was issued against Ronald Allgood on October 3, 2022, in St. Croix County case number 22-CF-683 in which Allgood was charged with threatening a law enforcement officer and disorderly conduct. (Dkt. 35-3.)

2.      Allgood missed the November 3, 2022, initial appearance in St. Croix County case number 22-CF-683 resulting in a bench warrant being issued for Allgood's arrest. (Dkt. 35, ¶ 11.)

3.      Sergeant Chase Durand has been employed as a deputy by the St. Croix County Sheriff's Office since 2015 and was promoted to sergeant in 2020. (Dkt. 23, pp. 7:4-6, 13:20-22.)

4.      On November 7, 2022, Sergeant Durand was working a patrol shift as the shift supervisor. (Dkt. 23, p. 21:4-5.)

5.      On November 7, 2022, Deputy Bryce Fayerweather was employed by SCCSO in field training and was paired with Sergeant Durand in the same squad. (Dkt. 23, pp. 24:19-20, 27:2; Dkt. 22, p. 19:9-13.)

6.      Deputy Fayerweather completed the Wisconsin Law Enforcement Academy on October 7, 2022, and began employment with SCCSO on October 10, 2022. (Dkt. 22, p. 10:7-20.)

7.      On November 7, 2022, Sergeant Durand was requested to make phone contact with Officer Cory Van Effen of the Village of Hammond Police Department. (Dkt. 23, p. 21:4-6.)

8.      During this phone contact, Officer Van Effen requested the assistance of SCCSO in serving an arrest warrant and taking into custody Ronald Allgood. (Dkt. 22, p. 18:15-18; Dkt. 23, p. 21:4-14.)

9.      Pursuant to SCCSO policy, SCCSO promptly responds to requests for assistance made by other law enforcement agencies. (Dec. of Knudson, Ex. F.)

10.    During the call, Officer Van Effen advised Sergeant Durand and Deputy Fayerweather that Allgood had a felony warrant for his arrest for threats to law enforcement, specifically threatening Officer Van Effen that he (Allgood) would snap Officer Van Effen's neck. (Dkt. 23, pp. 21:4-14, 25:6-12; Dkt. 22, p. 19:9-13.)

11.    Through his discussion with Officer Van Effen, Sergeant Durand and Deputy Fayerweather learned that Allgood had been aggressive with law enforcement officers in the past and had a lengthy history of contacts with law enforcement. (Dkt. 23, pp. 21:4-14, 25:6-12; Dkt. 22, p. 19:9-13.)

12.    Sergeant Durand also ran Allgood's name through his squad computer and confirmed the existence of the felony warrant for threatening law enforcement. (Dkt. 23, pp. 23:14-24:8.)

13.    Based on the information provided by Officer Van Effen, in an effort to deescalate the situation, Sergeant Durand decided that officers from the Village of Hammond Police Department would not be directly involved in Allgood's arrest and that SCCSO would handle the arrest. (Dkt. 23, p. 21:15-18.)

14.    Shortly thereafter, SCCSO Sheriff Scott Knudson called Sergeant Durand to provide additional information relevant to officer safety. (Dkt. 23, p. 21:18-24, 35:24-36:8.)

15.    Within the SCCSO, it is typical for deputies, including the sheriff, to contact other deputies upon learning about planned arrests or contacts in order to advise them of information that may be pertinent to officer safety. (Dkt. 23, pp. 35:24-36:5; Dkt. 24, p. 38:4-16; Dec. of Knudson, ¶ 16.)

16.     Sheriff Knudson advised Sergeant Durand and Deputy Fayerweather of a past incident when he and other SCCSO deputies, including a K-9 deputy, attempted to take Allgood's son into custody and Allgood produced a knife and threatened deputies with it. (Dkt. 23, p. 21:18-24; Dkt. 22, p. 19:9-13; Dec. of Knudson, ¶¶ 18-19.)

17.     Based on the felony warrant involving threats of violence, the information from Officer Van Effen regarding Allgood's aggression towards law enforcement, and the information from Sheriff Knudson about Allgood's history of threatening SCCSO deputies with a knife during a past contact, Sergeant Durand requested the assistance of one of SCCSO's K-9 handlers and the assistance of additional deputies. (Dkt. 23, pp. 21:25-22:6, 35:1-13.)

18.     It is typical for multiple deputies to assist in serving an arrest warrant where the warrant is for violent charges, for anything related to resisting arrest, or making threats to law enforcement officers. (Dkt. 22, p. 49:6-21; Dec. of Knudson, ¶ 15.)

19.     SCCSO typically has multiple deputies assist in the execution of felony warrants like those described above for officer safety, for the safety of the subject, and in an effort to minimize the level of force needed to effectuate the arrest. (Dkt. 22, p. 49:6-21; Dec. of Knudson, ¶ 15.)

20.     SCCSO deputies generally request a K-9 handler to the scene when one is available when effectuating arrests pursuant to a warrant for violent charges, felony-level charges, if the suspect has a known violent history, if the suspect has a history of using weapons, or where the history or other facts indicate the likelihood of an increased risk to officers' safety. (Dkt. 23, pp. 18:19-19:4; Dkt. 24, pp. 28:23-29:8; Dec. of

Knudson, ¶ 14.)

21.    SCCSO Deputies Joel Benson and Eric Johnson responded to Sergeant Durand's request for additional officers. (Dec. of Benson, Ex. Q; Dec. of Johnson, Ex. R.)

22.    Sergeant Durand then called Deputy Fred Mangine, who is a SCCSO K-9 deputy with his K-9 partner Ash, and requested his assistance with the arrest of Allgood pursuant to the felony warrant for threats to law enforcement. (Dkt. 24, p. 31:11-22.)

23.    When he received Sergeant Durand's call, Deputy Mangine was just about to start his shift and was leaving from his home approximately 11 miles away from the Village of Hammond. (Dkt. 24, pp. 30:16-31:1, 32:2-15.)

24.    Sergeant Durand directed Deputy Mangine to head towards Allgood's residence to meet the other deputies there. (Dkt. 24, p. 34:15-22.)

25.    While en route to the residence, Deputy Mangine reviewed the in-house history for Allgood, noting a prior violent encounter with law enforcement where Allgood armed himself with a knife and made threats; several prior encounters with law enforcement being extremely angry, verbally abusive, or threatening; a recent encounter with law enforcement where Allgood attempted to flee in a vehicle from the residence; threats to break a law enforcement officer's neck; and incidents of non-compliance and resisting while being arrested. (Dec. of Mangine, Ex. P; Dkt. 24, p. 37:12-21.)

26.    While Deputy Mangine was en route to Allgood's residence, Sheriff Knudson

used the SCCSO's secondary radio channel to relay to Deputy Mangine the information he had previously relayed to Sergeant Durand and advised that during that incident, Allgood had produced a knife and threatened to use it to stab a K-9 that had responded. (Dkt. 24, pp. 38:2-39:2; Dec. of Knudson, ¶ 20.)

27.    When communications from dispatch or other deputies are made over the radio, all deputies can hear the communication because all deputies are equipped with a radio while on duty. (Dkt. 23, pp. 36:23-37:2; Dec. of Knudson, ¶ 17.)

28.    It is the practice of SCCSO that when making arrests pursuant to warrants, deputies do not typically park right in front of the house, which would alert the subject that they have arrived.  (Dkt. 23, pp. 66:19-67:1; Dec. of Knudson, ¶ 21.)

29.    Because the Village of Hammond Police Department is only a few blocks from Allgood's residence, Sergeant Durand decided to have Deputies Benson and Johnson meet him and Deputy Fayerweather at the Police Department and then walk over to Allgood's residence on foot. (Dkt. 22, pp. 19:20-20:4; Dkt. 23, pp. 22:4-6, 66:19-67:1.)

30.    Each of the responding SCCSO deputies was wearing a body camera that recorded their actions in effectuating Allgood's arrest on November 7, 2022. (Dec. of Knudson, ¶ 27.)

31.    As Sergeant Durand approached Allgood's home on foot with Deputies Fayerweather, Benson, and Johnson, he could see Allgood outside of the house in a fenced-in area of the yard. (Dkt. 23, p. 28:11-19.)

32.    Sergeant Durand was the first officer to make contact with Allgood. While standing outside of the fenced yard, Sergeant Durand said to Allgood, "Hey Ronald,

can I chat with you for a minute?" (Dec. of Knudson, Ex. I at 03:03 -03:07.)

33.    Allgood responded by waving his hand in the air and saying, "Be right there" as he shook his head back and forth to the left and right and walked toward the door leading into the house. (Ex. I at 03:07-03:12.)

34.    Because Allgood was heading to the door and not toward officers, Sergeant Durand then said to Allgood, "Step over here please, alright?" (Ex. I at 03:10 -03:12.)

35.    Allgood stopped and asked Sergeant Durand, "Why are you here?" (Ex. I at 03:14.)

36.    Sergeant Durand responded to Allgood, "We're here because you have a warrant for your arrest," and Allgood then asked, "For what?" (Ex. I at 03:14 – 03:18.)

37.    Sergeant Durand responded that it was a warrant signed by a judge and said they could discuss the specifics in a bit. (Ex. I at 03:19 – 03:23.)

38.    SCCSO deputies do not typically have a discussion back and forth with a subject regarding what the warrant is for until after the subject is in custody. (Dkt. 23, p. 34:15-18.)

39.    Allgood did not begin moving toward Sergeant Durand or any of the other deputies, so Sergeant Durand then ordered, "Come here, Ronald." (Ex. I at 03:26 - 03:43.)

40.    Allgood then went inside the residence through the nearby door. (Dec. of Knudson, Ex. J at 04:10 – 04:15.)

41.    SCCSO deputies are trained that when an uncooperative subject retreats into a home or other building, it poses a significant threat to officer safety because the

subject may arm himself or otherwise obtain one or more objects that can be used as a weapon. (Dkt. 23, p. 38:12-18; Dec. of Knudson, ¶ 22.)

42.    Deputies cannot confirm that a subject is unarmed until the subject is in custody and has been searched for weapons. (Dkt. 23, pp. 39:19-40:3; Dec. of Knudson, ¶ 23.)

43.    Deputy Johnson positioned himself on the outside of a tall fence on the side of Allgood's yard across from the door that Allgood had entered and began attempting to speak with Allgood: "Come on out. We've got a warrant, come on out, okay?" (Ex. I at 04:09 -- 04:14.)

44.    Allgood then came back out of his residence through the same door, along with a woman, and stood on the patio arguing with Deputy Johnson. (Ex. I at 04:15- 04:45; Ex. J at 05:25 – 05:34.)

45.    As Allgood argued with Deputy Johnson, Sergeant Durand radioed dispatch and confirmed there was still a valid warrant for Allgood.  (Ex. I at 04:24- 04:48.)

46.    Approximately 30 minutes had passed between when Sergeant Durand first ran Allgood's name in his squad computer and his arrival at Allgood's residence. (Dkt. 23, p. 37:3-17.)

47.    It is Sergeant Durand's typical practice to confirm the existence and validity of a warrant with dispatch over the radio so that all deputies on the scene, including assisting deputies who may not have had as much information as Sergeant Durand, are aware of what the warrant is for, and for officer safety. (Dkt. 23, pp. 36:9-27:2.)

48.    Deputy Mangine was monitoring the radio traffic as he was driving towards

the Allgood residence and heard transmissions confirming that the deputies had made contact with Allgood and that he was noncompliant. (Dkt. 24, p. 35:5-9.)

49.     After close to a minute of Allgood arguing with deputies from his porch, Sergeant Durand advised in a loud voice, "Hey Ronald. You have a felony warrant. We'll be coming inside to arrest you if you don't comply. Step this way." (Ex. I at 04:52 – 04:59; Ex. J at 05:32 – 05:38.)

50.     Allgood again asked what the warrant was for and Sergeant Durand responded, "Threats to law enforcement. Step this way." (Ex. I at 04:59 – 05:02; Ex. J at 05:39 – 05:41; Dec. of Knudson, Ex. L at 00:00 – 00:05.)

51.     Allgood responded, "No, you tell me what it's for." (Ex. L at 00:00 – 00:05; Ex. J at 05:41 – 05:43.)

52.     Sergeant Durand then repeated, "Threats to law enforcement. Step this way, Ronald." (Ex. I at 05:05-05:07; Ex. L at 00:05-00:09.)

53.     When Deputy Mangine and K-9 Ash arrived, they immediately headed to the fence line where Deputy Johnson was positioned. (Dec. of Knudson, Ex. K at 00:00 – 00:10.)

54.     As he approached the fence, Deputy Mangine could see and hear Allgood arguing with Deputy Johnson and refusing to surrender. (Dkt. pp. 35:22-36:6.)

55.     Deputy Mangine then said to Allgood, "Come on surrender, or I'm going to throw the dog over and he's going to bite you. Come out and surrender now." (Ex. L at 00:08 – 00:11; Ex. K at 00:00 – 00:07.)

56.     At this point, Allgood went back into his residence through the same door he

had used earlier. (Ex. L at 00:15 – 00:17.)

57.    Deputy Johnson remained outside of the yard behind a tall fence directly opposite of the door that Allgood had retreated into and announced that Allgood was locking the door. (Ex. L at 00:10 – 00:25.)

58.    Based on the information he had learned from reviewing Allgood's in-house history and Allgood's behavior observed on scene in an unsecured residence, Deputy Mangine retrieved his 20-foot leash and secured it to K-9 Ash so that he could be used as a force option if necessary. (Ex. P; Dkt. 24, pp. 37:5 – 38:1; 39:14-20.)

59.    Sergeant Durand then hopped the short fence at the front of the residence and approached the door that Allgood had just used to enter his home. (Ex. I at 05:11 – 05:25.)

60.    Deputy Fayerweather followed Sergeant Durand into the fenced-in portion of the yard. (Ex. J at 05:51- 05:55.)

61.    Sergeant Durand radioed dispatch and advised that Allgood had barricaded himself in the residence and asked dispatch if Allgood had "a history." (Ex. I at 05:23-05:30.)

62.    Deputy Mangine then directed K-9 Ash to hop the short fence into the yard and Deputy Mangine did the same. (Ex. K at 00:45-00:52.)

63.    As Deputy Johnson remained at the fence, he could see Allgood inside the house and motioned to him with his hand while saying, "Ronald, come on out" at least three times. (Ex. L at 00:35 – 00:50.)

64.    Almost a minute after entering the house, Allgood exited the house through

the same door and stood on his patio, at which point Sergeant Durand repeated, "Step over here, Ronald." (Ex. I at 05:49 – 05:52.)

65.     Deputy Johnson calmly said, "Yep. Just step on over, Ronald." (Ex. L at 00:51-00:55.)

66.     Allgood responded, "You won't tell me what it's for?" (Ex. I at 05:52 – 05:54.)

67.     Sergeant Durand responded, "You're under arrest, get on the ground. Get on the ground." (Ex. I at 05:54 – 05:56.)

68.     Allgood initially appeared to begin raising his hands but simultaneously said to the deputies, "Shoot! Shoot first! Let me take care of my business first" and retreated back into his residence.  (Ex. I at 05:56 – 06:02; Dec. of Durand, Ex. N.)

69.     As Allgood retreated into his residence, Sergeant Durand ordered, "Ron, stop right there." (Ex. I at 06:00 – 06:02.)

70.     After only a few seconds, Allgood reemerged, stepping one foot out of the door, and Sergeant Durand repeated again, "Step over here. You're under arrest! Step out!" (Ex. I at 06:05 – 06:10.)

71.     Deputy Mangine and K-9 Ash approached the door and Deputy Mangine announced to Allgood, "Sheriff's Office K-9, stop! I'm going to send the dog in, you may be bit! Stop!" (Ex. K at 01:00 – 01:04; Dkt. 24, p. 40:12-20.)

72.     Allgood then retreated back into his house through the same door and slammed it closed. (Ex. I at 06:08 – 06:11; Dec. of Knudson, Ex. M at 00:00 – 00:08.)

73.     Deputy Mangine then attempted to open the door, but it was locked, and Sergeant Durand shouted through the door, "Step out, Ronald!" (Ex. I at 06:12- 06:23;

Ex. M at 00:00 – 00:12.)

74.     Deputy Johnson radioed dispatch and advised that Allgood had gone back into the residence and had locked the door again. (Ex. L at 01:22 – 01:27.)

75.     From his vantage point looking through a window into the home, Deputy Benson saw Allgood moving within the residence and announced, "He's going out the back. He's going out the back." (Ex. M at 00:23-00:25.)

76.     Based on Deputy Benson's comments, Deputy Johnson began running along the fence toward the back of the house.  (Ex. L at 01:28 – 01:35.)

77.     Then Sergeant Durand announced to the other deputies nearby, "He's going to the garage" as he began heading toward the front of the residence. (Ex. I at 06:27-06:28.)

78.     Deputy Fayerweather was the deputy closest to the front of the residence and the garage, so he hopped back over the fence and headed toward the garage with his taser unholstered. (Ex. J at 07:05 – 07:10.)

79.     Deputy Mangine and K-9 Ash also headed for the front of the residence where the garage is located and hopped the fence. (Ex. K at 01:20 – 01:33; Dkt. 24, p. 41:1-5.)[1]

80.     Upon arriving at the front of the garage, Deputy Fayerweather saw that the garage door was opening and announced, "Got a garage door opening!" (Ex. J at 07:10 – 07:12.)

81.     Once the garage door was about halfway open, Allgood ducked under the

---

[1] At this time, Deputy Mangine's cell phone rings and all sound on his body-worn camera footage is obscured by the ringing until approximately 1:50.

door and began exiting the garage. (Ex. J at 07:13 – 07:16.)

82.     Seeing Allgood exiting the garage, Deputy Fayerweather immediately raised his taser and yelled, "Ronald, step down!" (Ex. J at 07:16—07:17.)

83.     Deputy Fayerweather could see that Allgood had something in one of his hands but could not tell what it was. (Dkt. 22, p. 34:20-25.)

84.     Allgood did not stop or slow down but continued to walk quickly in a diagonal direction toward Deputy Fayerweather. (Ex. J at 07:17—07:19; Ex. P; Dec. of Durand, Ex. N; Dkt. 24, p. 41:20-24.)

85.     Deputy Fayerweather screamed, "Ronald! Stop!" as Allgood continued walking in the same direction at the same pace. (Ex. J at 07:17—07:19.)

86.     As Deputy Fayerweather ordered Allgood to stop a second time, Deputy Mangine and K-9 Ash arrived in the front of the residence and saw Allgood walking toward Deputy Fayerweather. (Ex. K at 01:30 – 01:36; Ex. J at 07:18-07:20.)

87.     Deputy Fayerweather yelled a third time, "Stop!" (Ex. J at 07:19- 07:20.)

88.     Because Allgood had approached within approximately one foot of Deputy Fayerweather, Deputy Fayerweather did not believe that his taser would be effective. (Dec. of Fayerweather, Ex. O; Dkt. 22, pp. 57:12-58:3.)

89.     The effective range of a taser that will result in full neuromuscular incapacitation of a subject is approximately seven feet of distance between the taser and the subject. (Dkt. 22, pp. 57:19-59:1.)

90.     SCCSO policy permits deputies to use a taser only when the deputy can safely do so within the operational range of the taser device. (Dec. of Knudson, Ex. B, p. 2.)

91.     Allgood did not stop or slow his pace in response to Deputy Fayerweather's commands. (Dkt. 22, pp. 55:20-56:2.)

92.     Once he was within 1-2 feet of Deputy Fayerweather, Allgood reached out one of his hands and pushed away Deputy Fayerweather's taser. (Ex. O; Dkt. 22, p. 56:3-6; 56:17-21.)

93.     Fayerweather believed that Allgood was attempting to disarm him of his taser. (Ex. O.)

94.     When Deputy Mangine approached the front of the house, he saw Allgood ignoring Deputy Fayerweather's commands while walking briskly toward Deputy Fayerweather. (Ex. P; Dkt. 24, p. 42:3-12.)

95.     Deputy Mangine then observed Allgood either grabbing or pushing away Deputy Fayerweather's taser in a motion that Deputy Mangine interpreted as Allgood attempting to disarm Deputy Fayerweather to avoid being tased. (Ex. P; Dkt. 24, pp. 42:13-20; 43:6-25.)

96.     Deputy Mangine observed that Allgood had an object in one of his hands but could not ascertain what it was. (Ex. P; Dkt. 24, p. 42:9-12.)

97.     When Sergeant Durand approached the front of the house, he also saw Allgood briskly walking and grabbing at Deputy Fayerweather. (Ex. N.)

98.     Deputy Fayerweather then decentralized Allgood by hooking his left arm under Allgood's right arm and tripping Allgood to direct him to the ground. (Dkt. 22, pp. 36:5-20, 38:17-39:5.)

99.     Based on his observations of Allgood's resistive behavior and a possible

weapon in hand, Deputy Mangine believed that Allgood posed an imminent threat to law enforcement officers on the scene and to the public if he was allowed to flee. (Ex. P; Dkt. 24, p. 42:13-20.)

100.    Because he believed that Allgood posed an imminent threat, Deputy Mangine commanded K-9 Ash to engage Allgood. (Ex. P; Dkt. 42, p. 24:13-23.)

101.    K-9 Ash bit Allgood's calf at the same time that Deputy Fayerweather decentralized Allgood to the ground. (Ex. P; Dkt. 24, p. 45:2-10.)

102.    Pursuant to his training and best practices, Deputy Mangine remained next to K-9 Ash on Allgood's leg with at least one hand on Ash to control and secure Ash. (Dkt. 24, pp. 48:21-49:9.)

103.    Once on the ground, Allgood was lying face-up with Deputy Fayerweather straddling him over his chest. (Dkt. 22, p. 40:7-12.)

104.    Allgood then grabbed Deputy Fayerweather's taser, which was still in Deputy Fayerweather's right hand, and tried to pull it away from Deputy Fayerweather. (Ex. O, Dkt. 22, pp. 42:16-43:2, 56:17-57:7)

105.    Deputy Mangine observed Allgood grabbing and pulling on Deputy Fayerweather's taser. (Ex. P; Dkt. 24, p. 46:9-20.)

106.    As he approached the men, Sergeant Durand saw that Allgood had his hand on Deputy Fayerweather's taser as the two men were on the ground. (Dkt. 23, pp. 44:24-45:5; Ex. N.)

107.    Sergeant Durand immediately reached for the taser to get it out of Allgood's hand to secure it. (Dkt. 23, p. 45:1-5; Dkt. 22, p. 42:17-43:2.)

108.    As the deputies struggled to secure Deputy Fayerweather's taser, Deputy Fayerweather told Allgood to stop resisting or he would be tased. (Ex. O; Ex. J at 07:25 – 07:28.)

109.    As the struggle over the taser continued, Deputy Fayerweather yelled to Allgood, "Give me my taser! Give me my taser!" (Dkt. 22, p. 43:17-22; Ex. J at 07:28 – 07:31.)

110.    Sergeant Durand was able to secure Deputy Fayerweather's taser and get it back to Deputy Fayerweather. (Ex. J at 07:31- 07:33.)

111.    Deputy Fayerweather continued ordering Allgood to stop resisting. (Ex. J at 07:33—07:38; Dkt. 22, p. 43:23-25.)

112.    Allgood continued to physically resist the deputies' effort to secure him by attempting to push and pull away and tensing his muscles. (Ex. P; Dkt. 23, p. 98:11-20; Dkt. 24, p. 46:20-23, 47:5-8, 56:23-3.)

113.    Sergeant Durand then pinned Allgood's right arm to the ground. (Ex. N.)

114.    Deputy Mangine told Allgood that the K-9 would be removed when Allgood stopped resisting. (Ex. P; Dkt. 24, p. 50:10-13.)

115.    Deputy Mangine did not release K-9 Ash at this point because Allgood was still resisting as deputies continued attempting to secure his arms in handcuffs, Deputy Mangine believed that Allgood had tried to disarm Deputy Fayerweather, he believed that Allgood was continuing to resist deputies, and multiple deputies were crouched over Allgood wearing duty vests that had easily accessible tools on their chests, including tasers. (Dkt. 24, pp. 46:2-47:4, 52:15-22.)

116.    Deputy Mangine believed that Allgood continued to pose a threat to officers until he was secured and no longer had the ability to try to take something from the officers' vests to use as a weapon. (Dkt. 24, pp. 46:2-47:4; 52:23-53:13.)

117.    Deputy Mangine did not release K-9 Ash at this point because he believed that Ash's bite could still assist in gaining some level of compliance from Allgood until his hands could be secured in handcuffs. (Dkt. 24, pp. 46:2-47:4, 52:23-53:13, 56:16-57:10, 71:8-18.)

118.    SCCSO deputies are trained that a resistive subject continues to pose a threat to officer safety until the subject is secured in handcuffs, because the subject still has the ability to kick, punch, bite, spit, break free from officers, and produce a concealed weapon. (Dkt. 23, pp. 47-48, 57; Dec. of Knudson, ¶ 24.)

119.    Because Allgood continued to actively resist and attempting to fight back, Sergeant Durand then took hold of Allgood's left arm to secure it and placed a handcuff on it. (Dkt. 23, pp. 44:21-45:5; Ex. N.)

120.    Deputy Benson then arrived and initially assisted in attempting to secure Allgood by stabilizing Allgood's head. (Dec. of Benson, Ex. Q.)

121.    After Sergeant Durand had secured a handcuff on Allgood's left hand, Allgood continued to pull his right arm away and resist efforts to place his right hand in handcuffs. (Dkt. 23, pp. 55:24-56:7, 89:21-25, 98:11-20.)

122.    Because Allgood was continuing to resist the deputies' efforts to secure him in handcuffs and was tensing his arms, Deputy Benson then grabbed Allgood's right forearm and assisted in placing it behind Allgood's back and securing the handcuffs.

(Ex. Q.)

123.    Deputy Johnson, who had run to the rear of the residence based on Deputy Benson's earlier announcement that Allgood was "going out back," saw there was no backyard once he reached the rear of the property. (Ex. L at 01:28 – 01:40; Dec. of Johnson, Ex. R.)

124.    After only a few seconds, Deputy Johnson could hear officers yelling that Allgood was exiting the front of the house and began running to the front of the residence. (Ex. L at 01:40 - 01:45; Ex. R.)

125.    By the time that Deputy Johnson arrived back in the front yard of the residence, Allgood was already on the ground with several deputies attempting to secure him. (Ex. L at 01:47 – 01:56; Ex. R.)

126.    Deputy Johnson secured Allgood's right leg by holding it down until Allgood was secured in handcuffs. (Ex. R.)

127.    K-9 Ash remained in place on Allgood's calf until Deputy Mangine believed that active resistance had been overcome and there was no danger of Allgood further attempting to disarm Deputy Fayerweather of his taser. (Ex. P.)

128.    Once Deputy Mangine learned that Allgood was handcuffed, Deputy Mangine informed the other deputies that he would be removing K-9 Ash. (Ex. P; Dkt. 23, p. 98:11-20; Dkt. 24, pp. 71:19 -72:6.)

129.    Deputy Mangine then took positive control of K-9 Ash's flat collar and verbally commanded Ash to release, which Ash quickly did without issue. (Ex. P.)

130.    Deputy Mangine then immediately requested EMS to the scene. (Ex. P.)

131.    SCCSO's standards of conduct dictate that every deputy's continued employment or appointment requires his or her conduct to be in accordance with the United States Constitution, the Wisconsin Constitution, and all applicable laws, ordinances, and rules enacted or established pursuant to legal authority. (Dec. of Knudson, Ex. E.)

132.    SCCSO's training policy requires all deputies to maintain all training required by the Wisconsin Law Enforcement Standards Board. (Dec. of Knudson, Ex. D.)

133.    As of November 7, 2022, Chase Durand, Bryce Fayerweather, Frederick Mangine, Eric Johnson, Joel Benson, and Scott Knudson had each completed all training required by the Wisconsin Law Enforcement Standards Board to be a certified law enforcement officer. (Dec. of Knudson, ¶ 12.)

134.    SCCSO's use of force policy requires deputies to use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the deputy at the time of the event to accomplish a legitimate law enforcement purpose. (Dec. of Knudson, ¶ 4, Ex. A.)

135.    All SCCSO deputies are trained to use the minimum amount of force necessary, if any, to effectuate an arrest. (Dkt. 23, p. 16:18-23.)

136.    [intentionally omitted]

137.    SCCSO's use of force policy includes a nonexhaustive list of factors that deputies should consider when determining whether to use force and the amount of force that is reasonable. (Ex. A, pp. 3-4.)

138.    SCCSO deputies are trained that a subject's height, weight, and age are three of

the many factors they should consider when determining whether to use force and when determining the appropriate level of force to use. (Dec. of Knudson, ¶ 25.)

139.    SCCSO deputies are also trained that a subject's height, weight, and age, whether alone or combined, are not necessarily an accurate predictor of whether the subject poses a threat to officer safety. (Dec. of Knudson, ¶ 25.)

140.    SCCSO has a policy that establishes guidelines for the use of K-9s to augment law enforcement services to the community including the apprehension of criminal offenders. (Dec. of Knudson, Ex. C.)

141.    SCCSO's K-9 policy requires that each K-9 team must be trained and certified to meet current nationally recognized standards or other recognized and approved certification standards prior to assignment in the field. (Ex. C, pp. 7-8.)

142.    SCCSO requires that each K-9 team must be recertified annually to a current nationally recognized standard or other recognized and approved certification standard. (Ex. C, p. 8.)

143.    As of November 7, 2022, Deputy Mangine and K-9 Ash maintained all certifications required under SCCSO policy. (Dec. of Knudson, ¶ 13, Ex. H.)

144.    SCCSO policy permits a K-9 to be used to apprehend a suspect if the canine handler reasonably believes that the individual has either committed, is committing or threatening to commit any serious offense and if any of the following conditions exist:

(a)    There is a reasonable belief the suspect poses an imminent threat of violence or serious harm to the public, any deputy or the handler.

(b)     The suspect is physically resisting or threatening to resist arrest and the use of a canine reasonably appears to be necessary to overcome such resistance.

(c)     The suspect is believed to be concealed in an area where entry by other than the canine would pose a threat to the safety of deputies or the public.

(Ex. C, p. 3.)

145.    SCCSO's K-9 policy includes a nonexhaustive list of factors that K-9 deputies should consider when determining whether the use of a K-9 is appropriate and reasonable. (Ex. C, pp. 3-4.)

146.    SCCSO directs that prior to releasing the K-9, K-9 deputies should give a clearly audible warning announcing that a K-9 will be used if the suspect does not surrender. (Ex. C, p. 4.)

147.    SCCSO policy states that if a K-9 has apprehended a suspect with a secure bite, the handler should promptly command the K-9 to release the suspect once the handler believes that the suspect no longer poses a threat. (Ex. C, p. 3.)

148.    Deputies employed by SCCSO who are not K-9 handlers receive regular training with SCCSO's K-9 handlers to familiarize the non-K-9 handlers with the K-9s and working around them. (Dkt. 23, pp. 14:3-12, 14:23-16:5; Ex. C, pp. 7-8.)

149.    All SCCSO deputies are trained on the types of calls or scenarios where it would be recommended to request a K-9 handler respond with his or her K-9 partner in order to have the K-9 as a use of force option. (Dkt. 23, pp. 15:12-16:5, 17:3-15.)

150.    All SCCSO deputies receive training on follow-up care after a K-9 deployment, including training to recognize the need for medical treatment and how to obtain it.

(Dkt. 23, p. 15:12-20.)

151.    The K-9 hander-deputy is the person who makes the decision on whether to deploy his or her K-9 partner on any given call. (Dkt. 23, p. 15:23-25.)

152.    Of the 50-100 arrests pursuant to felony warrants that Deputy Mangine and K-9 Ash have assisted in effectuating, Allgood's is the only arrest that resulted in Ash doing a bite apprehension. (Dkt. 24, pp. 29:18-30:15; Dec. of Knudson, Ex. G.)

153.    K-9 Ash is trained not to bite nontarget areas including the neck and face during physical apprehensions, because these could potentially become lethal. (Dkt. 24, pp. 15:14-16:4.)

154.    Prior to Allgood's arrest on November 7, 2022, Sheriff Knudson did not have any conversations with Officer Van Effen or anyone else from the Village of Hammond Police Department about Allgood's warrant, criminal charges, or anything related to effectuating his arrest. (Dec. of Knudson, ¶ 26.)

155.    Prior to Mr. Allgood's arrest on November 7, 2022, Sergeant Durand did not have any conversations with Officer Van Effen or anyone else from the Village of Hammond Police Department about using force of any kind to effectuate Mr. Allgood's arrest. (Dkt. 23, p. 102:1-20; Dec. of Durand, ¶ 13.)

156.    The only discussion that Sergeant Durand had with Officer Van Effen related to the specific actions to be taken in effectuating the arrest of Allgood was that Officer Van Effen would not participate in the arrest in an attempt to deescalate the situation and keep it as calm as possible given Officer Van Effen and Allgood's apparently contentious history. (Dkt. 23, p. 102:11-15.)

157.    Officer Van Effen did not ask or direct any of the responding SCCSO deputies to use force in effectuating Allgood's arrest. (Dec. of Durand, ¶ 13; Dec. of Fayerweather, ¶ 13; Dec. of Mangine, ¶ 13; Dec. of Benson, ¶ 13; Dec. of Johnson, ¶ 13.)

158.    K-9 Ash made a single and committed bite targeted to the fleshiest portion of Allgood's calf resulting in an approximately 250 psi compression injury. (Dec. of Mills, Ex. T, p. 5.)

159.    Proper police canine training is for the K-9 to bite and hold the areas of the body that are most dangerous to officers, specifically the hands and legs. (Ex. T, p. 5.)

160.    Knowing that Allgood's back-and-forth into his home posed a threat to deputies, and knowing that Allgood had not been searched, Sergeant Durand drew his handgun and held it in a modified carry position—or a low carry—so that he would have the weapon available to defend himself if Allgood produced a weapon. (Ex. N; Dkt. 23, pp. 43:7-44:14.)

161.    As deputies went back and forth with Allgood ordering him to surrender as he continued to retreat back into his home, Deputy Benson drew his department-issued handgun because he was concerned about the possibility of Allgood's access to weapons. (Ex. Q.)

162.    Once Deputy Benson saw that Segreant Durand had unholstered his handgun and therefore had "lethal cover," Deputy Benson holstered his handgun in exchange for his taser. (Ex. Q.)

163.    Plaintiff responded to the County Defendants Interrogatories and Requests for

Production on September 23, 2024. (Dec. of Mills, Ex. S.)

164.    To date, Plaintiff has not supplemented or amended his September 23, 2024, responses to the County Defendants Interrogatories and Requests for Production. (Dec. of Mills, ¶ 4.)

165.    Sergeant Durand spoke with Officer Van Effen on his work-issued phone, and only after Sergeant Durand was requested to make the contact either by dispatch or over the radio. (Dkt. 23, p. 22:10-15.)

166.    Sergeant Durand did not have Officer Van Effen's phone number and would have had to get it through dispatch. (Dkt. 23, p. 23:1-3.)

Dated this 13th day of January, 2025.

By: _____s/_____ *Sara C. Mills*_____
        SAMUEL C. HALL, JR.
        State Bar No: 1045476
        SARA C. MILLS
        State Bar No: 1029470
        ZACHARY J. FLOOD
        State Bar No: 1099136
        CRIVELLO, NICHOLS & HALL, S.C.
        Attorneys for Defendants, St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson and Joel Benson
        710 N. Plankinton Ave., Suite 500
        Milwaukee, WI 53203
        Phone: (414) 271-7722
        Fax: (414) 271-4438
        Email: shall@crivellolaw.com
              smills@crivellolaw.com
              zflood@crivellolaw.com

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| RONALD T. ALLGOOD,<br><br>          Plaintiff,<br><br><br>vs.<br><br><br>ST. CROIX COUNTY, ST. CROIX COUNTY SHERIFF'S OFFICE, VILLAGE OF HAMMOND, VILLAGE OF HAMMOND POLICE DEPARTMENT, CORY VAN EFFEN, DANIEL ORR, SCOTT KNUDSON, CHASE DURAND, BRYCE FAYERWEATHER, ERIC JOHNSON, JOEL BENSON, FREDERICK MANGINE, DOES 1-10, AND ROES 1-10,<br><br>          Defendants. | Case No. 3:23-cv-885 |

**PLAINTIFF RONALD T. ALLGOOD'S PROPOSED FINDINGS OF FACT IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMNT AND PLAINTIFF'S RESPONSES TO ST. CROIX DEFENDANTS' FINDINGS OF FACT**

Plaintiff, Ronald T. Allgood, by and through his attorney of record Frederick Melms, submits his response to Defendants St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson and Joel Benson's (Collectively St. Croix Defendants) Proposed Findings of Fact (Dkt 47) in conjunction with Plaintiff's Proposed Findings of Fact, in Opposition to Defendants' Motions for Summary Judgment.

I.     **PLAINTIFF'S PROPOSED FINDING OF FACT IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.**

-1-

1.      Shortly After Van Effen was hired by the Village of Hammond Police Department, Plaintiff witnessed Van Effen watching underage girls in Lions Park.  (Dkt 19 p. 15:7-10 Dkt 25 p.4-9)

2.      Sometime after Plaintiff noticed Defendant's disgusting habit, Plaintiff saw Defendant Van Effen in a gas station near his house and called him a pervert.  (Dkt 19 p. 31:5-6)

3.      In retaliation, Defendant Van Effen issued multiple unwarranted citations to Plaintiff, including citations for noise violations. Plaintiff had a long-standing practice of playing music while working in his garage and yard, having done so for nearly five years before Van Effen began citing him.  (Dkt 19 p. 38:16-40:22; Dkt 25, p. 14:18- 15:5; Exhibit 2 to the Declaration of Frederick Melms).

4.      Robin Gilbertson, Plaintiff's live-in girlfriend during all time relevant to this action, observed that Cory Van Effen regularly parked his police vehicle near their home and watched them for years leading up to November 7, 2022.   (Dkt 25 p. 7:8-20; Dkt 25 p. 8:7-16).

5.      Cory Van Effen was the complainant in State of Wisconsin. v. Ronald Todd Allgood St. Croix County Case Number 2021CM000586. (Exhibit 2 to the Declaration of Frederick Melms)

6.      St. Croix County Case Number 2021CM000586 was dismissed, because Van Effen requested criminal charges be filed against Plaintiff for criminal damage to property and disorderly conduct for demolishing his own mailbox. (Dkt 19 p. 41:1-42:8)

7.      Van Effen next referred Plaintiff to the St. Croix County District Attorney's office for disorderly conduct.  A citation was issued against Plaintiff in St. Croix County Case Number 2022FO000508 state of Wisconsin v. Ronald Todd Allgood.  (Exhibit 3 to the Declaration of Frederick Melms.  The Complaint relied exclusively on Van Effen's Statement to establish probable cause.

8.      The action against Mr. Allgood in 2022FO000508 was dismissed.  (Exhibit 4 to Declaration of Frederick Melms p. 1)

9.      Defendant Van Effen's retaliation escalated, and on September 17, 2022, Van Effen falsely alleged that Plaintiff had unlawfully threatened him, resulting in felony charges in State of Wisconsin v. Ronald Todd Allgood, St. Croix County Case No. 2022CF000683. The complaint relied solely on Van Effen's statement to establish probable cause that Plaintiff had violated Wis. Stat. § 940.203(2) (Battery or Threat to a Judge, Prosecutor, or Law Enforcement Officer) and Wis. Stat. § 947.01(1) (Disorderly Conduct).   A summons was issued on October 3, 2022, Plaintiff never received the summons because he started getting mail at PO box, missed his initial appearance on November 3, 2022 and the court issued a warrant for his arrest on November 4, 2022. (Exhibit 5; Exhibit 6 to the Declaration of Frederick Melms p. 1-2, and 15).

10.     Plaintiff took the case to trial and prevailed on both counts. (Exhibit 6 to the Declaration of Frederick Melms p. 1).

11.     There is substantial circumstantial evidence that Van Effen instructed Durand to use force and/or injure Plaintiff on November 7, 2022.

a.      Sergeant Durand and Officer Van Effen engaged in an unrecorded phone call that day, using their cell phones which also kept the conversation off the radio.

b.      Following their call, Durand quickly assembled five deputies for backup before he and Fayerweather parked at the Village of Hammond Police Department.

c.      After making contact with Plaintiff, the Defendants rapidly escalated to the use of force, and three of the Defendants used excessive force to effectuate Plaintiff's arrest.

i.      Durand aimed his sidearm at Plaintiff, despite there being no evidence that Plaintiff possessed a weapons

-3-

ii.     Fayerweather tackled Plaintiff after he verbally surrendered and was walking towards the police vehicles to be taken to jail.

iii.     Mangine released K-9 ash on Defendant and left K-9 Ash latched on to Plaintiff's leg for 58 seconds.

iv.     Mangine left K-9 Ash latched on to Plaintiff's leg even after multiple officers had physically secured Plaintiff.

d.     Van Effen initially observed from a distance before eventually joining the SCCSO deputies.

e.     Durand did not appear to have any knowledge that Plaintiff had an active warrant during his initial encounter with Plaintiff.

f.     The available circumstantial evidence strongly suggests that Van Effen called Durand asked him to use force and/or excessive force during Plaintiff's arrest, and Durand complied. (Dkt. 23, p. 21:4-25:4; Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 3-7; Dkt 23-p. 15: 9-20; Dkt 24- p. 64:11-13; Dkt 24- p. 72:4-73:22).

12.     After Plaintiff questioned Defendant Durand about the warrant, Durand radioed dispatch and appeared uncertain as to whether a valid arrest warrant for Ronald Allgood actually existed. Durand's uncertainty demonstrated that Durand suspected Van Effen fabricated the warrant as a pretext to harm Plaintiff.  (Dkt 40 - Ex. I 3:10-4:42).

13.     Durand also requested that his prearranged backup come to Plaintiff's residence, and they appeared within mere moments. (Dkt 40 - Ex. I 3:10-6:45; Dkt 40 - Ex. J at 03:10 -06:45; Dkt 40 - Ex. K at 1:27-3:00; Dkt 47 ¶ 21).

14.     During the encounter Durand referred to Plaintiff's retreat back into his home as Plaintiff barricading himself in his home.  Dkt 40 - Ex. I 3:10-6:45

15.     Durand also repeatedly pointed his firearm at Plaintiff despite there being no evidence that Plaintiff possessed a weapon.  Dkt 40 - Ex. I 5:00-6:10

16.     At no time during the arrest at issue in the instant case did any of the Defendants state that Defendant had a weapon.  (Dkt 40 - Ex. I 3:10-8:30; Dkt 40 - Ex. J at 03:10 -:830; Dkt 40 - Ex. K at 1:27-4:00).

17.     After Defendants arrived but before Plaintiff exited from his garage he went in and out of the side door of his home a few times but continued to speak with the officers throughout events leading up to his arrest.  (Dkt 40 - Ex. I 5:10-6:46; Dkt 40 - Ex. J at 05:10 6:45; Dkt 40 - Ex. K at 1:27-4:00).

18.     Plaintiff finally went into his home one last time and told Defendant Durand that he was coming out the garage, Defendant Durand informed the other Defendants that Plaintiff was exiting through his garage   (Dkt 19 p. 103:24-104:3; Dkt 40 - Ex. I 6:00-6:29)

19.     Plaintiff emerged from his garage with his hands in the air, verbally surrendered stating something to the effect of "I'm coming out, my hands are up. I have a cell phone". (Dkt 19 p. 103:1-20).

20.      Plaintiff then casually began walking over to the police vehicles parked in his lawn to be taken to jail, saying "lets go" in another failed attempt to verbally surrender. (Dkt 19 p. 100:17-23; Dkt 19 p. 103:1-20; Dkt 40 - Ex. J at 7:00 -0:7:20)

21.     After Plaintiff emerged from the garage, the first order he received was from Fayerweather who ordered him to "Step Down", a command which had no meaning to a man walking in his driveway. (Dkt 40 - Ex. J at 7:00 -0:7:20).

22.     After Plaintiff exited his garage Fayerweather aimed his taser at Plaintiff.  (Dkt 40 - Ex. J at 7:10 -0:7:24)

-5-

23.     Fayerweather then watched Plaintiff calmly walk towards the police vehicles, stating lets go, and then inexplicably decided to charge Plaintiff and tackle him to the ground with his taser still drawn.  (Dkt 40 - Ex. J at 7:00 -:7:25).

24.     The footage from Fayerweather's body worn camera makes it abundantly clear that Plaintiff was neither fleeing nor was a threat to any of the officers.  (Dkt 40 - Ex. J at 7:00 -:7:25).

25.      Fayerweather, was much larger than Plaintiff and easily tackled Plaintiff to the ground.  (Dkt 40 - Ex. J at 7:15 -0:7:25).

26.     Defendant Mangine saw Plaintiff calmly walking to the police vehicles saying, "lets go:, before he hoped the fence with K-9 Ash and released K-9 Ash to apprehend and bite Plaintiff. (Dkt 40 - Ex. J at 7:00 -0:7:20; Dkt 40 - Ex. K at 1:28 -1:38)

27.     Defendant Mangine can be seen witnessing Plaintiff's surrender in Fayerweather's body cam footage.  (Dkt 40 - Ex. J at 7:00 -0:7:20)

28.     Despite watching Plaintiff verbally surrender and calmly walk to the SCCSO vehicles in his yard, Defendant Mangine releases K-9 Ash after Fayerweather has charged Plaintiff and started to tackle him to the ground.  (Dkt 40 - Ex. K at 1:28 -1:38).

29.     Defendant Mangine never recalled K-9 Ash after seeing Defendant Fayerweather successfully take Plaintiff to the ground. (Dkt 40 - Ex. K at 1:05 -1:38; Dkt 40 - Ex. J at 7:10 -0:7:30)

30.     Defendant Mangine did not provide Plaintiff with any K-9 warnings after Plaintiff emerged from his garage, despite Mangine's failure to adequately warn Plaintiff, Defendant Mangine ordered K-9 Ash to apprehend and bite Plaintiff.  (Dkt 40 - Ex. K at 1:05 -1:38)

31.     The only K-9 warning Defendant Mangine provided to Plaintiff occurred before Plaintiff announced he was going out through his garage, and while Defendant Mangine was at

-6-

Plaintiff's side door.  At that time Mangine stated "I'm going to send the dog in you may be bit".
(Dkt 40 - Ex. K at 1:00 -1:38; Dkt 40 - Ex. I 6:15-6:29)

32.    Mangine's decision to apprehend Plaintiff using K-9 Ash constituted an objectively
unreasonable and excessive use of force. K-9 Ash was deployed despite Plaintiff being visibly
unarmed, having verbally surrendered, and calmly walking toward the police vehicles parked on his
lawn to be taken into custody. Plaintiff posed no threat to any officer and was not attempting to flee.
Additionally, Defendant Mangine released K-9 Ash after Defendant Fayerweather had already
initiated a tackle to bring Plaintiff to the ground. The deployment occurred before Mangine provided
adequate K-9 warnings or gave Plaintiff a meaningful opportunity to comply. (Dkt 40 - Ex. K at 1:00
-1:38; Dkt 40 - Ex. I 6:15-7:00; Dkt 40 - Ex. J at 7:00 -0:7:25; Dkt 19 p. 100:17-23; Dkt 19 p. 103:1-
20)

33.    After Defendant Fayerweather tackled Plaintiff, he was straddling Plaintiff's chest
ordering Plaintiff to "give me my taser" but Plaintiff never had Fayerweather's taser.  As depicted in
Durand's body worn camera footage, Fayerweather is wearing black gloves and Plaintiff is wearing
yellow gloves.  The taser remains in Fayerweather's gloved hand, while Plaintiff's yellow glove can
be seen grasping Fayerweather's wrist.  (Dkt 40 - Ex. I at 6:48 -6:53)

34.    Once Plaintiff is on the ground, Defendants, Durand, Johnson, Benson, Mangine and
Van Effen physically secure each of his limbs while K-9 ash is latched onto Plaintiff's left leg and
Fayerweather is straddling Plaintiff's chest.  This effectively immobilized Plaintiff. (Dkt 40 - Ex. I at
6:48 -7:02; Dkt 40 - Ex. K at 1:38 -1:54; Dkt 40 - Ex. J at 7:30 -0:7:37; Dkt 40 - Ex. L at 1:50 -1:58)

35.    Plaintiff begs Defendant's to release K-9 ash from his leg.  (Dkt 40 - Ex. L at 2:00 -
2:02; Dkt 40 - Ex. I at 6:57 -7:02).

36.    The pain of the dog bite can be seen in Plaintiff's face (Dkt 40 - Ex. I at 6:48 -7:15)

37.    When an individual experiences severe enough pain they can no longer comply with orders.  (Dkt 23 p 90:5-9)

38.    Deputy Mangine replied to Plaintiff's pleas by explaining that Ash was "not coming off until you stop resisting" (Dkt 40 - Ex. K at 1:00 -1:38)

39.    After Plaintiff was pinned to the ground and immobilized, Mangine stated that he would not release Ash until Plaintiff stopped resisting, Defendants had already secured each of Plaintiff's limbs and had held him in place for over 15 seconds, during that Plaintiff had not moved. (Dkt 40 - Ex. L at 1:50 -2:10)

40.     Defendants continue to yell, "stop resisting, after Plaintiff was physically held down by 6 men, many of whom were larger than him, and all of whom were younger than him, and he was no longer physically capable resisting. (Dkt 40 - Ex. I at 7:00 -7:08; Dkt 40 - Ex. J at 7:15 -0:7:45; Dkt 40 - Ex. L at 1:50 -2:10).

41.    Once Defendants had gained physical control of Plaintiff by pinning him to the ground and securing his limbs, Deputy Mangine left K-9 Ash latched on to Plaintiff's leg because Plaintiff was giving "resistive tension".  (Dkt 24, p. 47:21-24; Dkt 40 - Ex. I at 7:00 -8:00; Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 -2:30).

42.    Resistive tension does not justify an extreme use of force like a dog bite.  (Dkt 54 p. 5-6)

43.    Once Defendants had gained physical control of Plaintiff by holding him to the ground and securing his limbs, he was no longer physically able to move or fight back. (Dkt 24, p. 45:11-47:25; Dkt 40 - Ex. I at 7:00 -8:00; Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 -2:30)

44.    Despite the fact that Plaintiff was not actively resisting after he had been physically pinned to the ground and restrained by Defendants Durand, Johnson, Benson, Fayerweather, and Van

Effen, Defendant Mangine left K-9 Ash on Plaintiff's leg out of concern that Defendants might "invite further movement" from Plaintiff if K-9 ash was released prior Plaintiff being placed in handcuffs.  (Dkt 24, p. 48:2-8).

45.     Mangine did not release K-9 Ash until 52 seconds after Plaintiff had been physically secured by officers, was not resisting, and was not physically capable of resisting, and 20 seconds after Mangine explained that Ash was not coming off until Plaintiff stopped resisting.  (Dkt 40 - Ex. L at 1:50 -2:42; Dkt 40 - Ex. I at 6:50 -7:40; Dkt 40 - Ex. J at 7:30 -8:22).

46.     Once Mangine ordered "out" at K-9 Ash, K-9 Ash immediately released.  Dkt 40 - Ex. J at 7:30 -8:22).

47.     Plaintiff was born on October 3, 1962, and was 60 years old on November 7, 2022, making him significantly older than all of the Defendants (Exhibit 2 to the Declaration of Frederick Melms, p. 1; Dkt 23 p 86:8-10; Dkt 23 p 48:11-50:9).

48.     Plaintiff was also smaller than many of the Defendants on November 7, 2024. (Dkt 23 p 50:5-9)

49.     None of the Defendants were injured arresting Plaintiff. (Dkt 23 p 92:6-11).

50.     Plaintiff was unarmed when arrested by Defendants.  (Dkt 23 p 47:15-22)

51.     Mangine's decision to leave K-9 ash latched on to Plaintiff's left leg after Plaintiff was physically pinned to the ground and secured by Durand, Fayerweather, Benson, Johnson, and Van Effen, and Mangine was aware he was no longer actively resisting was an objectively unreasonable and excessive use of force.  (Dkt 24, p. 45:11-47:25; Dkt 40 - Ex. I at 7:00 -7:45; Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 -2:30; Dkt 40 - Ex. K at 1:40 -2:40; Docket 54 p. 4-6).

52.     An objectively reasonable officer would have been aware that Mangine's initial imposition of force on Plaintiff was objectively unreasonable and excessive and that Mangine's continued imposition of objectively unreasonable and excessive force whereby he left K-9 ash latched to Plaintiff's leg for 58 seconds even after Durand, Fayerweather, Benson, Jonson, and Van Effen had pinned Plaintiff to the ground and secured to the point he was no longer moving.  (Dkt 24, p. 45:11-47:25; Dkt 40 - Ex. I at 7:00 -7:45; Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 - 2:30; Dkt 40 - Ex. K at 1:40 -2:40; Docket 54 p. 4-6).

53.     Defendant Durand failed to intervene to prevent Mangine's imposition of objectively unreasonable and excessive force on Plaintiff or to terminate Mangine's imposition of objectively unreasonable and excessive force on Plaintiff. (Dkt 24, p. 45:11-47:25; Dkt 40 - Ex. I at 7:00 -7:45; Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 -2:30; Dkt 40 - Ex. K at 1:40 -2:40; Docket 54 p. 4-6)

54.     Defendant Fayerweather failed to intervene to prevent Mangine's imposition of objectively unreasonable and excessive force on Plaintiff or to terminate Mangine's imposition of objectively unreasonable and excessive force on Plaintiff. (Dkt 24, p. 45:11-47:25; Dkt 40 - Ex. I at 7:00 -7:45; Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 -2:30; Dkt 40 - Ex. K at 1:40 -2:40; Docket 54 p. 4-6)

55.     Defendant Benson failed to intervene to prevent Mangine's imposition of objectively unreasonable and excessive force on Plaintiff or to terminate Mangine's imposition of objectively unreasonable and excessive force on Plaintiff. (Dkt 24, p. 45:11-47:25; Dkt 40 - Ex. I at 7:00 -7:45; Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 -2:30; Dkt 40 - Ex. K at 1:40 -2:40; Docket 54 p. 4-6)

56.     Defendant Johnson failed to intervene to prevent Mangine's imposition of objectively unreasonable and excessive force on Plaintiff or to terminate Mangine's imposition of objectively unreasonable and excessive force on Plaintiff. (Dkt 24, p. 45:11-47:25; Dkt 40 - Ex. I at 7:00 -7:45;

Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 -2:30; Dkt 40 - Ex. K at 1:40 -2:40; Docket 54 p. 4-6)

57.    Defendant Van Effen failed to intervene to prevent Mangine's imposition of objectively unreasonable and excessive force on Plaintiff or to terminate Mangine's imposition of objectively unreasonable and excessive force on Plaintiff. (Dkt 24, p. 45:11-47:25; Dkt 40 - Ex. I at 7:00 -7:45; Dkt 40 - Ex. J at 7:15 -0:8:15; Dkt 40 - Ex. L at 1:40 -2:30; Dkt 40 - Ex. K at 1:40 -2:40; Docket 54 p. 4-6)

58.    The SCCSO does not regularly train on pain compliance techniques.  (Dkt 23 p 86:8-10)

59.    Following the incident Plaintiff was charged with Attempt Disarming a Peace Officer contrary to Wis. Stat. § 941.21 and Resisting or Obstructing a Police Officer contrary to Wis. Stat. § 946.41(1) in St. Croix County Case Number 2022CF000683 State of Wisconsin vs. Ronald Todd Allgood. (Exhibit 7 to the Declaration of Frederick Melms)

60.    While the criminal complaint in St. Croix County Case Number 2022CF000768, charges "resisting", Wis Stat. § 946.41(1) states "[e]xcept as provided in subs. (2m) and (2r), whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor. (Exhibit 7 p. 2 to the Declaration of Frederick Melms)

61.    On October 23, 2023, plaintiff pled guilty to Resisting or Obstructing a Police Officer contrary to Wis. Stat. § 946.41(1) in St. Croix County Case Number 2022CF000768, while Attempt Disarming a Peace Officer contrary to Wis. Stat. § 941.21 was dismissed. (Exhibit 8 p. 1 to the Declaration of Frederick Melms).

62.     Defendant Mangine failed to provide Plaintiff with a verbal K-9 warning and reasonable opportunity to comply prior to deploying K-9 Ash. (Dkt 54 p. 4; Dkt 40 - Ex. K at 1:05 - 1:38).

63.     Defendant Mangine's failure to provide Plaintiff with a verbal K-9 warning violated St. Croix County Sheriff's Office Police 300 Use of Force. (Dkt 54 p. 5)

64.     A reasonable K9 Officer/Handler would not have directed K-9 Ash to bite Plaintiff, and using K-9 ash was an unreasonable use of force. (Dkt 54 p. 5).

65.     Defendant Mangine's use of force through the release of K-9 Ash to apprehend Plaintiff was unreasonable because a reasonable K-9 officer would have known that Plaintiff was unarmed.  (Dkt 54 p. 5).

66.     Defendant Mangine's use of force through the release of K-9 Ash to apprehend Plaintiff was unreasonable because Plaintiff was not resisting the Defendants when Mangine ordered K-9 ash to apprehend Plaintiff.  (Dkt 54 p. 5).

67.     Defendant Mangine's use of force through the release of K-9 Ash to apprehend Plaintiff was unreasonable because Mangine allowed K-9 Ash to remain on the bite for 58 seconds including 5 seconds after Plaintiff was handcuffed.  (Dkt 54 p. 5).

68.     Defendant Mangine failed to comply with SCCSO, Policy 300, Use of Force: 300.3, which explains that deputes shall only use that amount of force necessary at the time to accomplish a legitimate law enforcement purpose.  (Dkt 54 p. 5).

69.     The SCCSO's Review process failed.  The SCCSO should have determined through their review process that Mangine's use of force through his release of K-9 Ash was unnecessary, unreasonable, and inappropriate based on the totality of the circumstances, as a K-9 bite is only justified when the amount of force involved in a K-9 bite is justified.  (Dkt 54 p. 6).

-12-

70.    Deployment of a K-9 bite constitutes a high level of force that will normally cause a suspect a significant injury.  Police K-9s should not be deployed on a routine or casual manner without objectively reasonable grounds.  In determining the reasonable grounds, courts must consider whether warnings were provided as well as whether the duration of a bite was reasonable.  (Dkt 54 p. 6).

71.    SCCSO failed to conduct a formal review of Mangine's use of K-9 Ash to apprehend Plaintiff with Defendant Mangine and Mangine was never disciplined, nor did he receive additional training.  (Dkt 24 p. 66:1-68:21).

72.    The SCCSO does not conduct reviews of every use of force incident involving a K-9 bite.  (Dkt 24 p. 68:14-21).

73.    Defendant Mangine was not informed if the SCCSO formally reviewed his use of force report. (Dkt 24 p. 66:1-15)

74.    The SCCSO K-9 supervisor was not a K-9 officer in November of 2022.  (Dkt 24 p. 66:9-24)


## II.    PLAINTIFF'S RESPONSES TO ST. CROIX DEFENDANTS' PROPOSED FINDINGS OF FACT.

1.    Defendants' Proposed Finding of Fact 1. A criminal complaint was issued against Ronald Allgood on October 3, 2022, in St. Croix County case number 22-CF-683 in which Allgood was charged with threatening a law enforcement officer and disorderly conduct. (Dkt. 35-3.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 1.  Not Disputed.**

2.    Defendants' Proposed Finding of Fact 2.  Allgood missed the November 3, 2022, initial appearance in St. Croix County case number 22-CF-683 resulting in a bench warrant being issued for Allgood's arrest. (Dkt. 35, ¶ 11.)

-13-

**Plaintiff's Response to Defendants' Proposed Finding of Fact 2.  Not Disputed.**

3.      Defendants' Proposed Finding of Fact 3. Sergeant Chase Durand has been employed as a Defendant by the St. Croix County Sheriff's Office since 2015 and was promoted to sergeant in 2020. (Dkt. 23, pp. 7:4-6, 13:20-22.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 3.  Not Disputed.**

4.      Defendants' Proposed Finding of Fact 4. On November 7, 2022, Sergeant Durand was working a patrol shift as the shift supervisor. (Dkt. 23, p. 21:4-5.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 4-10: Not Disputed.**

5.      Defendants' Proposed Finding of Fact 5. On November 7, 2022, Defendant Bryce Fayerweather was employed by SCCSO in field training and was paired with Sergeant Durand in the same squad. (Dkt. 23, pp. 24:19-20, 27:2; Dkt. 22, p. 19:9-13.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 4-10: Not Disputed.**

6.      Defendants' Proposed Finding of Fact 6. Defendant Fayerweather completed the Wisconsin Law Enforcement Academy on October 7, 2022, and began employment with SCCSO on October 10, 2022. (Dkt. 22, p.10:7-20.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 4-10: Not Disputed.**

7.      Defendants' Proposed Finding of Fact 7. On November 7, 2022, Sergeant Durand was requested to make phone contact with Officer Cory Van Effen of the Village of Hammond Police Department. (Dkt. 23,p. 21:4-6.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 4-10: Not Disputed.**

8.      Defendants' Proposed Finding of Fact 8. During this phone contact, Officer Van Effen requested the assistance of SCCSO in serving an arrest warrant and taking into custody Ronald Allgood. (Dkt. 22, p. 18:15-18; Dkt. 23, p. 21:4-14.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 4-10: Not Disputed.**

9.      Defendants' Proposed Finding of Fact 9. Pursuant to SCCSO policy, SCCSO promptly responds to requests for assistance made by other law enforcement agencies. (Dec. of Knudson, Ex. F.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 4-10: Not Disputed.**

10.     Defendants' Proposed Finding of Fact 10. During the call, Officer Van Effen advised Sergeant Durand and Defendant Fayerweather that Allgood had a felony warrant for his arrest for threats to law enforcement, specifically threatening Officer Van Effen that he (Allgood) would snap Officer Van Effen's neck. (Dkt. 23, pp. 21:4-14, 25:6-12; Dkt. 22, p. 19:9-13.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 4-10: Not Disputed.**

11.     Defendants' Proposed Finding of Fact 11. Through his discussion with Officer Van Effen, Sergeant Durand and Defendant Fayerweather learned that Allgood had been aggressive with law enforcement officers in the past and had a lengthy history of contacts with law enforcement. (Dkt. 23, pp. 21:4-14, 25:6-12; Dkt. 22, p. 19:9-13.)

**Plaintiff's Response to Proposed Finding of Fact 11. Not Disputed.**

12.     Defendants' Proposed Finding of Fact 12. Sergeant Durand also ran Allgood's name through his squad computer and confirmed the existence of the felony warrant for threatening law enforcement. (Dkt.23, pp. 23:14-24:8.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 12: Not Disputed.**

13.     Defendants' Proposed Finding of Fact 13. Based on the information provided by Officer Van Effen, in an effort to de-escalate the situation, Sergeant Durand decided that officers from the Village of Hammond Police Department would not be directly involved in Allgood's arrest and that SCCSO would handle the arrest. (Dkt. 23, p. 21:15-18.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 13: Not Disputed.**

14.     Defendants' Proposed Finding of Fact 14. Shortly thereafter, SCCSO Sheriff Scott Knudson called Sergeant Durand toprovide additional information relevant to officer safety. (Dkt. 23, p. 21:18-24, 35:24-36:8.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 14: Not Disputed.**

15.     Defendants' Proposed Finding of Fact 15. Within the SCCSO, it is typical for deputies, including the sheriff, to contact other deputies upon learning about planned arrests or contacts in order to advise them of information that may be pertinent to officer safety. (Dkt. 23, pp. 35:24-36:5; Dkt. 24, p. 38:4-16; Dec. of Knudson, ¶ 16.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 15: Not Disputed.**

16.     Defendants' Proposed Finding of Fact 16. Sheriff Knudson advised Sergeant Durand and Defendant Fayerweather of a past incident when he and other SCCSO deputies, including a K-9 Defendant, attempted to take Allgood's son into custody and Allgood produced a knife and threatened deputies with it. (Dkt. 23, p. 21:18-24; Dkt. 22, p. 19:9-13; Dec. of Knudson, ¶¶ 18-19.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 16. Disputed. Plaintiff Ronald T. Allgood never "produced" a knife or threatened Law Enforcement officers with a knife. (Exhibit 1 to the Declaration of Frederick Melms, p. 77- 84 of the Deposition of Ronald T. Allgood-p. 80:22- 82:5: Dkt. 19 p. 80:22- 82:5)**

17.     Defendants' Proposed Finding of Fact 17. Based on the felony warrant involving threats of violence, the information from Officer Van Effen regarding Allgood's aggression towards law enforcement, and the information from Sheriff Knudson about Allgood's history of threatening SCCSO deputies with a knife during a past contact, Sergeant Durand requested the assistance of one of SCCSO's K-9 handlers and the assistance of additional deputies. (Dkt. 23, pp. 21:25-22:6, 35:1-13.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 17. Disputed. Plaintiff Ronald T. Allgood never "produced" a knife or threatened Law Enforcement officers with a knife. (Exhibit 1 to the Declaration of Frederick Melms, p. 80:22- 82:5; Dkt. 19 p. 80:22- 82:5)**

-16-

18.    Defendants' Proposed Finding of Fact 18. It is typical for multiple deputies to assist in serving an arrest warrant where the warrant is for violent charges, for anything related to resisting arrest, or making threats to law enforcement officers. (Dkt. 22, p. 49:6-21; Dec. of Knudson, ¶ 15.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 18: Not Disputed.**

19.    Defendants' Proposed Finding of Fact 19. SCCSO typically has multiple deputies assist in the execution of felony warrants like those described above for officer safety, for the safety of the subject, and in an effort to minimize the level of force needed to effectuate the arrest. (Dkt. 22, p. 49:6-21; Dec. of Knudson, ¶ 15.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 19: Not Disputed.**

20.    Defendants' Proposed Finding of Fact 20. SCCSO deputies generally request a K-9 handler to the scene when one is available when effectuating arrests pursuant to a warrant for violent charges, felony- level charges, if the suspect has a known violent history, if the suspect has a history of using weapons, or where the history or other facts indicate the likelihood of an increased risk to officers' safety. (Dkt. 23, pp. 18:19-19:4; Dkt. 24, pp. 28:23-29:8; Dec. of Knudson, ¶ 14.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 20: Not Disputed.**

21.    Defendants' Proposed Finding of Fact 21. SCCSO Deputies Joel Benson and Eric Johnson responded to Sergeant Durand's request for additional officers. (Dec. of Benson, Ex. Q; Dec. of Johnson, Ex. R.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 21: Not Disputed.**

22.    Defendants' Proposed Finding of Fact 22. Sergeant Durand then called Defendant Fred Mangine, who is a SCCSO K-9 Defendant with his K-9 partner Ash, and requested his assistance with the arrest of Allgood pursuant to the felony warrant for threats to law enforcement. (Dkt. 24, p. 31:11-22.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 22: Not Disputed.**

-17-

23.    Defendants' Proposed Finding of Fact 23. When he received Sergeant Durand's call, Defendant Mangine was just about to start his shift and was leaving from his home approximately 11 miles away from the Village of Hammond. (Dkt. 24, pp. 30:16-31:1, 32:2-15.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 23: Not Disputed.**

24.    Defendants' Proposed Finding of Fact 24. Sergeant Durand directed Defendant Mangine to head towards Allgood's residence to meet the other deputies there. (Dkt. 24, p. 34:15-22.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 24: Not Disputed.**

25.    Defendants' Proposed Finding of Fact 25. While en route to the residence, Defendant Mangine reviewed the in-house history for Allgood, noting a prior violent encounter with law enforcement where Allgood armed himself with a knife and made threats; several prior encounters with law enforcement being extremely angry, verbally abusive, or threatening; a recent encounter with law enforcement where Allgood attempted to flee in a vehicle from the residence; threats to break a law enforcement officer's neck; and incidents of noncompliance and resisting while being arrested. (Dec. of Mangine, Ex. P; Dkt. 24, p. 37:12-21.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 25.  Disputed.  Plaintiff Ronald T. Allgood never armed himself or threatened Law Enforcement officers with a knife.  (Dkt 19, p. 80:22- 82:5; Dkt. 19 p. 80:22- 82:5). Additionally, Plaintiff was acquitted of threatening van Effen in St Croix County Case Number 2022CF000683 that resulted in the warrant for his arrest because he never threatened a law enforcement officer.  (Dec. of Melms Ext 6; Dkt. 35-3.). Furthermore, neither the cited portion of Defendant Mangine's deposition, nor his cited report, provide any support for the assertion that he was aware that Plaintiff threatened to break a law enforcement officers neck. (Dkt. 24, p. 37:12-21; Dec. of Mangine, Ex. P).**

26.    Defendants' Proposed Finding of Fact 26. While Defendant Mangine was en route to Allgood's residence, Sheriff Knudso While Defendant Mangine was en route to Allgood's

-18-

residence, Sheriff Knudson used the SCCSO's secondary radio channel to relay to Defendant Mangine the information he had previously relayed to Sergeant Durand and advised that during that incident, Allgood had produced a knife and threatened to use it to stab a K-9 that had responded. (Dkt. 24, pp. 38:2-39:2; Dec. of Knudson, ¶ 20.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 26: Not Disputed.**

27.    Defendants' Proposed Finding of Fact 27. When communications from dispatch or other deputies are made over the radio, all deputies can hear the communication because all deputies are equipped with a radio while on duty. (Dkt. 23, pp. 36:23-37:2; Dec. of Knudson, ¶ 17.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 27: Not Disputed.**

28.    Defendants' Proposed Finding of Fact 28. It is the practice of SCCSO that when making arrests pursuant to warrants, deputies do not typically park right in front of the house, which would alert the subject that they have arrived. (Dkt. 23, pp. 66:19-67:1; Dec. of Knudson, ¶ 21.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 28: Not Disputed.**

29.    Defendants' Proposed Finding of Fact 29. Because the Village of Hammond Police Department is only a few blocks from Allgood's residence, Sergeant Durand decided to have Deputies Benson and Johnson meet him and Defendant Fayerweather at the Police Department and then walk over to Allgood's residence on foot. (Dkt. 22, pp. 19:20-20:4; Dkt. 23, pp. 22:4-6, 66:19-67:1.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 29: Not Disputed.**

30.    Defendants' Proposed Finding of Fact 30. Each of the responding SCCSO deputies was wearing a body camera that recorded their actions in effectuating Allgood's arrest on November 7, 2022. (Dec. of Knudson, ¶ 27.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 30: Not Disputed.**

31.    Defendants' Proposed Finding of Fact 31. As Sergeant Durand approached Allgood's home on foot with Deputies Fayerweather, Benson, and Johnson, he could see Allgood outside of the house in a fenced-in area of the yard. (Dkt. 23, p. 28:11-19.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 31: Not Disputed.**

32.    Defendants' Proposed Finding of Fact 32. Sergeant Durand was the first officer to make contact with Allgood. While standing outside of the fenced yard, Sergeant Durand said to Allgood, "Hey Ronald, can I chat with you for a minute?" (Dec. of Knudson, Ex. I at 03:03 -03:07.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 32: Not Disputed.**

33.    Defendants' Proposed Finding of Fact 33. Allgood responded by waving his hand in the air and saying, "Be right there" as he shook his head back and forth to the left and right and walked toward the door leading into the house. (Ex. I at 03:07-03:12.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 33: Not Disputed.**

34.    Defendants' Proposed Finding of Fact 34. Because Allgood was heading to the door and not toward officers, Sergeant Durand then said to Allgood, "Step over here please, alright?" (Ex. I at 03:10 -03:12.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 34: Not Disputed.**

35.    Defendants' Proposed Finding of Fact 35. Allgood stopped and asked Sergeant Durand, "Why are you here?" (Ex. I at 03:14.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 35: Not Disputed.**

36.    Defendants' Proposed Finding of Fact 36. Sergeant Durand responded to Allgood, "We're here because you have a warrant for your arrest," and Allgood then asked, "For what?" (Ex. I at 03:14 – 03:18.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 36: Not Disputed.**

-20-

37.    Defendants' Proposed Finding of Fact 37. Sergeant Durand responded that it was a warrant signed by a judge and said they could discuss the specifics in a bit. (Ex. I at 03:19 – 03:23.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 37: Not Disputed.**

38.    Defendants' Proposed Finding of Fact 38. SCCSO deputies do not typically have a discussion back and forth with a subject regarding what the warrant is for until after the subject is in custody. (Dkt. 23, p. 34:15-18.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 38: Not Disputed.**

39.    Defendants' Proposed Finding of Fact 39. Allgood did not begin moving toward Sergeant Durand or any of the other deputies, so Sergeant Durand then ordered, "Come here, Ronald." (Ex. I at 03:26 - 03:43.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 39: Not Disputed.**

40.    Defendants' Proposed Finding of Fact 40. Allgood then went inside the residence through the nearby door. (Dec. of Knudson, Ex. J at 04:10 – 04:15.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 40: Not Disputed.**

41.    Defendants' Proposed Finding of Fact 41. SCCSO deputies are trained that when an uncooperative subject retreats into a home or other building, it poses a significant threat to officer safety because the subject may arm himself or otherwise obtain one or more objects that can be used as a weapon. (Dkt. 23, p. 38:12-18; Dec. of Knudson, ¶ 22.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 41: Not Disputed.**

42.    Defendants' Proposed Finding of Fact 42. Deputies cannot confirm that a subject is unarmed until the subject is in custody and has been searched for weapons. (Dkt. 23, pp. 39:19-40:3; Dec. of Knudson, ¶ 23.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 42: Disputed.  Plaintiff emerged from his garage with his hands in visible only holding a cellphone.  Additionally, Plaintiff announced his plans to leave through the garage and verbally surrendered after emerging from the garage. Defendants knew Plaintiff was unarmed.  (Dkt 40 - Ex. K at 1:00 -1:38; Dkt 40 - Ex. I 6:15-7:00; Dkt 40 - Ex. J at 7:00 -0:7:25; Dkt 19 p. 100:17-23; Dkt 19 p. 103:1-20)**

43.    Defendants' Proposed Finding of Fact 43. Defendant Johnson positioned himself on the outside of a tall fence on the side of Allgood's yard across from the door that Allgood had entered and began attempting to speak with Allgood: "Come on out. We've got a warrant, come on out, okay?" (Ex. I at 04:09 -- 04:14.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 43: Not Disputed.**

44.    Defendants' Proposed Finding of Fact 44. Allgood then came back out of his residence through the same door, along with a woman, and stood on the patio arguing with Defendant Johnson. (Ex. I at 04:15- 04:45; Ex. J at 05:25 – 05:34.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 44: Not Disputed.**

45.    Defendants' Proposed Finding of Fact 45. As Allgood argued with Defendant Johnson, Sergeant Durand radioed dispatch and confirmed there was still a valid warrant for Allgood.  (Ex. I at 04:24- 04:48.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 45: Not Disputed.**

46.    Defendants' Proposed Finding of Fact 46. Approximately 30 minutes had passed between when Sergeant Durand first ran Allgood's name in his squad computer and his arrival at Allgood's residence. (Dkt. 23, p. 37:3-17.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 46: Not Disputed.**

47.     Defendants' Proposed Finding of Fact 47. It is Sergeant Durand's typical practice to confirm the existence and validity of a warrant with dispatch over the radio so that all deputies on the scene, including assisting deputies who may not have had as much information as Sergeant Durand, are aware of what the warrant is for, and for officer safety. (Dkt. 23, pp. 36:9-27:2.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 47: Not Disputed.**

48.     Defendants' Proposed Finding of Fact 48. Defendant Mangine was monitoring the radio traffic as he was driving towards the Allgood residence and heard transmissions confirming that the deputies had made contact with Allgood and that he was noncompliant. (Dkt. 24, p. 35:5-9.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 48: Not Disputed.**

49.     Defendants' Proposed Finding of Fact 49. After close to a minute of Allgood arguing with deputies from his porch, Sergeant Durand advised in a loud voice, "Hey Ronald. You have a felony warrant. We'll be coming inside to arrest you if you don't comply. Step this way." (Ex. I at 04:52 – 04:59; Ex. J at 05:32 – 05:38.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 49: Not Disputed.**

50.     Defendants' Proposed Finding of Fact 50. Allgood again asked what the warrant was for and Sergeant Durand responded, "Threats to law enforcement. Step this way." (Ex. I at 04:59 – 05:02; Ex. J at 05:39 – 05:41; Dec. of Knudson, Ex. L at 00:00 – 00:05.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 50: Not Disputed.**

51.     Defendants' Proposed Finding of Fact 51. Allgood responded, "No, you tell me what it's for." (Ex. L at 00:00 – 00:05; Ex. J at 05:41 – 05:43.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 51: Not Disputed.**

52.     Defendants' Proposed Finding of Fact 52. Sergeant Durand then repeated, "Threats to law enforcement. Step this way, Ronald." (Ex. I at 05:05-05:07; Ex. L at 00:05-00:09.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 52: Not Disputed.**

53.     Defendants' Proposed Finding of Fact 53. When Defendant Mangine and K-9 Ash arrived, they immediately headed to the fence line where Defendant Johnson was positioned. (Dec. of Knudson, Ex. K at 00:00 – 00:10.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 53: Not Disputed.**

54.     Defendants' Proposed Finding of Fact 54. As he approached the fence, Defendant Mangine could see and hear Allgood arguing with Defendant Johnson and refusing to surrender. (Dkt. pp. 35:22-36:6.)

**Plaintiff's Response to Defendants Proposed Finding of Fact 54.  Plaintiff Disputes. Plaintiff eventually walked back in his house and then exited through his garage with his hands up to surrender, stating "let's go" as he walked towards a Police vehicle to be taken to jail. (Dec. Knudson- Ex. J at 05:45 -07:20).**

55.     Defendants' Proposed Finding of Fact 55. Defendant Mangine then said to Allgood, "Come on surrender, or I'm going to throw the dog over and he's going to bite you. Come out and surrender now." (Ex. L at 00:08 – 00:11; Ex. K at 00:00 – 00:07.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 55: Not Disputed.**

56.     Defendants' Proposed Finding of Fact 56. At this point, Allgood went back into his residence through the same door he had used earlier. (Ex. L at 00:15 – 00:17.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 56: Not Disputed.**

57.     Defendants' Proposed Finding of Fact 57. Defendant Johnson remained outside of the yard behind a tall fence directly opposite of the door that Allgood had retreated into and announced that Allgood was locking the door. (Ex. L at 00:10 – 00:25.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 57: Not Disputed.**

58.     Defendants' Proposed Finding of Fact 58. Based on the information he had learned from reviewing Allgood's in-house history and Allgood's behavior observed on scene in an unsecured

residence, Defendant Mangine retrieved his 20-foot leash and secured it to K-9 Ash so that he could be used as a force option if necessary. (Ex. P; Dkt. 24, pp. 37:5 – 38:1; 39:14-20.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 58: Not Disputed.**

59.    Defendants' Proposed Finding of Fact 59. Defendants' Proposed Finding of Fact 58Sergeant Durand then hopped the short fence at the front of the residence and approached the door that Allgood had just used to enter his home. (Ex. I at 05:11 – 05:25.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 59: Not Disputed.**

60.    Defendants' Proposed Finding of Fact 60. Defendant Fayerweather followed Sergeant Durand into the fenced-in portion of the yard. (Ex. J at 05:51- 05:55.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 60: Not Disputed.**

61.    Defendants' Proposed Finding of Fact 61. Sergeant Durand radioed dispatch and advised that Allgood had barricaded himself in the residence and asked dispatch if Allgood had "a history." (Ex. I at 05:23- 05:30.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 61. Plaintiff Disputes. Plaintiff eventually walked back in his house and then exited through his garage with his hands up to surrender, stating "let's go" as he walked towards a Police vehicle to be taken to jail. (Dec. Knudson- Ex. J at 05:45 -07:20).**

62.    Defendants' Proposed Finding of Fact 62. Defendant Mangine then directed K-9 Ash to hop the short fence into the yard  and Defendant Mangine did the same. (Ex. K at 00:45-00:52.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 62: Not Disputed.**

63.    Defendants' Proposed Finding of Fact 63. As Defendant Johnson remained at the fence, he could see Allgood inside the house and motioned to him with his hand while saying, "Ronald, come on out" at least three times. (Ex. L at 00:35 – 00:50.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 63: Not Disputed.**

64.    Defendants' Proposed Finding of Fact 64. Almost a minute after entering the house, Allgood exited the house through the same door and stood on his patio, at which point Sergeant Durand repeated, "Step over here, Ronald." (Ex. I at 05:49 – 05:52.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 64: Not Disputed.**

65.    Defendants' Proposed Finding of Fact 65. Defendant Johnson calmly said, "Yep. Just step on over, Ronald." (Ex. L at 00:51- 00:55.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 65: Not Disputed.**

66.    Defendants' Proposed Finding of Fact 66. Allgood responded, "You won't tell me what it's for?" (Ex. I at 05:52 – 05:54.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 66: Not Disputed.**

67.    Defendants' Proposed Finding of Fact 67. Sergeant Durand responded, "You're under arrest, get on the ground. Get on the ground." (Ex. I at 05:54 – 05:56.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 67: Not Disputed.**

68.    Defendants' Proposed Finding of Fact 68. Allgood initially appeared to begin raising his hands but simultaneously said to the deputies, "Shoot! Shoot first! Let me take care of my business first" and retreated back into his residence.  (Ex. I at 05:56 – 06:02; Dec. of Durand, Ex. N.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 68: Not Disputed.**

69.    Defendants' Proposed Finding of Fact 69. As Allgood retreated into his residence, Sergeant Durand ordered, "Ron, stop right there." (Ex. I at 06:00 – 06:02.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 69: Not Disputed.**

70.    Defendants' Proposed Finding of Fact 70. After only a few seconds, Allgood reemerged, stepping one foot out of the door, and Sergeant Durand repeated again, "Step over here. You're under arrest! Step out!" (Ex. I at 06:05 – 06:10.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 70: Not Disputed.**

71.    Defendants' Proposed Finding of Fact 71. Defendant Mangine and K-9 Ash approached the door and Defendant Mangine announced to Allgood, "Sheriff's Office K-9, stop! I'm going to send the dog in, you may be bit! Stop!" (Ex. K at 01:00 – 01:04; Dkt. 24, p. 40:12-20.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 71: Not Disputed.**

72.    Defendants' Proposed Finding of Fact 72. Defendants' Proposed Finding of Fact 72. Allgood then retreated back into his house through the same door and slammed it closed. (Ex. I at 06:08 – 06:11; Dec. of Knudson, Ex. M at 00:00 – 00:08.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 72: Not Disputed.**

73.    Defendants' Proposed Finding of Fact 73. Defendant Mangine then attempted to open the door, but it was locked, and Sergeant Durand shouted through the door, "Step out, Ronald!" (Ex. I at 06:12- 06:23, Ex. M at 00:00 – 00:12.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 73: Not Disputed.**

74.    Defendants' Proposed Finding of Fact 74. Defendant Johnson radioed dispatch and advised that Allgood had gone back into the residence and had locked the door again. (Ex. L at 01:22 – 01:27.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 74: Not Disputed.**

75.    Defendants' Proposed Finding of Fact 75. From his vantage point looking through a window into the home, Defendant Benson saw Allgood moving within the residence and announced, "He's going out the back. He's going out the back." (Ex. M at 00:23-00:25.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 75: Not Disputed.**

76.    Defendants' Proposed Finding of Fact 76. Based on Defendant Benson's comments, Defendant Johnson began running along the fence toward the back of the house. (Ex. L at 01:28 – 01:35.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 76: Not Disputed.**

77.     Defendants' Proposed Finding of Fact 77. Then Sergeant Durand announced to the other deputies nearby, "He's going to the garage" as he began heading toward the front of the residence. (Ex. I at 06:27- 06:28.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 77: Not Disputed.**

78.     Defendants' Proposed Finding of Fact 78. Defendant Fayerweather was the Defendant closest to the front of the residence and the garage, so he hopped back over the fence and headed toward the garage with his taser unholstered. (Ex. J at 07:05 – 07:10.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 78: Not Disputed.**

79.     Defendants' Proposed Finding of Fact 79. Defendant Mangine and K-9 Ash also headed for the front of the residence where the garage is located and hopped the fence. (Ex. K at 01:20 – 01:33; Dkt. 24, p. 41:1-5.)[1]

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 79: Not Disputed.**

80.     Defendants' Proposed Finding of Fact 80. Upon arriving at the front of the garage, Defendant Fayerweather saw that the garage door was opening and announced, "Got a garage door opening!" (Ex. J at 07:10 – 07:12.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 80: Not Disputed.**

81.     Defendants' Proposed Finding of Fact 81. Once the garage door was about halfway open, Allgood ducked under the door and began exiting the garage. (Ex. J at 07:13 – 07:16.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 81: Not Disputed.**

---

[1] At this time, Defendant Mangine's cell phone rings and all sound on his body-worn camera footage is obscured by the ringing until approximately 1:50.

82.     Defendants' Proposed Finding of Fact 82. Seeing Allgood exiting the garage, Defendant Fayerweather immediately raised his taser and yelled, "Ronald, step down!" (Ex. J at 07:16—07:17.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 82: Not Disputed.**

83.     Defendants' Proposed Finding of Fact 83. Defendant Fayerweather could see that Allgood had something in one of his hands but could not tell what it was. (Dkt. 22, p. 34:20-25.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 83.   Plaintiff Disputes. When Plaintiff exited his garage with his hands up to surrender, he clearly had a cell phone in his hands. (Dkt 40 - Ex. J at 06:45 -07:20; Dkt 40 - Ex. K 1:27-139, Dkt 54 p 5).**

84.     Defendants' proposed finding of fact 84. Allgood did not stop or slow down but continued to walk quickly in a diagonal direction toward Defendant Fayerweather. (Ex. J at 07:17—07:19; Ex. P; Dec. of Durand, Ex. N; Dkt. 24, p. 41:20-24.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 84.   Plaintiff Disputes. When Plaintiff exited his garage with his hands, surrendered, stated lets go, and started walking towards the police vehicles, Defendant Fayerweather had to run at Plaintiff to tackle him to the ground. (Dkt 40 - Ex. J at 06:45 -07:20; Dkt 40 - Ex. K 1:27-139).**

85.     Defendants' proposed finding of fact 85. Defendant Fayerweather screamed, "Ronald! Stop!" as Allgood continued  walking in the same direction at the same pace. (Ex. J at 07:17—07:19.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 85: Not Disputed.**

86.     Defendants' proposed finding of fact 86. As Defendant Fayerweather ordered Allgood to stop a second time, Defendant Mangine and K-9 Ash arrived in the front of the residence and saw Allgood walking toward Defendant Fayerweather. (Ex. K at 01:30 – 01:36; Ex. J at 07:18-07:20.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 86: Not Disputed.**

87.     Defendants' proposed finding of fact 87. Defendant Fayerweather yelled a third time, "Stop!" (Ex. J at 07:19- 07:20.)

**Plaintiff's Responses to Defendants' Proposed Finding of Fact 87: Not Disputed.**

88.     Defendants' proposed Finding of Fact 88. Because Allgood had approached within approximately one foot of Defendant Fayerweather, Defendant Fayerweather did not believe that his taser would be effective. (Dec. of Fayerweather, Ex. O; Dkt. 22, pp. 57:12-58:3.).

**Plaintiff's response Plaintiff's Response to Defendants' Proposed Finding of Fact 88.  Plaintiff Disputes. When Plaintiff exited his garage with his hands, surrendered, stated lets go, he did not "approach within one foot of Defendant Fayerweather, Defendant Fayerweather charged at him. (Dkt 40 - Ex. J at 06:45 -07:20; Dkt 40 - Ex. K 1:27-139).**

89.     Defendants' Proposed Finding of Fact 89. The effective range of a taser that will result in full neuromuscular incapacitation of a subject is approximately seven feet of distance between the taser and the subject. (Dkt. 22, pp. 57:19-59:1.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 89.  Plaintiff does not dispute the effective range of Defendant Fayerweather's Taser, but does dispute the implication that Plaintiff's conduct reduced the distance between himself and Defendant Fayerweather to less than 7 feet, when Defendant Fayerweather walked towards Plaintiff and ultimately charged him to tackle. (Dkt 40 - Ex. J at 06:45 -07:20; Dkt 40 - Ex. K 1:27-139).**

90.     Defendants' Proposed Finding of Fact 90. SCCSO policy permits deputies to use a taser only when the Defendant can safely do so within the operational range of the taser device. (Dec. of Knudson, Ex. B, p. 2.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 90. Plaintiff does not dispute the effective range of Defendant Fayerweather's Taser, but does dispute the implication that**

**Defendant Fayerweather could not have deployed the Taser. (Dkt 40 - Ex. J at 06:45 -07:20; Dkt 40 - Ex. K 1:27-139; Dec. of Knudson, Ex. B, p. 2).**

91.    Defendants' Proposed Finding of Fact 91. Allgood did not stop or slow his pace in response to Defendant Fayerweather's commands. (Dkt. 22, pp. 55:20-56:2.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 91. Plaintiff does not dispute his pace but had surrendered to law enforcement with his hands in the air and was walking towards the Police vehicles when Defendants used excessive force to arrest Allgood. (Dkt 40 - Ex. J at 06:45 -07:20; Dkt 40 - Ex. K 1:27-139).**

92.    Defendants' Proposed Finding of Fact 92. Once he was within 1-2 feet of Defendant Fayerweather, Allgood reached out one of his hands and pushed away Defendant Fayerweather's taser. (Ex. O; Dkt. 22, p. 56:3-6; 56:17-21.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 92.  Plaintiff Disputes.  The body worn camera footage does not depict Plaintiff trying to disarm Defendant Fayerweather as Defendant Fayerweather charged him. (Dkt 40 - Ex. J at 06:45 -07:35; Dkt 40 - Ex. K 1:27-1:40).**

93.    Defendants' proposed finding of fact 93. Fayerweather believed that Allgood was attempting to disarm him of his taser.  (Ex. O.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 93.  Plaintiff Disputes.  The body worn camera footage does not depict Plaintiff trying to disarm Defendant Fayerweather as Defendant Fayerweather charged him. (Dkt 40 - Ex. J at 06:45 -07:35; Dkt 40 - Ex. K 1:27-1:40).**

94.    Defendants' proposed finding of Fact 94. When Defendant Mangine approached the front of the house, he saw Allgood ignoring Defendant Fayerweather's commands while walking briskly toward Defendant Fayerweather. (Ex. P; Dkt. 24, p. 42:3-12.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 94.  Plaintiff Disputes.  The body worn camera footage depicts Plaintiff walking towards the police vehicles after verbally surrendering. (Dkt 40 - Ex. J at 06:45 -07:35; Dkt 40 - Ex. K 1:27-1:40).**

95.    Defendants' proposed finding of Fact 95. Defendant Mangine then observed Allgood either grabbing or pushing away Defendant Fayerweather's taser in a motion that Defendant Mangine interpreted as Allgood attempting to disarm Defendant Fayerweather to avoid being tased. (Ex. P; Dkt. 24, pp. 42:13-20; 43:6-25.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 95.  Plaintiff Disputes.  The body worn camera footage does not depict Plaintiff trying to disarm Defendant Fayerweather as Defendant Fayerweather charged him. (Dkt 40 - Ex. J at 06:45 -07:35; Dkt 40 - Ex. K 1:27-1:40).**

96.    Defendants' proposed finding of Fact 96. Defendant Mangine observed that Allgood had an object in one of his hands but could not ascertain what it was. (Ex. P; Dkt. 24, p. 42:9-12.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 96.  Plaintiff Disputes.  The body worn camera footage from the date in question depicts Ronald Allgood with a phone, and no officers ordered Allgood to drop anything in his hands suggesting they knew it wasn't a weapon. (Dkt 40 - Ex. J at 06:45 -07:35; Dkt 40 - Ex. K 1:27-1:40).**

97.    Defendants' proposed finding of Fact 97. When Sergeant Durand approached the front of the house, he also saw Allgood briskly walking and grabbing at Defendant Fayerweather. (Ex. N.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 97.  Plaintiff Disputes.  The body worn camera footage from the date in question depicts Plaintiff walking towards the police vehicles after verbally surrendering. (Dkt 40 - Ex. J at 06:45 -07:35; Dkt 40 - Ex. K 1:27-1:40).**

98.    Defendants' proposed finding of fact 98. Defendant Fayerweather then decentralized Allgood by hooking his left arm under Allgood's right arm and tripping Allgood to direct him to the ground. (Dkt. 22, pp. 36:5-20, 38:17-39:5.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 98.  Not disputed.**

99.    Defendants' proposed finding of Fact 99. Based on his observations of Allgood's resistive behavior and a possible weapon in hand, Defendant Mangine believed that Allgood posed an imminent

-32-

threat to law enforcement officers on the scene and to the public if he was allowed to flee. (Ex. P; Dkt. 24, p. 42:13-20.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 99. Plaintiff Disputes. As depicted in the body worn camera footage from the date in question, Plaintiff is in his front yard walking towards the police vehicles after verbally surrendering with a cell phone in his hand. Not only did Plaintiff verbally surrender, Plaintiff remained at a great enough distance away from officers that when Defendant Fayerweather tackled Plaintiff, it was at a high rate of speed in order to close the distance from himself and Plaintiff. (Dkt 40 - Ex. J at 06:45 -07:55; Dkt 40 - Ex. K 1:27-1:40).**

100.    Defendants' Proposed Finding of Fact 100. Because he believed that Allgood posed an imminent threat, Defendant Mangine commanded K-9 Ash to engage Allgood. (Ex. P; Dkt. 42, p. 24:13-23.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 100. Plaintiff Disputes. The body worn camera footage from the date in question depicts Plaintiff walking towards the police vehicles after verbally surrendering with a cell phone in his hand. Plaintiff remained at a great enough distance away from officers. No reasonable officer in Mangine's position would have believed Plaintiff to be a threat. (Dkt 40 - Ex. J at 06:45 -07:50; Dkt 40 - Ex. K 1:27-1:40).**

101.    Defendants' Proposed Finding of Fact 101. K-9 Ash bit Allgood's calf at the same time that Defendant Fayerweather decentralized Allgood to the ground. (Ex. P; Dkt. 24, p. 45:2-10.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 101. Plaintiff Disputes. The body worn camera footage from the date in question shows that K-9 ash was released after Defendant Fayerweather had tackled Plaintiff to the ground and K-9 Ash did not bite Plaintiff until after Plaintiff was on the ground (Dkt 40 - Ex. J at 06:45 -07:55; Dkt 40 - Ex. K 1:27-1:40).**

102.    Defendants' Proposed Finding of Fact 102. Pursuant to his training and best practices, Defendant Mangine remained next to K-9 Ash on Allgood's leg with at least one hand on Ash to control and secure Ash.  (Dkt. 24, pp. 48:21-49:9.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 102.  Plaintiff Disputes.  While Plaintiff does not dispute that Mangine remained in control of K-9 Ash once K-9 Ash had latched on to Plaintiff's leg, Plaintiff Disputes the implication that Mangine implemented the best practices for police K-9 handling at any point on November 7, 2022. (Dkt 54)**

103.    Defendants' Proposed Finding of Fact 103. Once on the ground, Allgood was lying face-up with Defendant Fayerweather straddling him over his chest. (Dkt. 22, p. 40:7-12.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 103.  Plaintiff Does not dispute.**

104.    Defendants' Proposed Finding of Fact 104. Allgood then grabbed Defendant Fayerweather's taser, which was still in Defendant Fayerweather's right hand, and tried to pull it away from Defendant Fayerweather. (Ex. O, Dkt. 22, pp. 42:16-43:2, 56:17-57:7)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 104.  Plaintiff Disputes.  The Body Worn Camera Footage from Defendant Durand demonstrates that after verbally surrendering to law enforcement, being taken to the ground unnecessarily by Fayerweather, bitten by K-9 Ash, and threatened with a taser, Plaintiff grabbed Defendant Fayerweather's wrist, not the Taser itself. Plaintiff clearly never made contact with Fayerweather's taser, nor tried to grab Fayerweather's taser, nor touched or ever took control of Fayerweather's Taser.  ( Dkt 40 Ex. I 6:45-6:55).**

105.    Defendants' Proposed Finding of Fact 105. Defendant Mangine observed Allgood grabbing and pulling on Defendant Fayerweather's taser. (Ex. P; Dkt. 24, p. 46:9-20.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 105.  Plaintiff Disputes.  The Body Worn Camera Footage from Defendant Durand demonstrates that after verbally surrendering to law enforcement, being taken to the ground unnecessarily by Fayerweather, bitten by K-9**

**Ash, and threatened with a taser, Plaintiff grabbed Defendant Fayerweather's wrist, not the Taser.  Defendant clearly never grabbed Fayerweather's taser, tried to grab Fayerweather's taser, took control of Fayerweather's taser or even touched the taser. Defendant Mangine could not see an event that didn't happen.  ( Dkt 40 Ex. I 6:45-6:55).**

106.     Defendants' Proposed Finding of Fact 106. As he approached the men, Sergeant Durand saw that Allgood had his hand on Defendant Fayerweather's taser as the two men were on the ground. (Dkt. 23, pp. 44:24-45:5; Ex. N.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 106.  Plaintiff Disputes.  The Body Worn Camera Footage from Defendant Durand demonstrates that after verbally surrendering to law enforcement, being taken to the ground unnecessarily by Fayerweather, bitten by K-9 Ash, and threatened with a taser, Plaintiff grabbed Defendant Fayerweather's wrist, not the Taser.  Defendant clearly never grabbed Fayerweather's taser, tried to grab Fayerweather's taser, took control of Fayerweather's taser or even touched the taser. Defendant Durand could not see an event that didn't happen.  (Dkt 40 Ex. I 6:45-6:55).**

107.     Defendants' Proposed Finding of Fact 107. Sergeant Durand immediately reached for the taser to get it out of Allgood's hand to secure it. (Dkt. 23, p. 45:1-5; Dkt. 22, p. 42:17-43:2.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 107.  Plaintiff Disputes.  The Body Worn Camera Footage from Defendant Durand demonstrates that after verbally surrendering to law enforcement, being taken to the ground unnecessarily by Fayerweather, bitten by K-9 Ash, and threatened with a taser, Plaintiff grabbed Defendant Fayerweather's wrist, not the Taser.  Plaintiff clearly never grabbed Fayerweather's taser, tried to grab Fayerweather's taser, took control of Fayerweather's taser or even touched the taser. Defendant Durand could not reach for the taser in Allgood's hand, when the taser was never in Allgood's hand.  (Dkt 40-Ex. I at 6:45-6:55).**

108.    Defendants' Proposed Finding of Fact 108. As the deputies struggled to secure Defendant Fayerweather's taser, Defendant Fayerweather told Allgood to stop resisting or he would be tased. (Ex. O; Ex. J at 07:25 – 07:28.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 108. Plaintiff does not dispute that Defendant Fayerweather threatened to tase Plaintiff. Plaintiff disputes that he was resisting while Fayerweather was threatening to tase him. Plaintiff had verbally surrendered, however was met with unnecessary, extreme use of force. It is also apparent that Defendant Fayerweather had control of his taser based on his threat to use it on Plaintiff. This would indicate that he was aware he had control of his taser. (Dkt 40- Ex. I at 6:45-6:55; Dkt 40 - Ex. J at 06:45 -07:55; Dkt 40 - Ex. K at 1:27-1:40)**

109.    Defendants' Proposed Finding of Fact 109. As the struggle over the taser continued, Defendant Fayerweather yelled to Allgood, "Give me my taser! Give me my taser!" (Dkt. 22, p. 43:17-22; Ex. J at 07:28 –07:31.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 109. Plaintiff does not dispute that Fayweather yelled "give me my taser". Plaintiff disputes the implication that Fayerweather was not in control of his taser, as the body worn camera footage from Defendant Durand demonstrates that Plaintiff grabbed Defendant Fayerweather's wrist, not his taser. Defendant clearly never grabbed Fayerweather's taser, tried to grab Fayerweather's taser, took control of Fayerweather's taser or even touched the taser. Therefore, Plaintiff would not have been able to give Fayerweather back his taser due to the fact that Plaintiff was never in possession or control of Fayerweather's taser. (Dkt 40 Ex. I 6:45-6:55).**

110.    Defendants' Proposed Finding of Fact 110. Sergeant Durand was able to secure Defendant Fayerweather's taser and get it back to Defendant Fayerweather. (Ex. J at 07:31- 07:33.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 110. Plaintiff Disputes. The Body Worn Camera Footage from Defendant Durand demonstrates that Defendant Durand could not**

have secured Fayerweathers taser when Fayerweather never lost control of his taser.  (Dkt 40-Ex. I at 6:45-6:55; Dkt 40 - Ex. J at 06:45 -07:55; Dkt 40 - Ex. K at 1:27-1:40).

111.    Defendants' Proposed Finding of Fact 111. Defendant Fayerweather continued ordering Allgood to stop resisting. (Ex. J at 07:33—07:38; Dkt. 22, p. 43:23-25.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 111.  Plaintiff does not dispute that Defendant Fayerweather stated to Plaintiff to stop resisting. Plaintiff does dispute the implication that he was resisting when he had verbally surrendered and was already on the ground. (Dkt 40-Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5).**

112.    Defendants' Proposed Finding of Fact 112. Allgood continued to physically resist the deputies' effort to secure him by attempting to push and pull away and tensing his muscles. (Ex. P; Dkt. 23, p. 98:11-20; Dkt. 24, p. 46:20-23, 47:5-8, 56:23-3.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 112.  Plaintiff Disputes. Plaintiff disputes that he was resisting, his movements while on the ground were a reaction to the pain of he was experiencing by K-9Ash's 58 second continuous bite to his leg. (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5)**

113.    Defendants' Proposed Finding of Fact 113. Sergeant Durand then pinned Allgood's right arm to the ground. (Ex. N.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 113.  Plaintiff does not dispute.**

114.    Defendants' Proposed Finding of Fact 114. Defendant Mangine told Allgood that the K-9 would be removed when Allgood stopped resisting. (Ex. P; Dkt. 24, p. 50:10-13.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 113.  Plaintiff does not dispute that Defendant Mangine told Plaintiff he would continue to torture him with the dog until he "stopped resisting". Plaintiff does dispute the implication that he was resisting. Plaintiff had verbally surrendered, only to be taken to the ground, and then experience a 58 second continuous biting from K-9 Ash. Plaintiff's movements while on the ground were a reaction to the pain of the dog**

bite, not resistance to law enforcement.  (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 - 08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5)

115.    Defendants' Proposed Finding of Fact 115. Defendant Mangine did not release K-9 Ash at this point because Allgood was still resisting as deputies continued attempting to secure his arms in handcuffs, Defendant Mangine believed that Allgood had tried to disarm Defendant Fayerweather, he believed that Allgood was continuing to resist deputies, and multiple deputies were crouched over Allgood wearing duty vests that had easily accessible tools on their chests, including tasers. (Dkt. 24, pp. 46:2-47:4, 52:15-22.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 115.  Plaintiff does not dispute that Defendant Mangine tortured him with a dog bite for 58 seconds.  Plaintiff does dispute that Defendant Mangine believed that Plaintiff had tried to disarm Defendant Fayerweather and was resisting.  Plaintiff walked out of his garage unarmed, with his hands up, verbally surrendered and was met with extreme force.  He was taken to the ground and then experienced a 58 second dog bite.  Defendant Durand's body camera demonstrates that Plaintiff grabbed Fayerweather's wrist and not the taser, and Plaintiff's movements while on the ground were a reaction to the pain of the dog bite, not resistance to law enforcement.   Additionally, there were 6 law enforcement officers restraining each of Plaintiff's limbs.  Defendant Mangine was a trained dog handler with years of experience, he was aware the bites were painful, and that Plaintiff would react physically to a dog bite.    (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 24- p64:11-13)**

116.    Defendants' Proposed Finding of Fact 116. Defendant Mangine believed that Allgood continued to pose a threat to officers until he was secured and no longer had the ability to try to take something from the officers' vests to use as a weapon. (Dkt. 24, pp. 46:2-47:4; 52:23-53:13.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 116.   Plaintiff disputes. If Defendant Mangine was an objectively reasonable officer, he would not have believed that**

-38-

**Plaintiff continued to pose a threat. However, what Defendant Mangine believed or did not believe about Plaintiff is not a finding of fact. (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 24- p64:11-13)**

117.    Defendants' Proposed Finding of Fact 117. Defendant Mangine did not release K-9 Ash at this point because he believed that Ash's bite could still assist in gaining some level of compliance from Allgood until his hands could be secured in handcuffs. (Dkt. 24, pp. 46:2-47:4, 52:23-53:13, 56:16-57:10, 71:8-18.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 117.   Plaintiff disputes this proposed finding of fact, as it is not based on facts, it is a statement made in regard to the beliefs of Defendant Mangine. Plaintiff also deputes the implication of this statement that he was not in full compliance. (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 24- p64:11-13)**

118.    Defendants' Proposed Finding of Fact 118. SCCSO deputies are trained that a resistive subject continues to pose a threat to officer safety until the subject is secured in handcuffs, because the subject still has the ability to kick, punch, bite, spit, break free from officers, and produce a concealed weapon. (Dkt. 23, pp. 47-48, 57; Dec. of Knudson, ¶ 24.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 118.   Plaintiff does not dispute that officers are trained as referenced in the proposed finding of fact.   Plaintiff does dispute any implication of this proposed finding that he was "a resistive subject". (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 24- p64:11-13)**

119.    Defendants' Proposed Finding of Fact 119. Because Allgood continued to actively resist and attempting to fight back, Sergeant Durand then took hold of Allgood's left arm to secure it and placed a handcuff on it. (Dkt. 23, pp. 44:21-45:5; Ex. N.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 119.  Plaintiff does not dispute that Defendant Durand took hold of his left arm. Plaintiff does dispute that on November 7, 2022, he was resisting and attempting to fight back, as Plaintiff had already verbally surrendered. (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 24– p64:11-13)**

120.    Defendants' proposed finding of fact 120. Defendant Benson then arrived and initially assisted in attempting to secure Allgood by stabilizing Allgood's head. (Dec. of Benson, Ex. Q.)

**Plaintiff's response to Defendants' Proposed Finding of Fact 120. Plaintiff does not dispute that in addition to the other officers, Defendant Benson was also restraining him by his head. Plaintiff does dispute whether this is a valid police tactic and whether this type of "stabilizing" was justifiable given that Plaintiff had verbally surrendered.**

121.    Defendants' proposed finding of fact 121. After Sergeant Durand had secured a handcuff on Allgood's left hand, Allgood continued to pull his right arm away and resist efforts to place his right hand in handcuffs. (Dkt. 23, pp. 55:24-56:7, 89:21-25, 98:11-20.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 121.  Plaintiff does not dispute that Defendant placed him in a handcuff.  Plaintiff does dispute that he resisted, as he was already on the ground with a K-9 biting his leg. Plaintiff asserts that any movements of his arms and legs were his body's instinctual reaction to the pain of being bitten by a large dog for 58 seconds.  Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 24– p64:11-13)**

122.    Defendants' proposed finding of Fact 122. Because Allgood was continuing to resist the deputies' efforts to secure him in handcuffs and was tensing his arms, Defendant Benson then grabbed Allgood's right forearm and assisted in placing it behind Allgood's back and securing the handcuffs.

**Plaintiff's Response to Defendants' Proposed Finding of Fact 122.  Plaintiff does not dispute that Defendant placed him in a handcuff.  Plaintiff does dispute that he resisted, as he was already on**

-40-

**the ground with a K-9 biting his leg. Plaintiff asserts that any movements of his arms and legs**

**were his body's instinctual reaction to the pain of being bitten by a large dog for 58 seconds. (Dkt**

**40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5;**

**Dkt 24- p64:11-13)**

123.    Defendants' Proposed Finding of Fact 123. Defendant Johnson, who had run to the rear of the residence based on Defendant Benson's earlier announcement that Allgood was "going out back," saw there was no backyard once he reached the rear of the property. (Ex. L at 01:28 – 01:40; Dec. of Johnson, Ex. R.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 123. Plaintiff does not dispute.**

124.    Defendants' Proposed Finding of Fact 124. After only a few seconds, Defendant Johnson could hear officers yelling that Allgood was exiting the front of the house and began running to the front of the residence. (Ex. L at 01:40 - 01:45; Ex. R.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 124. Plaintiff does not dispute.**

125.    Defendants' Proposed Finding of Fact 125. By the time that Defendant Johnson arrived back in the front yard of the residence, Allgood was already on the ground with several deputies attempting to secure him. (Ex. L at 01:47 – 01:56; Ex. R.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 125. Plaintiff does not dispute that there were several Defendants on top of him when Defendant Johnson arrived.  Defendant does dispute the implication that he had not been secured once Defendant Johnson arrived.  (Ex. L at 01:47 – 01:56)**

126.    Defendants' Proposed Finding of Fact 126. Defendant Johnson secured Allgood's right leg by holding it down until Allgood was secured in handcuffs. (Ex. R.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 126. Plaintiff does not dispute.**

127.    Defendants' Proposed Finding of Fact 127. K-9 Ash remained in place on Allgood's calf until Defendant Mangine believed that active resistance had been overcome and there was no danger of Allgood further attempting to disarm Defendant Fayerweather of his taser. (Ex. P.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 127. Plaintiff does not dispute that Defendant Mangine tortured Plaintiff with K-9 Ash for 58 seconds. Plaintiff disputes the implication that he was a threat or was actively resisting. Plaintiff disputes any implications that was a danger or that he was attempting any sort of disarming of an officer. Plaintiff disputes this proposed finding of fact as it is based on the beliefs of Defendant Fayerweather and not on facts. (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 24- p64:11-13)**

128.    Defendants' Proposed Finding of Fact 128. Once Defendant Mangine learned that Allgood was handcuffed, Defendant Mangine informed the other deputies that he would be removing K-9 Ash. (Ex. P; Dkt. 23, p. 98:11-20; Dkt. 24, pp. 71:19 -72:6.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 128. Plaintiff Disputes. Defendant Magine left K-9 Ash's latched jaw on Plaintiff's leg for 5 more seconds after Plaintiff was handcuffed. (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00)**

129.    Defendants' Proposed Finding of Fact 129. Deputy Mangine then took positive control of K-9 Ash's flat collar and verbally commanded Ash to release, which Ash quickly did without issue. (Ex. P.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 129. Plaintiff Disputes. Defendant left K-9 Ash on Plaintiff's leg for 5 seconds after Plaintiff was handcuffed (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00)**

130.    Defendants' Proposed Finding of Fact 130. Deputy Mangine then immediately requested EMS to the scene. (Ex. P.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 130. Plaintiff does not dispute.**

131.    Defendants' Proposed Finding of Fact 131. SCCSO's standards of conduct dictate that every Defendant's continued employment or appointment requires his or her conduct to be in accordance with the United States Constitution, the Wisconsin Constitution, and all applicable laws, ordinances, and rules enacted or established pursuant to legal authority. (Dec. of Knudson, Ex. E.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 131. Plaintiff does not dispute.**

132.    Defendants' Proposed Finding of Fact 132. SCCSO's training policy requires all deputies to maintain all training required by the Wisconsin Law Enforcement Standards Board. (Dec. of Knudson, Ex. D.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 132. Plaintiff does not dispute.**

133.    Defendants' Proposed Finding of Fact 133. As of November 7, 2022, Chase Durand, Bryce Fayerweather, Frederick Mangine, Eric Johnson, Joel Benson, and Scott Knudson had each completed all training required by the Wisconsin Law Enforcement Standards Board to be a certified law enforcement officer. (Dec. of Knudson, ¶ 12.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 133. Plaintiff does not dispute.**

134.    Defendants' Proposed Finding of Fact 134. SCCSO's use of force policy requires deputies to use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the Defendant at the time of the event to accomplish a legitimate law enforcement purpose.(Dec. of Knudson, ¶ 4, Ex. A.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 134. Plaintiff does not dispute.**

135.    Defendants' Proposed Finding of Fact 135. All SCCSO deputies are trained to use the minimum amount of force necessary, if any, to effectuate an arrest. (Dkt. 23, p. 16:18-23.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 135.  Plaintiff disputes as the 5 SCCSO Defendants that arrived at Plaintiff's house on November 7, 2022, either used excessive force to effectuate his arrest or watched other officers use excessive force to effectuate arrest and failed to intervene. Plaintiff walked out of his garage unarmed, with his hands up, verbally surrendered and was met with extreme force. First he was tackled to the ground by Fayerweather and Mangine sent K-9 Ash after Plaintiff causing Plaintiff to experience a 58 second dog bite.  Additionally, during the 58 second bite there were 6 law enforcement officers restraining each of Plaintiff's limbs and Mangine still did not release K-9 Ash.  Defendant Mangine used excessive force to effectuate the arrest of Plaintiff while Four other SCCSO officers looked on and did nothing, including Durand who was a Sergeant and a supervisor. Additionally, Frederick Mangine, believes that he could have driven a knife or nail into Plaintiff's calf to effectuate arrest if he had the certification.  (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 23-p. 15: 9-20; Dkt 24- p. 64:11-13; Dkt 24- p. 72:4-73:22)**

136.    Defendants' Proposed Finding of Fact 136. [intentionally omitted]

137.    Defendants' Proposed Finding of Fact 137. SCCSO's use of force policy includes a nonexhaustive list of factors that deputies should consider when determining whether to use force and the amount of force that is reasonable. (Ex. A, pp. 3-4.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 137.  Plaintiff does not dispute.**

138.    Defendants' Proposed Finding of Fact 138. SCCSO deputies are trained that a subject's height, weight, and age are three of the many factors they should consider when determining whether to use force and when determining the appropriate level of force to use. (Dec. of Knudson, ¶ 25.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 138.  Plaintiff does not dispute.**

139.    Defendants' Proposed Finding of Fact 139. SCCSO deputies are also trained that a subject's height, weight, and age, whether alone or combined, are not necessarily an accurate predictor of whether the subject poses a threat to officer safety. (Dec. of Knudson, ¶ 25.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 139.  Plaintiff does not dispute that Defendants are trained as mentioned above. Plaintiff does dispute any implication that his height, weight, and apparent age did not minimize the need for Defendants to use force to effectuate arrest.  (Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00)**

140.    Defendants' Proposed Finding of Fact 140. SCCSO has a policy that establishes guidelines for the use of K-9s to augment law enforcement services to the community including the apprehension of criminal offenders. (Dec. of Knudson, Ex. C.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 140.  Plaintiff does not dispute.**

141.    Defendants' Proposed Finding of Fact 141. SCCSO's K-9 policy requires that each K-9 team must be trained and certified to meet current nationally recognized standards or other recognized and approved certification standards prior to assignment in the field. (Ex. C, pp. 7-8.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 141.  Plaintiff does not dispute.**

142.    Defendants' Proposed Finding of Fact 142. SCCSO requires that each K-9 team must be recertified annually to a current nationally recognized standard or other recognized and approved certification standard. (Ex. C, p. 8.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 142.  Plaintiff does not dispute.**

143.    Defendants' Proposed Finding of Fact 143. As of November 7, 2022, Defendant Mangine and K-9 Ash maintained all certifications required under SCCSO policy. (Dec. of Knudson, ¶ 13, Ex. H.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 143.  Plaintiff does not dispute.**

144.    Defendants' Proposed Finding of Fact 144. SCCSO policy permits a K-9 to be used to apprehend a suspect if the canine handler reasonably believes that the individual has either committed, is committing or threatening to commit any serious offense and if any of the following conditions exist:

(a) There is a reasonable belief the suspect poses an imminent threat of violence or serious harm to the public, any Defendant or the handler.

(b) The suspect is physically resisting or threatening to resist arrest and the use of a canine reasonably appears to be necessary to overcome such resistance.

(c) The suspect is believed to be concealed in an area where entry by other than the canine would pose a threat to the safety of deputies or the public. (Ex. C, p. 3.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 144.  Plaintiff does not dispute.**

145.    Defendants' Proposed Finding of Fact 145. SCCSO's K-9 policy includes a nonexhaustive list of factors that K-9 deputies should consider when determining whether the use of a K-9 is appropriate and reasonable. (Ex. C, pp. 3-4.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 145.  Plaintiff does not dispute.**

146.    Defendants' Proposed Finding of Fact 146. SCCSO directs that prior to releasing the K-9, K-9 deputies should give a clearly audible warning announcing that a K-9 will be used if the suspect does not surrender. (Ex. C, p. 4.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 146.  Plaintiff does not dispute.**

147.    Defendants' Proposed Finding of Fact 147. SCCSO policy states that if a K-9 has apprehended a suspect with a secure bite, the handler should promptly command the K-9 to release the suspect once the handler believes that the suspect no longer poses a threat. (Ex. C, p. 3.).

**Plaintiff's Response to Defendants' Proposed Finding of Fact 147.  Plaintiff does not dispute.**

148.    Defendants' Proposed Finding of Fact 148. Deputies employed by SCCSO who are not K-9 handlers receive regular training with SCCSO's K-9 handlers to familiarize the non-K-9 handlers with the K-9 and working around them. (Dkt. 23, pp. 14:3-12, 14:23-16:5; Ex. C, pp. 7-8.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 148.  Plaintiff does not dispute.**

149.    Defendants' Proposed Finding of Fact 149. All SCCSO deputies are trained on the types of calls or scenarios where it would be recommended to request a K-9 handler respond with his or her K-9 partner in order to have the K-9 as a use of force option. (Dkt. 23, pp. 15:12-16:5, 17:3-15.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 149.  Plaintiff does not dispute.**

150.    Defendants' Proposed Finding of Fact 150. All SCCSO deputies receive training on follow-up care after a K-9 deployment, including training to recognize the need for medical treatment and how to obtain it. (Dkt. 23, p. 15:12-20.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 150.  Plaintiff does not dispute.**

151.    Defendants' Proposed Finding of Fact 151. The K-9 hander-Defendant is the person who makes the decision on whether to deploy his or her K-9 partner on any given call. (Dkt. 23, p. 15:23-25.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 151.  Plaintiff does not dispute.**

152.    Defendants' Proposed Finding of Fact 152. Of the 50-100 arrests pursuant to felony warrants that Defendant Mangine and K-9 Ash have assisted in effectuating, Allgood's is the only arrest that resulted in Ash doing a bite apprehension. (Dkt. 24, pp. 29:18-30:15; Dec. of Knudson, Ex. G.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 152.  Plaintiff does not dispute.**

153.    Defendants' Proposed Finding of Fact 153. K-9 Ash is trained not to bite nontarget areas including the neck and face during physical apprehensions, because these could potentially become lethal. (Dkt. 24, pp. 15:14-16:4.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 153.  Plaintiff does not dispute.**

154.    Defendants' Proposed Finding of Fact 154. Prior to Allgood's arrest on November 7, 2022, Sheriff Knudson did not have any conversations with Officer Van Effen or anyone else from the Village of Hammond Police Department about Allgood's warrant, criminal charges, or anything related to effectuating his arrest. (Dec. of Knudson, ¶ 26.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 154.  Plaintiff does not dispute.**

155.    Defendants' Proposed Finding of Fact 155. Prior to Mr. Allgood's arrest on November 7, 2022, Sergeant Durand did not have any conversations with Officer Van Effen or anyone else from the Village of Hammond Police Department about using force of any kind to effectuate Mr. Allgood's arrest. (Dkt. 23, p. 102:1-20; Dec. of Durand, ¶ 13.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 155.  Plaintiff Disputes.  Sergeant Durand and Officer Van Effen engaged in an unrecorded phone call on November 7, 2022, using their cellphones, in order to keep the conversation off of the radio. Following the conversation Officer Durand very quickly organized a lot of backup and Durand and Fayerweather then parked at the Village of Hammond Police Department.  After making contact with Plaintiff Allgood, the Defendants were very quick to use excessive force.  Additionally, Durand didn't appear to actually know that Plaintiff had a warrant.  The circumstantial evidence suggests that Van Effen requested excessive force be used.  (Dkt. 23, p. 21:4-25:4; Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 23-p. 15: 9-20; Dkt 24- p. 64:11-13; Dkt 24- p. 72:4-73:22).**

156.    Defendants' Proposed Finding of Fact 156. The only discussion that Sergeant Durand had with Officer Van Effen related to the specific actions to be taken in effectuating the arrest of Allgood was that Officer Van Effen would not participate in the arrest in an attempt to deescalate the situation and keep it as calm as possible given Officer Van Effen and Allgood's apparently contentious history. (Dkt. 23, p. 102:11-15.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 156.  Plaintiff Disputes.  Sergeant Durand and Officer Van Effen engaged in an unrecorded phone call on November 7, 2022, using their cellphones, keeping the conversation off of the radio, Officer Durand very quickly organized a lot of backup and Durand and Fayerweather then parked at the Village of Hammond Police Department.  After making contact with Plaintiff Allgood, the Defendants were very quick**

**to use excessive force. Additionally, Durand didn't appear to actually know that Plaintiff had a warrant. The circumstantial evidence suggests that Van Effen requested excessive force be used. (Dkt. 23, p. 21:4-25:4; Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 23-p. 15: 9-20; Dkt 24- p. 64:11-13; Dkt 24- p. 72:4-73:22).**

157.    Defendants' Proposed Finding of Fact 157. Officer Van Effen did not ask or direct any of the responding SCCSO deputies to use force in effectuating Allgood's arrest. (Dec. of Durand, ¶ 13; Dec. of Fayerweather, ¶ 13; Dec. of Mangine, ¶ 13; Dec. of Benson, ¶ 13; Dec. of Johnson, ¶13.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 156. Plaintiff Disputes. Sergeant Durand and Officer Van Effen engaged in an unrecorded phone call on November 7, 2022, using their cellphones, keeping the conversation off of the radio, Officer Durand very quickly organized a lot of backup and Durand and Fayerweather then parked at the Village of Hammond Police Department. After making contact with Allgood, the Defendants were very quick to use excessive force. Additionally, Durand didn't appear to actually know that Plaintiff had a warrant. The circumstantial evidence suggests that Van Effen requested excessive force be used. (Dkt. 23, p. 21:4-25:4; Dkt 40- Ex. I at 06:45-08:15; Dkt 40 - Ex. J at 06:45 -08:15; Dkt 40 - Ex. K at 1:27-3:00; Dkt 54 p. 5; Dkt 23-p. 15: 9-20; Dkt 24- p. 64:11-13; Dkt 24- p. 72:4-73:22).**

158.    Defendants' Proposed Finding of Fact 158. K-9 Ash made a single and committed bite targeted to the fleshiest portion of Allgood's calf resulting in an approximately 250 psi compression injury. (Dec. of Mills, Ex. T, p. 5.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 158. Plaintiff does not dispute.**

159.    Defendants' Proposed Finding of Fact 159. Proper police canine training is for the K-9 to bite and hold the areas of the body that are most dangerous to officers, specifically the hands and legs. (Ex. T, p. 5.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 159. Plaintiff does not dispute.**

160.    Defendants' Proposed Finding of Fact 160. Knowing that Allgood's back-and-forth into his home posed a threat to deputies, and knowing that Allgood had not been searched, Sergeant Durand drew his handgun and held it in a modified carry position—or a low carry—so that he would have the weapon available to defend himself if Allgood produced a weapon. (Ex. N; Dkt. 23, pp. 43:7-44:14.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 160.  Plaintiff does disputes that any of his conduct posed a threat to deputies. Plaintiff disputes there would be any reason to search him. Plaintiff disputes that there was any reason that Sergeant Durand need to draw his firearm and Plaintiff asserts that doing so is excessive force.**

161.    Defendants' Proposed Finding of Fact 161. As deputies went back and forth with Allgood ordering him to surrender as he continued to retreat back into his home, Defendant Benson drew his department-issued handgun because he was concerned about the possibility of Allgood's access to weapons. (Ex. Q.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 161.  Plaintiff disputes that it was necessary for Durand to use his firearm. Plaintiff asserts that this is excessive force, as there was no clear nor visible weapons for Plaintiff to possess.**

162.    Defendants' Proposed Finding of Fact 162. Once Defendant Benson saw that Segreant Durand had unholstered his handgun and therefore had "lethal cover," Defendant Benson holstered his handgun in exchange for his taser. (Ex. Q.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 162.  Plaintiff does not dispute that Defendant Bensen drew his firearm. Plaintiff disputes the need for officers to use "lethal cover", as he did not pose a threat nor had any weapons. Plaintiff asserts that Durand's use of his firearm was excessive force.**

163.    Defendants' Proposed Finding of Fact 163. Plaintiff responded to the County Defendants Interrogatories and Requests for Production on September 23, 2024. (Dec. of Mills, Ex. S.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 163.  Plaintiff does not dispute.**

164.    Defendants' Proposed Finding of Fact 164. To date, Plaintiff has not supplemented or amended his September 23, 2024, responses to the County Defendants Interrogatories and Requests for Production. (Dec. of Mills, ¶ 4.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 164.  Plaintiff Disputes.  Plaintiff provided Defendants with the executed medical releases for Plaintiff's healthcare information on February 21, 2025.**

165.    Defendants' Proposed Finding of Fact 165. Sergeant Durand spoke with Officer Van Effen on his work-issued phone, and only after Sergeant Durand was requested to make the contact either by dispatch or over the radio. (Dkt. 23, p. 22:10-15.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 165.  Plaintiff does not dispute.**

166.    Defendants' Proposed Finding of Fact 166. Sergeant Durand did not have Officer Van Effen's phone number and would have had to get it through dispatch. (Dkt. 23, p. 23:1-3.)

**Plaintiff's Response to Defendants' Proposed Finding of Fact 165.  Plaintiff does not dispute.**

February 24, 2025

Frederick B. Melms

Attorney for Plaintiff

  /s/ Frederick Melms
Frederick B. Melms
Bar no. 1093957
Fbmelmsesq@gmail.com
PO Box 212
Woodruff, WI 54568
715-892-3023

-51-

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RONALD T. ALLGOOD,

                      Plaintiff,                  OPINION AND ORDER

    v.

                                                    23-cv-885-wmc

ST. CROIX COUNTY, ST. CROIX COUNTY
SHERIFF'S OFFICE, CHASE DURAND,
SCOTT KNUDSON, BRYCE FAYWEATHER,
FREDERICK MANGINE, ERIC JOHNSON and
JOEL BENSON,

                      Defendants.

Plaintiff Ronald Allgood was bitten and injured by a police dog during his arrest by several St. Croix County sheriff's deputies. Allgood claims that the deputy responsible for the K-9 violated his Fourth Amendment rights by using unreasonable force, as did the other deputies on the scene by failing to intervene to prevent the unreasonable use of force. Before the court is defendants' motion for summary judgment (dkt. #37), arguing that their use of force was reasonable under the circumstances, but even if not, they are entitled to qualified immunity. Because Allgood has failed to identify any controlling law clearly establishing that defendants' actions violated the Fourth Amendment, the court agrees that they are entitled to qualified immunity and will enter summary judgment accordingly.

UNDISPUTED FACTS[1]

On November 7, 2022, defendant Chase Durand, a sergeant in the St. Croix County Sheriff's Office and the patrol shift supervisor at the time, received a request for assistance

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as from the record evidence where appropriate. The court recounts the facts in the light most favorable to plaintiff, *McGee v. Parsano*, 55 F.4th 563, 566 (7th Cir. 2022), although many of the facts are undisputed

with an arrest from a Village of Hammond police officer.[2]  Specifically, the Hammond officer told Sergeant Durand that while trying to arrest plaintiff Ronald Allgood on a felony warrant for making threats to law enforcement, he threatened to snap the officer's neck. The officer also told Durand that Allgood had a lengthy history of contacts with law enforcement and had been aggressive with Village of Hammond law enforcement officers in the past.  During the discussion, Durand ran Allgood's name though his squad car computer and confirmed the existence of the felony warrant.

Under St. Croix County Sheriff Office's policy, the county routinely provided assistance to other law enforcement agencies within its jurisdiction, including the Village of Hammond.  Considering Allgood's apparent contentious history with Village officers, however, Durand decided that the St. Croix County Sheriff's Office should handle the arrest directly.  After being informed of Durand's plan, Sheriff Scott Knudson warned Durand and defendant Bryce Fayerweather, a deputy sheriff also working the patrol shift, about a previous incident in which he and other St. Croix County Sheriff deputies, including a K-9 officer and his dog, attempted to take Allgood's son into custody,

---

because much of the incident was captured by defendants' body-worn cameras.  *See Horton v. Pohjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (at summary judgment, court must view the facts in the light most favorable to the nonmovant," but should "rely on clear and conclusive videos if they 'firmly settle a factual issue.'") (citation omitted).

[2] Plaintiff proposed several findings of fact relating to the Village of Hammond police officer who issued the initial criminal complaint, accusing the officer of falsifying information and retaliating against plaintiff.  However, that officer is not a defendant in this case, and those facts are irrelevant to the Fourth Amendment claims against the St. Croix County Sheriff's Office defendants.  Plaintiff also alleges that the same Village of Hammond officer instructed Durand to use force and/or injure plaintiff while arresting him (Plt.'s PFOF (dkt. #55) ¶ 11), but he has no evidence to support that assertion.

2

prompting Allgood to produce a knife and threaten deputies with it.[3]  After speaking with the sheriff, Durand decided to request assistance from additional deputies, as well as one of the Sheriff Department's K-9 handlers.  Defendants Joel Benson and Eric Johnson, both deputy sheriffs, responded to Sergeant Durand's request for additional assistance, and Durand also asked defendant Deputy Fred Mangine and his K-9 partner "Ash" to meet at Allgood's residence.

While en route to the residence, Sheriff Knudson radioed Deputy Mangine and relayed that during a previous incident, Allgood had threatened to use a knife to stab a K-9 officer.  Deputy Mangine also reviewed Allgood's history, noting several past encounters with law enforcement in which he was described as extremely angry, verbally abusive, or threatening.  That history further included reports of noncompliance and resisting while being arrested, including a recent encounter with law enforcement in which Allgood attempted to flee in a vehicle from the residence.

Defendants Durand, Fayerweather, Benson and Johnson all parked at the Village of Hammond Police Department, which was near Allgood's residence.  When Durand approached Allgood's home with Deputies Fayerweather, Benson and Johnson on foot, Allgood was outside of his house in a fenced-in area of his yard.[4]  While standing outside

---

[3] Allgood denies that he actually threatened officers with a knife, saying that he only touched a knife on his kitchen counter because officers were not listening to him.  (Allgood Dep. (dkt. #19) 80–81.)  Whether Allgood actually threatened officers with a knife is immaterial to this case, however, because the relevant question for the Fourth Amendment analysis is what information was *communicated* to Sergeant Durand and Officer Fayerweather before they encountered Allgood, and there appears no dispute on that score.

[4] Each deputy was wearing a body camera that recorded portions of Allgood's arrest.  Thus, the court's description of what happened during the arrest is drawn primarily from the recorded footage, unless noted otherwise.

3

the fenced in yard, Durand stated, "Hey Ronald, can I chat with you for a minute?" Allgood responded by waving his hand in the air and saying, "Be right there." However, he was also shaking his head back and forth and walking toward the door leading into the house. Durand then said, "Step over here please, alright?" Allgood then stopped and asked Durand, "Why are you here?" At that point, Durand responded, "We're here because you have a warrant for your arrest." Allgood asked what the warrant was for, and Durand responded that the warrant was signed by a judge, and they could discuss the warrant "in a bit." When Allgood did not move toward the deputies, Durand ordered, "Come here, Ronald." Instead, Allgood went inside the residence through a nearby door.

The deputies next positioned themselves in various locations around Allgood's fence. Defendant Johnson stood outside of a tall fence near the door that Allgood had just entered, and began attempting to speak with Allgood, stating: "Come on out. We've got a warrant, come on out, okay?" Allgood then came back out of his residence through the same door, along with a woman, and stood on the patio arguing with Johnson. As Allgood argued with Johnson, Sergeant Durand radioed dispatch to reconfirm that there was still a valid warrant for Allgood. Dispatch then confirmed Allgood's outstanding felony warrant for "battery or threat to judge, prosecutor or law enforcement."

After close to a minute of Allgood arguing back and forth with deputies from his porch, Sergeant Durand advised in a loud voice, "Hey Ronald. You have a felony warrant. We'll be coming inside to arrest you if you don't comply. Step this way." Around this same time, Durand drew his gun, holding it low and toward the ground. Allgood again asked what the warrant was for, and Durand responded, "Threats to law enforcement. Step

4

this way." Allgood responded, "No, you tell me what it's for." Durand repeated again, "Threats to law enforcement. Step this way, Ronald."

Meanwhile, Deputy Mangine was driving with K-9 Ash towards Allgood's residence and heard over the radio that deputies had made contact, but Allgood was not complying with orders. When Mangine and Ash arrived, therefore, they immediately headed to the fence line where Deputy Johnson was already positioned. As Mangine approached the fence, he could see and hear Allgood arguing with Johnson. Mangine next said to Allgood, "Come on surrender, or I'm going to throw the dog over and he's going to bite you. Come out and surrender now." At this point, Allgood went back into his residence through the same door he had used earlier. Johnson announced that Allgood was locking the door, causing Mangine to retrieve his 20-foot leash and secure K-9 Ash so that he could be deployed, if necessary.

Sergeant Durand then hopped the short fence at the front of the residence and approached the same door that Allgood had been using. Defendant Fayerweather also followed Durand into the fenced-in portion of the yard. From there, Durand radioed dispatch to advise that Allgood had barricaded himself in the residence and to ask if Allgood had "a history," presumably beyond what he had already been told. Deputy Mangine and K-9 Ash then similarly hopped the short fence into the yard. While Deputy Johnson continued directing Allgood to exit, saying, "Ronald, come on out," at least three times, Allgood again exited the house through the same door, almost a minute since he had last entered, and stood on his patio, holding a phone up,

At this point, Durand commanded, "Step over here, Ronald," while Johnson calmly repeated, "Yep. Just step on over, Ronald." When Allgood responded, "You won't tell me

what it's for?"  Durand said simply, "You're under arrest, get on the ground.  Get on the ground."  Allgood initially appeared to begin raising his hands, but simultaneously said to the deputies, "Shoot! Shoot first!  Let me take care of my business first," then he again retreated into his residence.  As Allgood retreated, Durand also ordered, "Ron, stop right there."

After only a few seconds, Allgood reemerged for a third time, stepping one foot out of the door, causing Durand to repeat, "Step over here.  You're under arrest! Step out!"  Defendant Mangine and K-9 Ash approached the door and Mangine announced, "Sheriff's Office K-9, stop!  I'm going to send the dog in, you may be bit!  Stop!"  Nevertheless, Allgood once more retreated into his house, slamming and locking the door behind him.  Durand again shouted through the door, "Step out, Ronald!"  Johnson radioed dispatch and advised that Allgood had gone back into the residence and had locked the door again.

From his vantage point looking through a window into the home, Deputy Benson saw Allgood moving within the residence, and announced to the other officers, "He's going out the back.  He's going out the back."  Based on Benson's comments, Deputy Johnson began running along the fence toward the back of the house.  Then Sergeant Durand announced, "He's going to the garage," and began heading toward the front of the residence.  Being closest to the front of the residence and the garage, Deputy Fayerweather similarly hopped back over the fence and headed toward the garage with his taser unholstered.  Finally, Mangine and K-9 Ash also headed to the front of the residence where the garage was located and hopped the fence.

Upon arriving at the front of the garage, Fayerweather saw that the garage door was opening and announced, "Got a garage door opening!"  Once the garage door was about

halfway open, Allgood ducked under the door and began exiting the garage. Fayerweather immediately raised his taser and yelled, "Ronald, step down!" According to Fayerweather, he could see that Allgood had something in one of his hands but could not tell what it was, while Allgood says he was clearly holding a cell phone. The body camera footage does not resolve what Allgood was holding.[5] Once Allgood exited the garage, he said, "Let's go, and began walking briskly in the direction of Fayerweather and a parked police vehicle. Deputy Fayerweather twice more yelled, "Ronald! Stop!" However, Allgood continued walking.

Just as Fayerweather ordered Allgood to stop the second time, Deputy Mangine and K-9 Ash arrived in front of the residence. Mangine saw Allgood walking toward Fayerweather and heard him yell a third time, "Stop!" Allgood did not stop walking. According to Deputies Fayerweather and Mangine, once Allgood was within one or two feet of Fayerweather, Allgood reached out one of his hands and pushed away the taser, causing them to believe Allgood was attempting to knock the taser from Fayerweather's hand. Allgood denies reaching for Fayerweather, and unfortunately, the video footage does not clearly show what Allgood was doing with his hands. Regardless, Fayerweather then tripped Allgood, bringing him to the ground and hooking his left arm under Allgood's right

---

[5] Allgood also represents that his hands were raised and he told Fayerweather that he was coming out, but it *is* clear from the camera footage that: his hands were *not* raised when he exited the garage; and he did *not* say that his hands were up or that he had a phone. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment); *U.S. v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022) ("a video record of the events at issue can evaporate any factual dispute that would otherwise exist").

arm.  At the same time, Mangine commanded K-9 Ash to "engage" (bite) Allgood.[6]  Ash then bit Allgood's calf as Fayerweather brought Allgood to the ground.  Although Allgood asserts that Mangine ordered Ash to bite him after he was already subdued on the ground, the video footage confirms that Ash bit Allgood *at the same time* Fayerweather brought him to the ground.

Seconds before, Sergeant Durand had come around the front of the house, just in time to see Allgood walking toward Fayerweather, then being brought down by Fayerweather and Ash.   In taking Allgood to the ground, Durand also saw that Fayerweather had lost control of his taser and began yelling at Allgood, "Give me my taser! Give me my taser!"  According to both Durand and Fayerweather, Allgood was attempting to take the taser, while Allgood claims only to be reaching for Fayerweather's wrist.  Here, the video footage shows that Allgood was grabbing near Fayerweather's wrist *and* taser, and while unclear whether he was actually reaching for the taser, an objectively reasonable officer would almost certainly act on that concern until the risk was neutralized.  It *is* clear that the taser slipped out of Fayerweather's hand at some point in the scuffle, and Durand was ultimately able to grab it, while around this time, Deputies Johnson and Benson also arrived at the front of the house.

At this point, Allgood was lying face-up on the ground, with Deputy Fayerweather straddling his chest and Ash biting his leg.  Mangine remained next to Ash, keeping one hand on Ash and one on Allgood's leg.  Further, defendants Durand, Johnson and Benson

---

[6] Because Mangine's cell phone was ringing loudly at the time, it is also not possible to tell from the body camera footage whether Deputy Mangine warned plaintiff again that Ash would bite him, although he had already warned Allgood more than once by this point that being bitten by the K-9 was a distinct possibility.

were also attempting to secure his hands and legs, while Allgood said, "Get that dog off my leg."   In reply, Mangine explained that the dog was "not coming off until you stop resisting."   The deputies continued to yell, "stop resisting," although Allgood maintains he was no longer physically *able* to resist.   In particular, Mangine claims to have been concerned that if he released Ash's hold on the leg, *he* would lose control of the leg and Allgood could move again.   Once Durand stated to the deputies, "Alright, he's in cuffs," Mangine said, "Alright, dog is coming straight back."   After the other deputies moved back, Mangine commanded Ash to "out" (release Allgood's leg and Ash immediately did so.)   In total, Ash had bitten Allgood for approximately 58 seconds.[7]

## OPINION

Plaintiff Allgood claims a reasonable jury could find on this record that Deputy Mangine used excessive force when he ordered his canine partner Ash to bite him and hold the bite for nearly a minute.   Plaintiff also claims a reasonable jury could find that the other deputies should have intervened to either prevent the bite or at least direct Mangine to release the dog within a few seconds of engaging Ash because a reasonable officer would have concluded further control with six other officers engaged in subduing the 60 year old plaintiff was excessive.[8]   Plaintiff's excessive force claim originates from the Fourth

---

[7] Plaintiff represents that Ash's bite was the "longest 58 second of his life," but beyond this pain and suffering, he offers no evidence of any physical, permanent injury.

[8] In his complaint, plaintiff further pleaded excessive force claims against the other deputies, as well as municipal liability claims against St. Croix County.   (Dkt. #1.)   However, plaintiff's brief in opposition to summary judgment focused almost exclusively on the actions of Deputy Mangine and K-9 Ash, while failing to respond to defendants' arguments regarding his claims against the other deputies and the County.   Defendants are entitled to summary judgment on those claims based on plaintiff's failure to meaningfully rebut any of defendants' arguments.   *See Bradley v. Vill. of Univ.*

9

Amendment's protection against unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386,

394 (1989).  An officer's use of force is analyzed under an objective reasonableness

standard, which "must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight."  *Id.* at 396.  Among other possible factors,

an officer's use of force is judged by:  (1) the severity of the crime at issue; (2) whether the

suspect poses an immediate threat to the safety of officers or others; and (3) whether the

suspect is actively resisting arrest or attempting to evade arrest by flight.  *Id.*  The officer's

action must also account for "the information known to the officer at the time of the

encounter; the duration of the encounter; the level of duress involved; and the need to

make split-second decisions under intense, dangerous, uncertain, and rapidly changing

circumstances."  *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (citation

omitted).

Defendants contend that their actions did not violate the Fourth Amendment, and

even if they did, they are entitled to qualified immunity.  The court will address qualified

immunity first, as that issue is dipositive in this case.  *Schimandle v. Dekalb Cnty. Sheriff's

Off.*, 114 F.4th 648, 654 (7th Cir. 2024) (district court may resolve case on qualified

immunity without addressing underlying constitutional violation).  Qualified immunity

shields government officials from monetary liability unless they "violate clearly established

statutory or constitutional rights."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Ashcroft

v. al-Kidd,* 563 U.S. 731, 735 (2011).  The doctrine balances "the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officials

---

*Park, Illinois*, 59 F.4th 887, 897 (7th Cir. 2023) (arguments waived if underdeveloped, conclusory, unsupported by law or not raised at all).

from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743.

When a defendant asserts qualified immunity at the summary judgment stage, the *plaintiff* has the burden of defeating it by showing that a defendant violated a clearly established statutory or constitutional right. *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021). To be clearly established, the right must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Schimandle*, 114 F.4th at 655. At this step, the United States Supreme Court has frequently cautioned against defining that right at too high a level of generality, rendering the defense of qualified immunity relatively meaningless. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Moreover, the Supreme Court has emphasized the importance of applying qualified immunity correctly in excessive force cases, an area of the law "in which the result depends very much on the facts of each case." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam); *see also City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) ("[I]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.") (citation and quotation marks omitted). Thus, police officers are entitled to qualified immunity in Fourth Amendment excessive force cases "unless existing precedent squarely governs the specific facts at issue." *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021). And to overcome qualified immunity in an excessive-force case, plaintiff must either: (1) identify a closely analogous case that established a right to be free from the type of force the police officers used; or (2)

11

show that the force was so plainly excessive that, as an objective matter, the police officers

would have been on notice that they were violating the Fourth Amendment. *Id.*

Here, plaintiff argues that it was clearly established law that "police officers could

not use significant force on nonresisting or passively resisting suspects." (Plt.'s Br. (dkt.

#59) 19–20.) Plaintiff relies principally on *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016),

and *Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016), for this principle, two cases involving

canine police partners. However, the general proposition that "officers cannot use

significant force on a nonresisting or passively resisting suspect" is insufficiently specific,

by itself, to govern the outcome of this case. Indeed, such a reading would run headlong

into the Supreme Court's repeated warning "not to define clearly established law at too

high a level of generality" for purposes of a qualified immunity analysis. *E.g.*, *Rivas-Villegas

v. Cortesluna*, 595 U.S. 1, 2 (2021). Similarly, the Seventh Circuit has specifically held that

"framing the right" in the excessive force context "as the right to be free from force once

subdued is impermissibly broad." *Brumitt v. Smith*, 102 F.4th 444, 448 (7th Cir. 2024);

*see also Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025) (framing constitutional right

as "deadly force cannot be used when there is no longer an imminent threat of danger" is

"too high a level of generality").

Regardless, neither the facts in *Becker* nor in *Alicea* "squarely govern" the specific

facts at issue here. *See Manery*, 124 F.4th at 1081 ("Because the inquiry into whether an

officer used excessive force is highly fact-dependent, police officers are entitled to qualified

immunity unless existing precedent '*squarely governs*' the specific facts at issue.") (citation

omitted) (emphasis added). In *Becker*, police officers went to Becker's mother's home to

execute an arrest warrant, based on reports of his having threatened to kill someone with

12

a knife three weeks earlier. *Id.* at 923. From the front porch, Becker's mother "called upstairs to her son that the police were there to arrest him." *Id.* In that case, the parties disputed whether an officer gave warnings before releasing his canine partner into the home. Moreover, according to Becker, "within two minutes of his mother's announcement, he began descending the stairs" from his upstairs bedroom, "with his hands on top of his head so officers knew he was surrendering." *Id.* at 924.

Nevertheless, as Becker was descending, the officer released his canine, which reached Becker as he was still three steps from the bottom of the stairs. The dog bit Becker's ankle, and Becker shouted, still with his hands up, "Call the dog off. I'm coming towards you." *Id.* Even after the K-9 officer reached Becker and the dog, there was no command for the dog to release Becker. Instead, the officer "grabbed Becker . . . and yanked him down the last few steps onto the floor, where he landed hard on his chest and head." *Id.* According to Becker, the dog then continued to bite him for several minutes, "while violently shaking his head," only to be released after Becker was handcuffed. *Id.* Finally, Becker had to undergo surgery and stay in the hospital for two or three days to recover, and he suffered severe permanent muscle and nerve damage as a result of the incident. *Id.* at 925.

In *Alicea*, the facts were even more egregious. The defendant-officer ordered his K-9 partner to attack a burglary suspect who was standing still, arms raised, inside of an empty above-ground pool, surrounded by five-foot walls, and who had immediately complied with police orders. 815 F.3d at 289–90. Further, the officer had his gun drawn and trained on the plaintiff the entire time as he stood in the swimming pool, "effectively

trapped." *Id.* at 290.  On those facts, the plaintiff did not pose a sufficient threat to justify ordering a police K-9 to attack and hold him.

The facts of both *Becker* and *Alicea* are clearly distinguishable from the present case.  Becker involved a suspect who had announced that he was complying with officer commands *and* walked toward the officer with his hands on his head.  His alleged crime, threatening someone with a knife, had occurred several weeks earlier, and there was no reason to suspect that he was armed or in a position to attack police at the time of the arrest.  *Id.* at 927.  Nonetheless, and without warning, the officer ordered his K-9 partner to bite the suspect for several minutes, causing permanent damage.  Similarly, the burglary suspect in *Alicea* had complied with officer commands, had his arms raised, held no weapon, and could not flee or attack without first having to vault out of a swimming pool.

In contrast, defendant Mangine knew that plaintiff's arrest warrant was for threats to law enforcement, and he, his sergeant and the other deputies had been told that plaintiff had a history of anger, verbal abuse and violent threats to law enforcement, including a threat to break a law enforcement officer's neck and use a knife on a K-9 officer.  Mangine also knew that plaintiff had:  refused to comply with numerous officer commands that he surrender; argued with deputies for several minutes; told deputies to "shoot first" at one point; and locked himself in his house for a time.  Worse still, by the time Mangine ordered his K-9 partner to apprehend him, plaintiff was walking, without his hands visible to Mangine, at a steady pace toward another officer who was shouting for him to stop.  Further, unlike the suspects in *Becker* and *Alicea*, plaintiff at *no* point put his hands in the air or said that he would comply with officer commands.  If anything, his comments and actions were consistent with *non*-compliance all throughout.  Thus, the officers were not

14

required to interpret his behavior or statements as any kind of compliance or surrender, passive or otherwise, under the case law.  Finally, although plaintiff argues that Mangine, or another officer, should have ordered Ash to release him earlier, Mangine reasonably believed that plaintiff *remained* a danger given the ongoing confusion over Fayerweather's taser and resistance, interrupted by a few moments when he *may* have been thinking about complying but never did.

Specifically, Mangine observed plaintiff, Fayerweather and Durand struggling over Fayerweather's taser, and it is clear from the camera footage that plaintiff continued to move as the deputies attempted to place him into handcuffs.  Plaintiff does not dispute that he moved, but says his actions were his "body's instinctual reaction to the pain of being bitten."  (Plt.'s Resp. to DPFOF (dkt. #55) ¶ 121.)  Nonetheless, Mangine was entitled to err on the side of caution, given the uncertainty and threat posed by plaintiff historically *and* as a result of his erratic, potentially dangerous behavior as he repeatedly resisted arrest.  And while Deputy Mangine *may* have been able to release Ash safely sooner, there is *no* caselaw, much less controlling law, clearly holding that he must do so until confident that plaintiff was secured in handcuffs.

Certainly, the *Becker* and *Alicea* cases involved an officer commanding a K-9 partner to bite a suspect, but the similarities between the cases end there.  Not every reasonable officer familiar with *Becker* and *Alicea* would have known that commanding a K-9 to apprehend and hold a suspect under the circumstances here would be a Fourth Amendment violation.  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.")  Instead, this case is more analogous to *Johnson v. Scott*, 576 F.3d

658 (7th Cir. 2009), in which the Seventh Circuit affirmed summary judgment where a police officer, in pursuit of a fleeing suspect, released his dog to assist in running the suspect down.  Despite the suspect throwing his hands up and saying, "I give up," shortly after the dog release, it bit and held him as the officer caught up to make an arrest.  *Id.* at 659.  The officer further struck the suspect to subdue him, because he interpreted his continued struggle with the dog as resistance.  *Id.*  Thus, the Seventh Circuit held that the officer's split-second decision to use force was reasonable to apprehend a suspect in active flight because "not all surrenders are genuine . . . the police are entitled to err on the side of caution when faced with an uncertain or threatening situation."  *Id.*

In this instance, as in *Johnson*, defendants faced a situation that was tense, uncertain and rapidly evolving with a suspect who was known to be threatening, had resisted in the past *and* was actively resisting up to and after the dog was released (or at least a reasonable officer could objectively believe) -- precisely the context in which the Supreme Court has counseled courts to make allowances for on-the-scene decisions about the amount of force that is necessary, "even if it may later seem unnecessary in the peace of a judge's chambers[.]"  *Graham*, 490 U.S. at 396–97.  However unfortunate the outcome of this incident may have been for the plaintiff, it was largely of his own doing, and not every reasonable officer should have known that defendants' conduct under the circumstances was objectively, beyond question, a violation of the Fourth Amendment.  Thus, defendants are entitled to qualified immunity and summary judgment.

ORDER

IT IS ORDERED that defendants motion for summary judgment (dkt. #37) is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 14th day of May, 2025.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

17

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RONALD T. ALLGOOD,

Plaintiff,

v.                                                        Case No.  23-cv-885-wmc

ST. CROIX COUNTY, ST. CROIX
COUNTY SHERIFF'S OFFICE, CHASE
DURAND, SCOTT KNUDSON, BRYCE
FAYERWEATHER, FREDERICK
MANGINE, ERIC JOHNSON and JOEL
BENSON,

Defendants.

---

## JUDGMENT IN A CIVIL CASE

---

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of
defendants St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott
Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson
against plaintiff Ronald T. Allgood dismissing the case.

| s/ Deputy Clerk | 5/14/2025 |
|---|---|
| Joel Turner, Clerk of Court | Date |

CERTIFICATE OF SERVICE

I hereby certify that on September 17th, 2025, I caused the foregoing document to be

electronically filed with the Clerk of the Court for the United States Court of Appeals for the

Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Frederick Melms
Attorney for Appellant

By: Electronically signed by Frederick Melms
_____
Frederick B. Melms
Bar no. 1093957
Melms Law
Frederick@melmslaw.com
219 S. Main St.
PO Box 81
Eagle River, WI 54521
715-892-3023