# The United States Court of Appeals for the Seventh Circuit

RONALD ALLGOOD,

*Plaintiff-Appellant,*

v.

ST. CROIX COUNTY, WISCONSIN, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin
Case No. 23-CV-885
District Judge William M. Conley

**RESPONSE BRIEF OF DEFENDANTS-APPELLEES
ST. CROIX COUNTY, ST. CROIX COUNTY SHERIFF'S OFFICE, CHASE
DURAND, SCOTT KNUDSON, BRYCE FAYERWEATHER, FREDERICK
MANGINE, ERIC JOHNSON, AND JOEL BENSON**

SARA C. MILLS
WI State Bar No. 1029470
Counsel of Record
SAMUEL C. HALL, JR.
WI State Bar No. 1045476
ZACHARY J. FLOOD
WI State Bar No. 1099136
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendants-Appellees,
St. Croix County, St. Croix County Sheriff's
Office, Chase Durand, Scott Knudson, Bryce
Fayerweather, Frederick Mangine, Eric
Johnson, and Joel Benson
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
SHall@CrivelloLaw.com
SMills@CrivelloLaw.com
ZFlood@CrivelloLaw.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Appellees furnishes the following list in compliance with Circuit Rule 26.1:

1. The full name of every party the attorneys represent in this case:

   St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson.

2. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

   Crivello, Nichols & Hall, S.C. represents Defendants-Appellees.

3. Any parent corporation and any publicly held company that own 10% or more of stock or shares:

   Not Applicable—Defendant-Appellee St. Croix County is a municipal corporation.

*s/ Sara C. Mills*

SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
ZACHARY J. FLOOD
State Bar No. 1099136
Attorneys for Defendants-Appellees, St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson
Crivello, Nichols & Hall, S.C.
710 N. Plankinton Ave.
Suite 500
Milwaukee, WI 53203-2404
(414) 271-7722
shall@crivellolaw.com
smills@crivellolaw.com
zflood@crivellolaw.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Appellees furnishes the following list in compliance with Circuit Rule 26.1:

4.  The full name of every party the attorneys represent in this case:

    St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson.

5.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Crivello, Nichols & Hall, S.C. represents Defendants-Appellees.

6.  Any parent corporation and any publicly held company that own 10% or more of stock or shares:

    Not Applicable—Defendant-Appellee St. Croix County is a municipal corporation.

*s/ Samuel C. Hall, Jr.*
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
ZACHARY J. FLOOD
State Bar No. 1099136
Attorneys for Defendants-Appellees, St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson
Crivello, Nichols & Hall, S.C.
710 N. Plankinton Ave.
Suite 500
Milwaukee, WI 53203-2404
(414) 271-7722
shall@crivellolaw.com
smills@crivellolaw.com
zflood@crivellolaw.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Appellees furnishes the following list in compliance with Circuit Rule 26.1:

7. The full name of every party the attorneys represent in this case:

   St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson.

8. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

   Crivello, Nichols & Hall, S.C. represents Defendants-Appellees.

9. Any parent corporation and any publicly held company that own 10% or more of stock or shares:

   Not Applicable—Defendant-Appellee St. Croix County is a municipal corporation.

*s/ Zachary J. Flood*
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
ZACHARY J. FLOOD
State Bar No. 1099136
Attorneys for Defendants-Appellees, St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson
Crivello, Nichols & Hall, S.C.
710 N. Plankinton Ave.
Suite 500
Milwaukee, WI 53203-2404
(414) 271-7722
shall@crivellolaw.com
smills@crivellolaw.com
zflood@crivellolaw.com

# TABLE OF CONTENTS

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**....................................................**II**

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**....................................................**III**

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**....................................................**IV**

**TABLE OF CONTENTS** ......................................................................................... **V**

**TABLE OF AUTHORITIES** ....................................................................................**VI**

**JURISDICTIONAL STATEMENT** ...........................................................................1

**STATEMENT OF THE ISSUES** ..............................................................................2

**STATEMENT OF THE CASE**..................................................................................3

   I.   PROCEDURAL HISTORY .............................................................................3
   II.  FACTS RELEVANT TO APPEAL...................................................................5

**SUMMARY OF THE ARGUMENT**........................................................................**19**

**STANDARD OF REVIEW**.....................................................................................**20**

**ARGUMENT**.......................................................................................................**22**

   I.   ALLGOOD MATERIALLY MISREPRESENTED THE
       RECORD ON APPEAL...............................................................................22

   II.  ALLGOOD WAIVED HIS ARGUMENTS AGAINST ALL
       DEPUTIES OTHER THAN MANGINE IN THE DISTRICT
       COURT, INCLUDING HIS CLAIMS ALLEGING A FAILURE
       TO INTERVENE. ......................................................................................28

   III.  THE DISTRICT COURT CORRECTLY CONCLUDED
       THAT MANGINE WAS ENTITLED TO QUALIFIED IMMUNITY. .....................29
      A.  *Allgood Failed to Demonstrate That Mangine Violated*
         *his Constitutional Rights.*.................................................................30
      B.  *Any Right Violated by Mangine was Not Clearly Established* ...................37

   IV.  ALLGOOD'S CLAIMS ALLEGING A FAILURE TO INTERVENE FAIL .............46

**CONCLUSION**....................................................................................................**47**

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE**...................................................**48**

**32(A)(7), FRAP RULE 32(G), FRAP RULE 32(C)**..................................................**48**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alicea v. Thomas,*
815 F.3d 283 (7th Cir. 2016) ............................................................... 39, 41, 42, 43

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ....................................................................................21

*Becker v. Elfreich,*
821 F.3d 920 (7th Cir. 2016) ......................................................................*passim*

*Borello v. Allison,*
446 F.3d 742 (7th Cir. 2006) .............................................................................30

*Carson v. ALL Erection & Crane Rental Corp.,*
811 F.3d 993 (7th Cir. 2016) .............................................................................22

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ....................................................................................21

*Cham v. Wodnick,*
123 F.3d 1005 (7th Cir. 1997), *cert denied,* 522 U.S. 1117 (1998) ......................................30

*Colaizzi v. Walker,*
812 F.2d 304 (7th Cir. 1987) .............................................................................38

*Doxtator v. O'Brien,*
39 F.4th 852 (7th Cir. 2022) ........................................................................ 37, 46

*Gant v. Hartman,*
924 F.3d 445 (7th Cir. 2019) .............................................................................21

*Gill v. City of Milwaukee,*
580 F.3d 335 (7th Cir. 2017) .............................................................................47

*Gobitz v. Corvilla, Inc.,*
196 F.3d 879 (7th Cir. 1999) .............................................................................21

*Graham v. O'Connor,*
490 U.S. 386 (1989) ....................................................................................46

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ....................................................................................37

*Johnson v. Scott*,
  576 F.3d 658 (7th Cir. 2009) ......................................................... 45

*King v. Henricks County Comm'r*,
  954 F.3d 981 (7th Cir. 2020) .................................................. 20, 29

*Mannola v. Farrow*,
  476 F.3d 453 (7th Cir. 2007) ......................................................... 30

*Miller v. Gonzalez*,
  761 F.3d 822 (7th Cir. 2014) .................................................... 43, 44

*Estate of Phillips v. City of Milwaukee*,
  123 F.3d 586 (7th Cir. 1997) ......................................................... 35

*Plumhoff v. Rickard*,
  572 U.S. 765 (2014) ...................................................................... 46

*Robinette v. Barnes*,
  854 F.2d 909 (6th Cir. 1988) ......................................................... 34

*Saucier v. Katz*,
  533 U.S. 194 (2001) ................................................................ 30, 38

*Scott v. Harris*,
  550 U.S. 372 (2007) ...................................................................... 21

*U.S. v. Montoya de Hernandez*,
  473 U.S. 531 (1985) ...................................................................... 35

*U.S. v. Norville*,
  43 F.4th 680 (7th Cir. 2022) ......................................................... 21

*Wilson v. Layne*,
  526 U.S. 603 (1999) ...................................................................... 30

**Statutes**

28 U.S.C. § 1291 ................................................................................ vii

28 U.S.C. § 1331 ................................................................................ vii

28 U.S.C. § 1343 ................................................................................ vii

42 U.S.C. § 1983 ........................................................ vii, 3, 20, 46

**Other Authorities**

First Amendment ................................................................................ 3

Fourth Amendment ....................................................................................*passim*

F.R.A.P Rule 32(a)(7) ...........................................................................48

F.R.A.P Rule 32(a)(7) and C. ..............................................................48

Fed. R. App. P. 32(a)(7)(F) ..................................................................48

Federal Rule of Civil Procedure 56.....................................................22

Federal Rule of Civil Procedure 56(c) ................................................27

FRAP RULE 32(g)..................................................................................48

RULE 32(c) .............................................................................................48

United States Constitution First and Fourth Amendments.................vii

# JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiff-Appellant, Ronald Allgood, is not complete and correct. The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the First and Fourth Amendments of the United States Constitution, and pursuant to 28 U.S.C. § 1343 because relief is sought under 42 U.S.C. § 1983. The United States Court of Appeals for the Seventh Circuit has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment or order of the United States District Court for the Western District of Wisconsin.

The District Court, the Honorable William M. Conley, entered an order and final judgment on May 14, 2025, granting Defendants-Appellees' motion for summary judgment dismissing all claims against Defendants-Appellees. (App. 103). Plaintiff-Appellant Allgood timely filed a notice of appeal on June 13, 2025. (App. 074) No claims or issues remain before the District Court.

# STATEMENT OF THE ISSUES

1. Whether Defendant-Appellee Frederick Mangine was entitled to qualified immunity for his use of K-9 Ash to subdue and control Plaintiff-Appellant Ronald Allgood based on the facts and circumstances presented to Mangine on November 7, 2022.

2. Whether the District Court properly dismissed Plaintiff-Appellant Ronald Allgood's claims against Defendants-Appellees Chase Durand, Bryce Fayerweather, Eric Johnson, and Joel Benson due to Allgood's failure to meaningfully develop and rebut the arguments of Defendants-Appellees.

# STATEMENT OF THE CASE

## I.     PROCEDURAL HISTORY

Plaintiff-Appellant Ronald Allgood ("Allgood"), represented by counsel, filed suit on December 23, 2023, under 42 U.S.C. § 1983 against St. Croix County, St. Croix County Sheriff's Office, Village of Hammond, Village of Hammond Police Department, Cory Van Effen, Daniel Orr, Scott Knudson, Chase Durand, Bryce Fayerweather, Eric Johnson, Joel Benson, Frederick Mangine, Does 1-10, and Roes 1-10. (R.1.) He alleged a violation of his First Amendment rights against Cory Van Effen and Daniel Orr, who were employed by the Village of Hammond, asserting that they issued him "dubious" citations and caused baseless criminal charges to be issued against him in retaliation for Allgood calling Van Effen a "pervert." Allgood included a related *Monell* claim against the Village of Hammond and Orr alleging the existence of an unconstitutional policy or practice of First Amendment retaliation and the use of excessive force. He also alleged that Durand, Fayerweather, Johnson, Benson, and Mangine—all with the St. Croix County Sheriff's Office—along with Van Effen used excessive force when effectuating his arrest on November 7, 2022, in violation of his Fourth Amendment rights. Finally, Allgood included related *Monell* claims against St. Croix County and Scott Knudson alleging the existence of an unconstitutional policy or practice of using excessive force and a failure to train officers.

On January 10, 2025, the Village of Hammond, Orr, and Van Effen ("Village Defendants") filed a motion for summary judgment seeking dismissal of all claims. On January 13, 2025, Defendants-Appellees St. Croix County, Knudson, Durand, Fayerweather, Johnson, Benson, and Mangine also timely filed a motion for summary judgment seeking dismissal of all claims against them as a matter of law; Defendants-Appellees also affirmatively asserted the defense of qualified immunity. During briefing on those motions, the Village Defendants and Allgood stipulated to the dismissal of all claims against the Village Defendants. An order granting the stipulated dismissal was entered on March 3, 2025. (R.61.)

On May 14, 2025, the District Court issued an Order granting Defendants-Appellees' motion for summary judgment on the remaining claims. (*See* App 086-126.) In ruling in favor of Defendants-Appellees, the District Court noted that Allgood failed to respond to Defendants-Appellees' arguments in favor of dismissal of the claims against St. Croix County, Knudson, Durand, Fayerweather, Johnson, or Benson; instead, he focused exclusively on his claim against Mangine related to his use of force. (App. 094-5, fn. 8.) Thus, the District Court granted summary judgment on all claims against St. Croix County, Knudson, Durand, Fayerweather, Johnson, and Benson based on Allgood's failure to meaningfully rebut any of Defendants-Appellees' arguments. As for the claim against Mangine, the District Court held that he was entitled to qualified immunity. (App. 101.) The

District Court did not reach the question of whether Mangine was entitled to summary judgment as a matter of law based on the merits of the claim.

Defendants-Appellees now submit this response to Plaintiff-Appellant's appeal and respectfully ask the Court to affirm the District Court's decision in all respects.

## II.    FACTS RELEVANT TO APPEAL

On October 3, 2022, a criminal complaint was issued against Allgood in St. Croix County case number 22-CF-683 in which Allgood was charged with threatening a law enforcement officer and disorderly conduct. (R. 35-3.) Allgood missed the November 3, 2022, initial appearance in that case, resulting in a bench warrant being issued for his arrest. (R. 35, ¶ 11.) On November 7, 2022, Sergeant Chase Durand of the St. Croix County Sheriff's Office ("SCCSO") was working a patrol shift as the shift supervisor. (R. 23, p. 21:4-5.) Durand was paired in the same squad car with Deputy Bryce Fayerweather, who was in field training at the time. (R. 23, pp. 24:19-20, 27:2; R. 22, p. 19:9-13.)

On that day, Durand was requested to make phone contact with Officer Cory Van Effen of the Village of Hammond Police Department. (R. 23, p. 21:4-6.) During this call, Van Effen requested the assistance of SCCSO in serving the arrest warrant on Allgood and taking him into custody. (R. 22, p. 18:15-18; R. 23, p. 21:4-14; R. 40-6.) During the call, Van Effen advised Durand and Fayerweather

that Allgood had a felony warrant for his arrest for threats to law enforcement, specifically threatening Van Effen that he (Allgood) would snap Van Effen's neck. (R. 23, pp. 21:4-14, 25:6-12; R. 22, p. 19:9-13.) Through their discussion with Van Effen, Durand and Fayerweather also learned that Allgood had been aggressive with law enforcement officers in the past and had a lengthy history of contacts with law enforcement. (R. 23, pp. 21:4-14, 25:6-12; R. 22, p. 19:9-13.) Durand also ran Allgood's name through his squad computer and confirmed the existence of the felony warrant for threatening law enforcement. (R. 23, pp. 23:14-24:8.)

Based on the information provided by Van Effen, in an effort to deescalate the situation, Durand decided that officers from the Village of Hammond Police Department would not be directly involved in Allgood's arrest and that SCCSO would handle the arrest. (R. 23, p. 21:15-18.) Shortly thereafter, SCCSO Sheriff Scott Knudson called Durand to provide additional information relevant to officer safety. (R. 23, p. 21:18-24, 35:24-36:8.) Within the SCCSO, it is typical for deputies, including the sheriff, to contact other deputies upon learning about planned arrests or contacts in order to advise them of information that may be pertinent to officer safety. (R. 23, pp. 35:24-36:5; R. 24, p. 38:4-16; R. 40, ¶ 16.) Sheriff Knudson advised Durand and Fayerweather of a past incident when he and other SCCSO deputies, including a K-9 deputy, attempted to take Allgood's

son into custody and Allgood produced a knife and threatened deputies with it. (R. 23, p. 21:18-24; R. 22, p. 19:9-13; R. 40, ¶¶ 18-19.)

Based on the felony warrant involving threats of violence, the information from Van Effen regarding Allgood's aggression towards law enforcement, and the information from Sheriff Knudson about Allgood's history of threatening SCCSO deputies with a knife during a past contact, Durand requested the assistance of one of SCCSO's K-9 handlers and the assistance of additional deputies. (R. 23, pp. 21:25-22:6, 35:1-13.) It is typical for multiple SCCSO deputies to assist in serving an arrest warrant where the warrant is for violent charges, for anything related to resisting arrest, or making threats to law enforcement officers. (R. 22, p. 49:6-21; R. 40, ¶ 15.) Additionally, SCCSO deputies generally request a K-9 handler to the scene when one is available when effectuating arrests pursuant to a warrant for violent charges, felony-level charges, if the suspect has a known violent history, if the suspect has a history of using weapons, or where the history or other facts indicate the likelihood of an increased risk to officers' safety. (R. 23, pp. 18:19-19:4; R. 24, pp. 28:23-29:8; R. 40, ¶ 14.)

SCCSO Deputies Joel Benson and Eric Johnson responded to Durand's request for additional officers. (R. 44-1; R. 45-1.) Durand then called Deputy Fred Mangine, who is a SCCSO K-9 deputy with his K-9 partner Ash, and requested

his assistance arresting Allgood pursuant to the felony warrant for threats to law enforcement. (R. 24, p. 31:11-22.) When he received Durand's call, Mangine was just about to start his shift and was leaving from his home approximately 11 miles away from the Village of Hammond, where Allgood resided. (R. 24, pp. 30:16-31:1, 32:2-15.) Durand directed Mangine to head towards Allgood's residence to meet the other deputies there. (R. 24, p. 34:15-22.)

While en route to the residence, Mangine reviewed the in-house history for Allgood, noting a prior violent encounter with law enforcement where Allgood armed himself with a knife and made threats; several prior encounters with law enforcement being extremely angry, verbally abusive, or threatening; a recent encounter with law enforcement where Allgood attempted to flee in a vehicle from the residence; threats to break a law enforcement officer's neck; and incidents of non-compliance and resisting while being arrested. (R. 43-1; R. 24, p. 37:12-21.) Also while en route, Sheriff Knudson used the SCCSO's secondary radio channel to relay to Mangine the information he had previously relayed to Durand and advised that during that past incident, Allgood had produced a knife and threatened to use it to stab a police K-9 that had responded. (R. 24, pp. 38:2-39:2; R. 40, ¶ 20.)

Durand, Fayerweather, Benson, and Johnson arrived in the area of Allgood's home and approached on foot. (R. 22, pp. 19:20-20:4; R. 23, pp. 22:4-6,

66:19-67:1.) As they neared the home, Durand could see Allgood outside of the house in a fenced-in area of the yard. (R. 23, p. 28:11-19.) While standing outside of the fenced yard, Durand said to Allgood, "Hey Ronald, can I chat with you for a minute?" (R. 40-9 at 03:03 -03:07.) Allgood responded by waving his hand in the air and saying, "Be right there" as he shook his head back and forth to the left and right and walked toward the door leading into the house. (R. 40-9 at 03:07-03:12.) Because Allgood was heading to the door and not toward officers, Durand then said to Allgood, "Step over here please, alright?" (R. 40-9 at 03:10 - 03:12.) Allgood stopped and asked Durand, "Why are you here?" (R. 40-9 at 03:14.)

Durand responded to Allgood, "We're here because you have a warrant for your arrest," and Allgood then asked, "For what?" (R. 40-9 at 03:14 – 03:18.) Durand responded that it was a warrant signed by a judge and said they could discuss the specifics in a bit. (R. 40-9 at 03:19 – 03:23.) Allgood did not begin moving toward Durand or any of the other deputies, so Durand then ordered, "Come here, Ronald." (R. 40-9 at 03:26 - 03:43.)  Allgood then went inside the residence through the nearby door. (R. 40-10 at 04:10 – 04:15.) SCCSO deputies are trained that when an uncooperative subject retreats into a home or other building, it poses a significant threat to officer safety because the subject may arm himself or otherwise obtain one or more objects that can be used as a

9

weapon. (R. 23, p. 38:12-18; R. 40, ¶ 22.) Deputies cannot confirm that a subject is unarmed until the subject is in custody and has been searched for weapons. (R. 23, pp. 39:19-40:3; R. 40, ¶ 23.)

Johnson positioned himself on the outside of a tall fence on the side of Allgood's yard across from the door that Allgood had entered and began attempting to speak with Allgood: "Come on out. We've got a warrant, come on out, okay?" (R. 40-9 at 04:09 -- 04:14.) Allgood then came back out of his residence through the same door, along with a woman, and stood on the patio arguing with Johnson. (R. 40-9 at 04:15- 04:45; R. 40-10 at 05:25 – 05:34.) After close to a minute of Allgood arguing with deputies from his porch, Durand advised in a loud voice, "Hey Ronald. You have a felony warrant. We'll be coming inside to arrest you if you don't comply. Step this way." (R. 40-9 at 04:52 – 04:59; R. 40-11 at 05:32 – 05:38.) Allgood again asked what the warrant was for and Durand responded, "Threats to law enforcement. Step this way." (R. 40-9 at 04:59 – 05:02; R. 40-10 at 05:39 – 05:41; R. 40-12 at 00:00 – 00:05.) Allgood responded, "No, you tell me what it's for." (R. 40-12 at 00:00 – 00:05; R. 40-10 at 05:41 – 05:43.) Durand then repeated, "Threats to law enforcement. Step this way, Ronald." (R. 40-9 at 05:05-05:07; R. 40-12 at 00:05-00:09.)

For his part, Mangine was monitoring the radio traffic as he was driving towards the Allgood residence and heard transmissions confirming that the

deputies had made contact with Allgood and that he was noncompliant. (R. 24, p. 35:5-9.) When Mangine and K-9 Ash arrived, they immediately headed to the fence line where Johnson was positioned. (R. 40-11 at 00:00 – 00:10.) As he approached the fence, Mangine could see and hear Allgood arguing with Johnson and refusing to surrender. (R. 24, pp. 35:22-36:6.) Mangine then said to Allgood, "Come on surrender, or I'm going to throw the dog over and he's going to bite you. Come out and surrender now." (R. 40-12 at 00:08 – 00:11; R. 40-11 at 00:00 – 00:07.) Instead, Allgood went back into his residence through the same door he had used earlier. (R. 40-12 at 00:15 – 00:17.)

Based on the information he learned from reviewing Allgood's in-house history and Allgood's behavior observed on scene in an unsecured residence, Mangine retrieved his 20-foot leash and secured it to K-9 Ash so that he could be used as a force option if necessary. (R. 43-1; R. 24, pp. 37:5 – 38:1; 39:14-20.) Durand then hopped the short fence at the front of the residence and approached the door that Allgood had just used to enter his home. (R. 40-9 at 05:11 – 05:25.) Fayerweather followed Durand into the fenced-in portion of the yard. (R. 40-10 at 05:51- 05:55.) Mangine then directed K-9 Ash to hop the short fence into the yard and Mangine did the same. (R. 40-11 at 00:45-00:52.)

As Johnson remained at the fence, he could see Allgood inside the house and motioned to him with his hand while saying, "Ronald, come on out" at least

three times. (R. 40-12 at 00:35 – 00:50.) Almost a minute after entering the house, Allgood exited the house through the same door and stood on his patio, at which point Durand repeated, "Step over here, Ronald." (R. 40-9 at 05:49 – 05:52.) Johnson calmly said, "Yep. Just step on over, Ronald." (R. 40-12 at 00:51-00:55.) Allgood responded, "You won't tell me what it's for?" (R. 40-9 at 05:52 – 05:54.) Durand replied, "You're under arrest, get on the ground. Get on the ground." (R. 40-9 at 05:54 – 05:56.) Allgood initially appeared to begin raising his hands but simultaneously said to the deputies, "Shoot! Shoot first! Let me take care of my business first" and retreated back into his residence. (R. 40-9 at 05:56 – 06:02; R. 41-1.) As Allgood retreated into his residence, Durand ordered, "Ron, stop right there." (R. 40-9 at 06:00 – 06:02.)

After only a few seconds, Allgood reemerged, stepping one foot out of the door, and Durand repeated again, "Step over here. You're under arrest! Step out!" (R. 40-9 at 06:05 – 06:10.) Mangine and K-9 Ash approached the door and Mangine announced to Allgood, "Sheriff's Office K-9, stop! I'm going to send the dog in, you may be bit! Stop!" (R. 40-11 at 01:00 – 01:04; R. 24, p. 40:12-20.) Allgood then retreated back into his house through the same door and slammed it closed. (R. 40-9 at 06:08 – 06:11; R. 40-13 at 00:00 – 00:08.) Mangine attempted to open the door, but it was locked, and Durand shouted through the door, "Step out, Ronald!" (R. 40-9 at 06:12- 06:23; R. 40-13 at 00:00 – 00:12.) Johnson radioed

dispatch and advised that Allgood had gone back into the residence and had locked the door again. (R. 40-12 at 01:22 – 01:27.)

The deputies watched Allgood inside his home from different vantage points attempting to determine where he was going and what he was doing. Then Durand announced to the other deputies nearby, "He's going to the garage" as he began heading toward the front of the residence. (R. 40-9 at 06:27-06:28.) Fayerweather was the deputy closest to the front of the residence and the garage, so he hopped back over the fence and headed toward the garage with his taser unholstered. (R. 40-10 at 07:05 – 07:10.) Mangine and K-9 Ash also headed for the front of the residence where the garage is located and hopped the fence. (R. 40-11 at 01:20 – 01:33; R. 24, p. 41:1-5.)[1] Upon arriving at the front of the garage, Fayerweather saw that the garage door was opening and announced, "Got a garage door opening!" (R. 40-10 at 07:10 – 07:12.) Once the garage door was about halfway open, Allgood ducked under the door and began exiting the garage. (R. 40-10 at 07:13 – 07:16.) Seeing Allgood exiting the garage, Fayerweather immediately raised his taser and yelled, "Ronald, step down!" (R. 40-10 at 07:16—07:17.) Fayerweather could see that Allgood had something in one of his hands but could not tell what it was. (R. 22, p. 34:20-25.)

---

[1] At this time, Deputy Mangine's cell phone rings and all sound on his body-worn camera footage is obscured by the ringing until approximately 1:50.

Allgood did not stop or slow down but continued to walk quickly in a diagonal direction toward Fayerweather. (R. 40-10 at 07:17—07:19; R. 43-1; R. 41-1; R. 24, p. 41:20-24.) Fayerweather screamed, "Ronald! Stop!" as Allgood continued walking in the same direction at the same pace. (R. 40-10 at 07:17—07:19.) As Fayerweather ordered Allgood to stop a second time, Mangine and K-9 Ash arrived in the front of the residence and saw Allgood walking toward Fayerweather. (R. 40-11 at 01:30 – 01:36; R. 40-10 at 07:18-07:20.) Fayerweather yelled a third time, "Stop!" (R. 40-10 at 07:19- 07:20.) Because Allgood had approached within approximately one foot of him, Fayerweather did not believe that his taser would be effective. (R. 42-1; R. 22, pp. 57:12-58:3.) The effective range of a taser that will result in full neuromuscular incapacitation of a subject is approximately seven feet of distance between the taser and the subject. (R. 22, pp. 57:19-59:1.) SCCSO policy permits deputies to use a taser only when the deputy can safely do so within the operational range of the taser device. (R. 40-2, p. 2.)

Allgood did not stop or slow his pace in response to Fayerweather's commands. (R. 22, pp. 55:20-56:2.) Once he was within 1-2 feet of Fayerweather, Allgood reached out one of his hands and pushed away Fayerweather's taser. (R. 42-1; R. 22, p. 56:3-6; 56:17-21.) When Mangine approached the front of the house, he saw Allgood ignoring Fayerweather's commands while walking

briskly toward Fayerweather. (R. 43-1; R. 24, p. 42:3-12.) Mangine then observed Allgood either grabbing or pushing away Fayerweather's taser in a motion that Mangine interpreted as Allgood attempting to disarm Fayerweather to avoid being tased. (R. 43-1; R. 24, pp. 42:13-20; 43:6-25.) Mangine observed that Allgood had an object in one of his hands but could not ascertain what it was. (R. 43-1; R. 24, p. 42:9-12.)

Fayerweather then decentralized Allgood by hooking his left arm under Allgood's right arm and tripping Allgood to direct him to the ground. (R. 22, pp. 36:5-20, 38:17-39:5.) Based on his observations of Allgood's resistive behavior and a possible weapon in hand, Mangine believed that Allgood posed an imminent threat to law enforcement officers on the scene and to the public if he was allowed to flee. (R. 43-1; R. 24, p. 42:13-20.) Therefore, Mangine commanded K-9 Ash to engage Allgood. (R. 43-1; R. 42, p. 24:13-23.) K-9 Ash bit Allgood's calf at the same time that Fayerweather decentralized Allgood to the ground. (R. 43-1; R. 24, p. 45:2-10.) Pursuant to his training and best practices, Mangine remained next to K-9 Ash on Allgood's leg with at least one hand on Ash to control and secure Ash. (R. 24, pp. 48:21-49:9.)

Once on the ground, Allgood was lying face-up with Fayerweather straddling him over his chest. (R. 22, p. 40:7-12.) Allgood then grabbed Fayerweather's taser, which was still in Fayerweather's right hand, and tried to

pull it away from Fayerweather. (R. 42-1, R. 22, pp. 42:16-43:2, 56:17-57:7) Mangine observed Allgood grabbing and pulling on Fayerweather's taser. (R. 43-1; R. 24, p. 46:9-20.) As he approached the men, Durand saw that Allgood had his hand on Fayerweather's taser as the two men were on the ground. (R. 23, pp. 44:24-45:5; R. 41-1.) Durand immediately reached for the taser to get it out of Allgood's hand to secure it. (R. 23, p. 45:1-5; R. 22, p. 42:17-43:2.) As the deputies struggled to secure Fayerweather's taser, Fayerweather told Allgood to stop resisting or he would be tased and yelled to Allgood, "Give me my taser! Give me my taser!" (R. 42-1; R. 40-10 at 07:25 – 07:31; R. 22, p. 43:17-22.)

Durand was able to secure Fayerweather's taser and get it back to Deputy Fayerweather while Fayerweather continued ordering Allgood to stop resisting. (R. 40-10 at 07:31- 07:38; R. 22, p. 43:23-25.) Allgood continued to physically resist the deputies' effort to secure him by attempting to push and pull away and tensing his muscles. (R. 43-1; R. 23, p. 98:11-20; R. 24, p. 46:20-23, 47:5-8, 56:23-3.) Durand then pinned Allgood's right arm to the ground. (R. 41-1.) Mangine told Allgood that the K-9 would be removed when Allgood stopped resisting. (R. 43-1; R. 24, p. 50:10-13.)

Mangine did not release K-9 Ash at this point because Allgood was still resisting as deputies continued attempting to secure his arms in handcuffs, Mangine believed that Allgood had tried to disarm Fayerweather, he believed

that Allgood was continuing to resist deputies, and multiple deputies were crouched over Allgood wearing duty vests that had easily accessible tools on their chests, including tasers. (R. 24, pp. 46:2-47:4, 52:15-22.) Accordingly, Mangine believed that Allgood continued to pose a threat to officers until he was secured and no longer had the ability to try to take something from the officers' vests to use as a weapon. (R. 24, pp. 46:2-47:4; 52:23-53:13.) Mangine did not release K-9 Ash at this point because he believed that Ash's bite could still assist in gaining some level of compliance from Allgood until his hands could be secured in handcuffs. (R. 24, pp. 46:2-47:4, 52:23-53:13, 56:16-57:10, 71:8-18.) SCCSO deputies are trained that a resistive subject continues to pose a threat to officer safety until the subject is secured in handcuffs, because the subject still has the ability to kick, punch, bite, spit, break free from officers, and produce a concealed weapon. (R. 23, pp. 47-48, 57; R. 40, ¶ 24.)

Because Allgood continued to actively resist and attempting to fight back, Durand then took hold of Allgood's left arm to secure it and placed a handcuff on it. (R. 23, pp. 44:21-45:5; R. 41-1.) Benson then arrived and initially assisted in attempting to secure Allgood by stabilizing Allgood's head. (R. 44-1.) After Durand had secured a handcuff on Allgood's left hand, Allgood continued to pull his right arm away and resist efforts to place his right hand in handcuffs. (R. 23, pp. 55:24-56:7, 89:21-25, 98:11-20.) Benson then grabbed Allgood's right

forearm and assisted in placing it behind Allgood's back and securing the handcuffs. (R. 44-1.) Johnson, who had initially run to the rear of the residence, ran to the front of the residence. (R. 40-12 at 01:28 - 01:45; R. 45-1.) By the time that Johnson arrived, Allgood was already on the ground with several deputies attempting to secure him. (R. 40-12 at 01:47 – 01:56; R. 45-1.) Johnson secured Allgood's right leg by holding it down until Allgood was secured in handcuffs. (R. 45-1.)

K-9 Ash remained in place on Allgood's calf until Mangine believed that active resistance had been overcome and there was no danger of Allgood further attempting to disarm Fayerweather of his taser. (R. 43-1.) Once Mangine learned that Allgood was handcuffed, Mangine informed the other deputies that he would be removing K-9 Ash. (R. 43-1; R. 23, p. 98:11-20; R. 24, pp. 71:19 -72:6.) Mangine then took positive control of K-9 Ash's flat collar and verbally commanded Ash to release, which Ash quickly did without issue. (R. 43-1.) Mangine then immediately requested EMS to the scene. (R. 43-1.)

## SUMMARY OF THE ARGUMENT

This Court should affirm the District Court's decision holding that Deputy Mangine was entitled to qualified immunity for his deployment of K-9 Ash during Defendants-Appellees' efforts to take Allgood into custody on November 7, 2022. The undisputed facts, the majority of which are clearly depicted in multiple angles of body-worn camera footage, show that Mangine was confronted with a tense, uncertain, threatening, and rapidly evolving situation. These facts would warrant a reasonable officer in Deputy Mangine's position to believe that Allgood posed an imminent threat to law enforcement officers on the scene and to the public if he was allowed to flee. In turn, Mangine's deployment of Ash was objectively reasonable.

Similarly, the undisputed facts demonstrate that a reasonable officer in Mangine's position would interpret Allgood's actions as continued resistance as officers' attempted to subdue and handcuff him, even despite K-9 Ash's hold on Allgood's leg. And a reasonable officer in that position would believe that it was not safe to release K-9 Ash until Allgood was handcuffed and no longer posed a threat to officers. As the District Court noted, however unfortunate the outcome of this incident may have been for Allgood, it was largely of his own doing.

As for Durand, Fayerweather, Johnson, and Benson's alleged failure to intervene, no reasonable officer in their position would have understood that

Mangine's use of K-9 Ash on an actively resisting subject was a violation of clearly established Fourth Amendment rights.

Accordingly, the District Court properly granted summary judgment in Defendants-Appellees' favor and recognized that 1) Allgood abandoned all claims other than that for excessive force against Mangine; and 2) Mangine was entitled to qualified immunity. Allgood has not identified any factual or legal error in the District Court's conclusions and has not provided any basis to overturn the District Court's decision or to depart from well-established precedent. Therefore, this Court should affirm the judgment in favor of Defendants-Appellees in its entirety.

## STANDARD OF REVIEW

A district court's grant of summary judgment in a case brought under 42 U.S.C. § 1983 is subject to *de novo* review, including summary judgment based on qualified immunity. *King v. Henricks County Comm'r*, 954 F.3d 981, 983-984 (7th Cir. 2020). This Court may affirm on any basis for which it finds support in the record and that was adequately presented to the district court. *Id.* Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Id.* Video evidence, in particular, can eviscerate a factual dispute where the video "utterly discredit[s]" the non-movant's version of the facts and there can be no reasonable disagreement about

what the video depicts. *U.S. v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022); *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019).

The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate the specific facts showing that there is a genuine issue for trial. *Id.* However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Nor will speculation, hearsay, or conclusory allegations suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ARGUMENT

## I.  ALLGOOD MATERIALLY MISREPRESENTED THE RECORD ON APPEAL.

At the outset, here as in the District Court, Allgood repeatedly mischaracterizes or outright misrepresents the record in an attempt to avoid affirmance of summary judgment. His efforts cannot be dismissed as taking creative license with, or engaging in zealous advocacy of, an otherwise ambiguous record that is subject to reasonable interpretation. Rather, the record includes video footage from the body-worn cameras of five deputies that objectively establishes almost the entire span of relevant events from beginning to end. Federal Rule of Civil Procedure 56 only entitled Allgood, as the nonmovant, to reasonable inferences from evidentiary facts; it does not require the trial court to construct inferences where the necessary building blocks for that construction have not been furnished. *See, e.g., Carson v. ALL Erection & Crane Rental Corp.*, 811 F.3d 993, 997 (7th Cir. 2016).

Yet here, as in the District Court, speculation and mischaracterization are all that Allgood has offered. While the Defendants-Appellees do not wish to belabor the point, many of Allgood's factual assertions beg for correction because they go to the very heart of his claims against Defendants-Appellees. For example, one of Allgood's main themes is that he "verbally surrendered" to deputies as he "calmly" walked out of his garage "with his hands in the air." (*See* Doc. 19, p. 8.)

But this characterization of events is entirely contradicted by the objective evidence in the record.

First, Allgood asserts that he "told Durand he would exit through the garage," implying that he was cooperating and communicating with deputies' attempts to take him into custody. (Doc. 19, p. 8.) Allgood does not cite anything in the record for this claim, because it did not happen. The incident in question was captured on the body-worn cameras of five deputies, and the footage from those cameras is devoid of any such evidence. (*See* R. 40-9 – R. 40-13.)

Nevertheless, Allgood amplifies the misrepresentation by claiming that "Durand relayed this to the other deputies," implying that deputies were all aware of his alleged cooperation and communication. (*Id.*) This is also incorrect. Instead, after Allgood retreated into his house for at least the third time, Durand observed Allgood inside the residence and alerted the other deputies to Allgood's direction of travel based on his observations. (R. 41-1; R. 40-9 at 06:27-06:28.) Indeed, Allgood's total lack of cooperation or communication resulted in Benson mistakenly believing that Allgood was going to exit the residence from the rear and announcing, "He's going out the back! He's going out the back!" (R. 40-13 at 00:23-00:25.) Any insinuation that Allgood told any deputy that he was going to exit through the garage is false.

Similarly, Allgood's claim that he "emerged from the garage with his hands

in the air, verbally surrendered, and announced, 'I'm coming out, my hands are up. I have a cell phone,'" is demonstrably false. (*See* Doc. 19, p. 8.)  A frame-by-frame review of footage from five different body-worn cameras shows that Allgood did ***not*** put his hands in the air at ***any time*** on November 7, 2022.  Allgood made this same claim in the District Court, and the District Court flatly rejected it:

> Allgood also represents that his hands were raised and he told Fayerweather that he was coming out, but it ***is*** clear from the camera footage that:  his hands were not raised when he exited the garage; and he did not say that his hands were up or that he had a phone.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment); *U.S. v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022) ("a video record of the events at issue can evaporate any factual dispute that would otherwise exist").

(App. 092, fn. 5 (emphasis in original).) Even the document cited by Allgood for this false claim does not support it. Rather, he cited his response to a fact proposed by Defendants-Appellees about multiple deputies assisting in the execution of felony warrants, which has nothing to do with Allgood's actions exiting the garage. (*See* Doc. 19, p. 8 (citing R. 55, ¶ 19).)

Allgood's claim that Mangine saw Allgood "walking with his hands visible, verbally surrendering" is also rebutted by the record. (Doc. 19, p. 8.) Again, the evidence cited by Allgood is unrelated to the assertion. (*See id.* (citing R. 55, ¶¶ 26-27 (Defendants-Appellees' proposed facts about the use of SCCSO radio channels

to relay information to deputies)).) As explained above, Allgood never "verbally surrendered." Moreover, the evidence in the record demonstrates that when Mangine reached the front of the house, he saw Allgood ignoring Fayerweather's commands while walking briskly toward Fayerweather and then saw Allgood either grab or push away Fayerweather's taser in what he interpreted as an attempt to disarm Fayerweather. (R. 24, p. 42:3-20, 43:6-25; R. 43-1.) And while Mangine did observe Allgood's hands, he only observed that Allgood had an object in one hand but could not tell what it was. (R. 24, p. 42:9-12; R. 43-1.)

To the extent that Allgood implies or asserts that Mangine ordered K-9 Ash to apprehend him only after Fayerweather had already "charged and tackled him," this must also be rejected. The body-worn camera footage unequivocally rebuts any such claim. Fayerweather did not "charge" Allgood at any time. (See R. 40-10 at 07:15 – 07:22; R. 40-11 at 01:30 – 1:36.) Similarly, the moment at which Mangine released K-9 Ash is depicted on video. (R. 40-11 at 01:34 – 01:37.) As shown in the screenshot below, K-9 Ash can be seen biting Allgood's calf at 01:37, exactly the same second that Fayerweather is using a leg sweep to decentralize Allgood to the ground.



(R. 40-11 at 01:37.) And Allgood's reference to a "tackle" is disingenuous at best, because he did not dispute that Fayerweather decentralized him by hooking his left arm under Allgood's right arm and tripping Allgood to direct him to the ground. (R. 55, ¶ 98.)

Allgood also attempts to paint himself as non-resistive, immobilized, and subdued once on the ground, arguing and implying that Mangine's use of K-9 Ash was unreasonable. (*See* Doc. 19, p. 8-9.) But this must also be rejected. For example, in the District Court, Allgood asserted that once on the ground, he grabbed Fayerweather's wrist holding the taser—not the taser itself—and that he "clearly

never made contact" with the Taser. (R. 55, ¶¶ 104-107.) However, the only evidence he cited was body-worn camera footage showing Allgood's hand (in the yellow glove) on the yellow taser as the deputies (with khaki-colored shirtsleeves) were trying to get control of it.



(R. 40-9 at 06:48 - 06:50.) This was further confirmed by the sworn testimony of Fayerweather and Durand (R. 22, pp. 42:16-43:2, pp. 56:17-57:7; R. 23, pp. 44:21-45:20), none of which was rebutted by Allgood.

Other examples of Allgood's misrepresentation and mischaracterization abound. While Allgood continually emphasizes these themes throughout his opening brief, they have no factual support and are instead directly contradicted by the record. His attempts to manufacture a material factual dispute where none exists must be rejected, and this Court should affirm the District Court's grant of summary judgment based on Allgood's failure to meet his burden under Federal Rule of Civil Procedure 56(c).

## II.   ALLGOOD WAIVED HIS ARGUMENTS AGAINST ALL DEPUTIES OTHER THAN MANGINE IN THE DISTRICT COURT, INCLUDING HIS CLAIMS ALLEGING A FAILURE TO INTERVENE.

Throughout his opening brief, Allgood repeatedly refers to "officers" collectively and does not attempt to differentiate the actions of any individual. Against that backdrop, Allgood asserts that the District Court erred in "finding appellees were entitled to qualified immunity." (*See* Doc. 19, p. 12.) But the District Court never held that Defendants-Appellees Durand, Fayerweather, Johnson, and Benson were entitled to qualified immunity. Instead, it was Allgood's failure to develop any arguments against those Defendants-Appellees that resulted in their dismissal:

> In his complaint, plaintiff further pleaded excessive force claims against the other deputies, as well as municipal liability claims against St. Croix County. (Dkt. #1.) However, plaintiff's brief in opposition to summary judgment focused almost exclusively on the actions of Deputy Mangine and K-9 Ash, **while failing to respond to defendants' arguments regarding his claims against the other deputies and the County.** Defendants are entitled to summary judgment on those claims based on plaintiff's failure to meaningfully rebut any of defendants' arguments. *See Bradley v. Vill. of Univ. Park, Illinois*, 59 F.4th 887, 897 (7th Cir. 2023) (arguments waived if underdeveloped, conclusory, unsupported by law or not raised at all).

(App. 094-095, fn. 8 (emphasis added).)

The same is true for his claims alleging that Durand, Fayerweather, Johnson, and Benson failed to intervene against Mangine's use of K-9 Ash. Allgood asserts that "[t]he district court did not address the failure to intervene claim, because it

found for appellees on qualified immunity…" (Doc. 19, p. 19.) But those claims were dismissed because Allgood failed to meaningfully address them. In his response to summary judgment, Allgood merely asserted in a single paragraph that each defendant was "on top of [him] immobilizing him and subduing him when Mangine allowed K-9 Ash to continue to bite him." (R. 58, p. 17.) He then concluded that each defendant could have tried to remove Ash or force Mangine to remove Ash, without citing any case law or evidentiary support in the record. (*Id.*)

On appeal, Allgood is foreclosed from attempting to resurrect these claims. This Court may only affirm on a basis for which it finds support in the record **and** that was adequately presented to the District Court. *King*, 954 F.3d at 983-984. Because Allgood did not present any arguments in favor of his claims against Durand, Fayerweather, Johnson, and Benson in the District Court, he may not do so now. And because the undisputed record confirms that they were entitled to summary judgment, this Court should affirm the District Court's dismissal of all claims against those individual Defendant-Appellees.

## III. THE DISTRICT COURT CORRECTLY CONCLUDED THAT MANGINE WAS ENTITLED TO QUALIFIED IMMUNITY.

Under the qualified immunity doctrine, "government officials performing discretionary functions are immune from suit if their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'"

*Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997), *cert denied*, 522 U.S. 1117 (1998). The Seventh Circuit instructs that "[a]lthough the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *Mannola v. Farrow*, 476 F.3d 453, 357 (7th Cir. 2007).

In determining whether Mangine is entitled to qualified immunity, the trial court conducts a two-step inquiry. First, it must determine whether the disputed conduct violated a constitutional right. *Borello*, 446 F.3d at 746. Second, the District Court must determine whether the right was "clearly established" at the time of the alleged conduct. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Whether the law was "clearly established" turns on the "objective legal reasonableness of the action" given the contemporaneous legal rules. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). Thus, a defendant government official is entitled to qualified immunity for unconstitutional conduct so long as there could be a reasonable, albeit mistaken, belief about the legality of his or her conduct. *Saucier*, 533 U.S. at 205-06.

## A.    ALLGOOD FAILED TO DEMONSTRATE THAT MANGINE VIOLATED HIS CONSTITUTIONAL RIGHTS.

Here, the qualified immunity inquiry stops at the first prong of the analysis, because no jury could find that Mangine used excessive force in light of the totality

of the facts and under the circumstances confronting him at the time of the incident, and without the benefit of hindsight.

Prior to his arrival at Allgood's residence on November 7, 2022, Mangine was aware of several facts that informed his use of force that evening. He had reviewed Allgood's in-house history showing a prior violent encounter with law enforcement where Allgood armed himself with a knife and made threats; several prior encounters with law enforcement being extremely angry, verbally abusive, or threatening; a recent encounter with law enforcement where Allgood attempted to flee in a vehicle from the residence; threats to break a law enforcement officer's neck; and incidents of non-compliance and resisting while being arrested. (R. 24, p. 37:12-21; R. 43-1.) He had also heard Sheriff Knudson on the secondary channel advising of a prior incident during which Allgood had produced a knife and threatened to stab a K-9 deputy. (R. 24, pp. 38:2 – 39:2; R. 40, ¶ 20.) And as he traveled to Allgood's house, he heard radio traffic from the other responding deputies stating that Allgood was being noncompliant. (R. 24, p. 35: 5-9.)

Upon his arrival at Allgood's residence, Mangine immediately observed Allgood being argumentative and uncooperative with Johnson and refusing to surrender. Mangine said to Allgood, "Come on surrender, or I'm going to throw the dog over and he's going to bite you. Come out and surrender now." But Allgood retreated into his residence. Based on what he had learned prior to his

arrival, combined with what he observed on the scene, Mangine determined that he may need to use K-9 Ash as a force option if necessary.

In the minutes that followed, Mangine observed Allgood step back outside of his residence, continue to argue with deputies, and refuse multiple commands. (*See* R. 43-1.) At one point while deputies were still on the side of the house, he observed Allgood begin to raise his hands over his head while simultaneously saying, "Shoot. Shoot first. Let me take care of my business first," as he returned back into his residence. (R. 40-9 at 06:00 – 06:02.) Allgood then reemerged with one foot out of his door as Durand repeated again, "Step over here. You're under arrest! Step out!" (*Id.* at 06:05 – 06:10.) At that point, Mangine gave Allgood a clear, concise verbal warning, "Sheriff's Office K-9, stop! I'm going to send the dog in, you may be bit! Stop!" (R. 40-11 at 01:00 – 01:04; R. 24 at 40:12-20.) But Allgood returned inside, and Mangine found the door was locked. (R. 43-1.)

It was against this backdrop that Mangine ran to the front of the residence as he heard Fayerweather ordering Allgood to stop. Mangine saw Allgood walking briskly toward Fayerweather with something unidentifiable in one of his hands, despite Fayerweather continuing to order Allgood to stop. He then observed Allgood either grabbing or pushing away Fayerweather's taser in a motion that Mangine reasonably interpreted as Allgood attempting to disarm Fayerweather to avoid being tased. Based on his observations of Allgood's

resistive behavior and a possible weapon in hand, Mangine believed that Allgood posed an imminent threat to law enforcement officers on the scene and to the public if he was allowed to flee. (R. 43-1.) And because he believed that Allgood posed an imminent threat, he commanded K-9 Ash to engage Allgood. (*Id.*)

As trained, K-9 Ash bit Allgood's left calf. He did so at the same time that Fayerweather decentralized Allgood to the ground. Mangine observed Allgood grabbing and pulling on Fayerweather's taser, but pursuant to his training and best practices, Mangine remained next to K-9 Ash on Allgood's leg with at least one hand on Ash to control and secure Ash. (R. 24, pp. 48:21-49:9.) Durand arrived almost immediately to assist in recovering Fayerweather's taser, but Allgood continued to resist against deputies' efforts to secure him and put him into handcuffs. Thus, Mangine told Allgood that the K-9 would be removed when Allgood stopped resisting. (R. 43-1; R. 24, p. 50:10-13.)

But Mangine did not release K-9 Ash at this point, because Allgood continued to resist as deputies continued attempting to secure his arms in handcuffs. Further, Mangine believed that Allgood had tried to disarm Fayerweather, and multiple deputies were crouched over Allgood wearing duty vests that had easily accessible tools on their chests, including tasers. Deputy Mangine believed that Allgood continued to pose a threat to officers until he was secured and no longer had the ability to try to take something from the officers'

vests to use as a weapon. (R. 24, pp. 46:2-47:4; 52:23-53:13.) He also did not release K-9 Ash at this point, because he believed that Ash's bite could still assist in gaining some level of compliance from Allgood until his hands could be secured in handcuffs.

Even after Durand had secured a handcuff on Allgood's left hand, Allgood continued to pull his right arm away and resist efforts to place his right hand in handcuffs. But immediately upon learning that Allgood was secured in handcuffs, Mangine informed the other deputies that he would be removing K-9 Ash. Mangine then took positive control of K-9 Ash's flat collar and verbally commanded Ash to release, which Ash quickly did without issue, just as he is trained to do. K-9 Ash remained in place on Allgood's calf until Mangine believed that active resistance had been overcome and there was no danger of Allgood further attempting to disarm Fayerweather of his taser.

As in other Fourth Amendment cases analyzing a use of force involving a police K-9, "it is 'useful to pin down the quantum of force' used" by Mangine in deploying K-9 Ash, because it "'represents the nature and significance of the governmental intrusion'" on Allgood's Fourth Amendment rights. *See Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (quoting *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir. 2013)). Here, the force used via Mangine's deployment of K-9 Ash was a lesser quantum of force than deadly force. *See id.* at 926; *Robinette*

*v. Barnes*, 854 F.2d 909 (6th Cir. 1988) (holding that the use of canines by law enforcement is not a deadly use of force); (*see also* R. 24, pp. 15:13 – 16:4).

By the time Mangine and K-9 Ash arrived at the residence, Allgood had been refusing to cooperate with deputies for several minutes already. Mangine observed Allgood refusing countless orders to surrender, and he observed Allgood return into his residence multiple times. Based on his training, Mangine knew that these retreats into the residence posed a significant threat to officer safety, because Allgood could be arming himself. And Mangine knew of a prior incident during which Allgood had threatened to kill a police K-9 with a knife.

As time passed and Allgood continued refusing to cooperate, it became more and more reasonable for Mangine to perceive a threat. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997). Mangine observed that the presence of multiple deputies and continued dialogue had proven unsuccessful in gaining Allgood's compliance. Even his earlier verbal warning that a K-9 was present and that Allgood could be bit was ineffective and only prompted Allgood to lock himself in his house. "Authorities must be allowed 'to graduate their response to the demands of any particular situation.'" *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985). But it was not until Mangine observed Allgood's interaction with Fayerweather than he determined it was reasonable and appropriate to command Ash to engage Allgood. And this was based on his

beliefs that 1) Allgood could be armed; 2) Allgood was attempting to disarm Fayerweather; and 3) Allgood posed an imminent threat to officers on the scene and the public if he was allowed to flee.

Further, K-9 Ash's bite was straightforward and as trained. Ash made a single and committed full-mouth, targeted bite to the fleshiest portion of Allgood's calf. (R. 46-2, p. 5.) This is exactly what police canines are properly trained to do: bite and hold the areas of the body that are the most dangerous to officers, specifically hands and legs. (*Id.*)

Finally, to the extent that Allgood complains about the length of time that Ash was engaged before Mangine released him, this too was objectively reasonable based on the circumstances facing deputies that evening. Mangine had witnessed Allgood attempting to disarm Fayerweather and then witnessed Allgood grabbing and pulling on Fayerweather's taser even once they were on the ground. He had witnessed Allgood exit the garage with something in his hand but could not immediately confirm what it was or that it was not a weapon. As the other deputies arrived and attempted to secure Allgood's limbs as Allgood continued to resist, Mangine knew that the deputies were wearing duty vests with various items, including tasers and OC spray, that would be within Allgood's reach if he was able to break free from the deputies' holds. Based on SCCSO's training and Mangine's experience, a resistive subject continues to pose a threat to

officer safety until the subject is secured in handcuffs, because the subject still has the ability to kick, punch, bite, spit, break free from officers, and produce a concealed weapon. (R. 23, pp. 47-48, 57; R. 40, ¶ 24.)

Thus, even though deputies were physically attempting to secure each limb, given Allgood's attempts to grab Fayerweather's taser, the possible presence of a weapon, Allgood's history of threats against law enforcement, and Allgood's continued resistance, it was reasonable for Mangine to keep Ash in place until Allgood was secured in handcuffs. *See, e.g., Doxtator v. O'Brien*, 39 F.4th 852, 862 (7th Cir. 2022) ("being on one's stomach on the ground does not preclude one from firing a gun, so the fact that he was facedown on the ground and handcuffed does not render him 'subdued,' especially if officers believed that one of his hands contained a firearm"). Therefore, Mangine's actions were objectively reasonable as a matter of law. Because he did not violate Allgood's Fourth Amendment rights, Mangine is entitled to the protection of qualified immunity.

## B.     ANY RIGHT VIOLATED BY MANGINE WAS NOT CLEARLY ESTABLISHED

Nevertheless, even assuming Allgood could establish that Mangine violated his Fourth Amendment rights, these rights were not clearly established at the time of the alleged conduct. The Supreme Court instructs that the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). The

inquiry is narrow and assesses whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Saucier*, 533 U.S. at 201; *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987) ("[T]he test for immunity [is] whether the law was clear in relation to the specific facts confronting the public official when he acted.").

Each of Mangine's actions was a reasonable and appropriate response to the information relayed to him and to the conduct he observed. Thus, qualified immunity is also warranted, because Allgood cannot demonstrate with the requisite level of specificity a clearly established right at the time of the alleged deprivation. He did not have the right to be free from any use of force in the face of his continued resistance, nor did he have the right to be free from an escalation in that use of force as he escalated and continued his resistance and attempted to disarm Fayerweather. Likewise, Mangine's perception of the threat posed by Allgood was reasonable based on the continuing resistance and refusal to comply with any verbal commands.

And Allgood did not have the right to any immediate cessation of the use of force via K-9 Ash once he was on the ground, because he continued struggling with deputies for Fayerweather's taser, he continued physically resisting and tensing against deputies' attempts to secure him in handcuffs, it was unknown whether he was armed, and he had demonstrated a propensity for attempting to

disarm deputies which made it unsafe for Mangine to release Ash until Allgood was secured in handcuffs. Even the use of K-9 Ash was measured and controlled, as he only made a single, committed bite and held until he was commanded to release. Any law enforcement officer in Mangine's position reasonably could have believed that his or her actions did not violate a clearly established law in the face of Allgood's continued active resistance to arrest combined with the immediate threat he posed to officers.

Allgood's reliance on the *Alicea* and *Becker* cases is unavailing. First, the defendant officer in *Becker*, Elfreich, arrived at the residence where the plaintiff, Becker, was believed to be staying (Becker's mother's house) to arrest him on a warrant for a violent felony. *Becker v. Elfreich*, 821 F.3d 920, 923 (7th Cir. 2016). Becker's mother called upstairs to her son that the police were there to arrest him. According to Becker, he had been upstairs asleep when he heard his mother calling. In response, he replied he was getting dressed and would be down. *Id.* However, after waiting 30 seconds without seeing or hearing Becker, Officer Elfreich released his police K-9, Axel, into the house and directed the dog to "find him." *Id.* Axel was trained upon hearing the command "find him," to use the "bite-and-hold" technique. *Id.*

Within two minutes of his mother's announcement, Becker began descending the stairs with his hands on top of his head so officers knew he was

surrendering, and his girlfriend was following him. *Id.* Axel immediately ran from the front door through the house to the stairway and began heading up the stairs, which Becker was then descending. *Id.* Axel encountered Becker as he reached a landing on the stairs, about three steps from the bottom, and Axel bit Becker's left ankle. *Id.* At 924. At that point, Becker shouted, "Call the dog off. I'm coming towards you." *Id.* Officer Elfreich saw that Axel had bitten Becker's leg and that Becker had his hands on his head, but Elfreich did not command Axel to release Becker. *Id.* Instead, Officer Elfreich ordered Becker to get on the floor. *Id.*

Becker claimed he could not hear Officer Elfreich's command because his girlfriend was screaming, so he did not immediately get on the floor. *Id.* When Becker did not immediately comply, Officer Elfreich grabbed Becker by his shirt collar and yanked him down the last few steps onto the floor, where he landed hard on his chest and head. *Id.* Becker claimed that he lay still on the ground with his hands behind his back, while Officer Elfreich continued to allow Axel to bite his leg. *Id.* According to Becker, Officer Elfreich told him that he could not have the dog release him until he was handcuffed. *Id.* Officer Elfreich then placed his knee in Becker's back, handcuffed him, and only then ordered Axel to release his grip. *Id.*

The plaintiff's actions in *Becker* were materially different than those of Allgood. The plaintiff in *Becker* did not refuse countless commands from multiple

officers over the course of several minutes or barricade himself inside the residence. The plaintiff in *Becker* did not approach within 1-2 feet of an officer and reach for the officer's taser while ignoring multiple commands to stop. At all relevant times, the plaintiff in *Becker* unequivocally indicated that he was surrendering—first with his hands over his head as he descended the stairs toward the officer, and then with his hands behind his back as he laid face-down on the ground. And once on the ground, the plaintiff in *Becker* did not resist, refuse to be handcuffed, or grab at any officer's taser.

The *Becker* Court reversed summary judgment because, if the plaintiff's facts were accepted, the continued use of K-9 Axel was objectively unreasonable and excessive. The plaintiff had surrendered, was not resisting, was not fleeing, and posed no apparent immediate danger to officer safety that would justify any use of force at all. Here, Allgood did not meaningfully dispute any of the material underlying facts, and this Court has the benefit of multiple angles of footage from the body-worn cameras of all five responding deputies. In light of the undisputed record, *Becker* is not a reasonably analogous case that both articulated the right at issue and applied it to a factual circumstance similar to the one at hand that would have put Mangine on notice that his actions would violate Allgood's rights.

The *Alicea* case is similarly distinguishable. *Alicea* involved two excessive force claims: one against Officer Thomas for his use of his police canine, Leo,

against Alicea; and one for the force used by Officer Alvarez to control the situation following the use of canine force (which is not relevant to the present case because it did not involve the use of a canine). *See Alicea v. Thomas*, 815 F.3d 283, 288-290 (7th Cir. 2016). Alicea burglarized a home and fled the crime scene upon seeing a police vehicle. Officer Thomas, who was on duty with K-9 Leo, received a radio dispatch about the burglary and that the suspect may have fled. Upon arriving at the scene, Officer Thomas released K-9 Leo and directed him to begin tracking the suspect. *Id.* at 286. Leo tracked the garage and backyard, and he began barking by a pool. *Id.*

In his attempt to flee, Alicea had jumped into an empty, five-foot deep, above-ground pool to hide from the responding officers. *Id.* With Leo barking, Officer Thomas approached the pool with his weapon drawn and commanded Alicea to show him his hands, which were in his sweatshirt. *Id.* There was a dispute about whether Alicea complied with the request, but then Officer Thomas assisted Leo into the pool and commanded him to bite and hold Alicea. *Id.*

In analyzing Officer Thomas's use of K-9 Leo to bite and hold Alicea in the pool, the *Alicea* Court held the use of the canine constituted excessive force. At the time the force was used, Alicea was standing in broad daylight with his hands up at gunpoint, he was effectively trapped within the pool, and he was not in active flight. *Id.* at 289. Officer Thomas had his gun drawn and trained on Alicea the

entire time, and the "obstacle of [Alicea] vaulting out of the pool would provide Thomas with ample time to discharge his weapon or to command Leo to chase and hold Alicea." *Id.* Moreover, Alicea gave no indication that he would flee and immediately complied with Officer Thomas's commands. *Id.* Under those circumstances, the use K-9 Leo to bite and hold Alicea was not reasonable. *Id.* at 290.

Like *Becker*, the plaintiff in *Alicea* had surrendered, was not resisting, was not fleeing, and posed no apparent immediate danger to officer safety that would justify any use of force at all. In fact, the plaintiff in *Alicea* was effectively prevented from fleeing due to his position inside a swimming pool. In light of the undisputed record in the present case, and with the benefit of multiple angles of body-worn camera footage, *Alicea* is not a reasonably analogous case.

Finally, to the extent that Allgood mentions *Miller v. Gonzalez* in passing within his arguments, that case is similarly distinguishable. The *Miller* case did not involve the use of a police canine at all. Instead, in *Miller*, the defendant-officer, Gonzalez, was searching a neighborhood for a fleeing suspect in a reported stabbing. *See Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014). As he approached a gas station, Gonzalez saw the plaintiff, Miller, exit an idling car while drinking a beer. *Id.* at 824. Gonzalez began questioning Miller, who became increasingly fidgety and nervous and then "took off running with Gonzalez in pursuit." *Id.*

Miller's flight path serendipitously crossed paths with another officer, Stange, who was also searching for the stabbing suspect. As Stange approached Miller, Miller darted away and jumped a chest-high chain link fence into a small, enclosed yard. He was now trapped. *Id.* at 824-5. Stange then jumped the fence and ordered Miller to the ground, and Miller laid on the ground face-down. *Id.* at 825. He remained there motionless at gunpoint for upwards of 10 seconds when Gonzalez arrived. Gonzalez testified that he could not see Miller at all at this time, as it was dark and the yard was overgrown. *Id.* Gonzalez then jumped the chain link fence and landed directly on Miller's head, breaking his jaw. *Id.*

Miller sued Gonzalez, alleging a violation of his Fourth Amendment rights. In analyzing Miller's claim against Gonzalez, the question of the intentionality of Gonzalez's physical act of jumping the fence was crucial: whether Gonzalez was simply jumping over the fence to get into the yard, or whether he was jumping over the fence to drop his knee on Miller and subdue him. *See id.* at 827-828. Due to genuine factual disputes about Gonzalez's intentionality, the *Miller* Court reversed and remanded to the district court for further proceedings. Obviously, the question of the intentionality of Mangine's deployment of K-9 Ash is not at issue in the present case, and Miller's facts are easily distinguished. Allgood was not lying face-down, motionless, for upwards of 10 seconds when Mangine released Ash. Thus, *Miller* does not overcome qualified immunity.

As recognized by the District Court, these cases are not sufficiently clear that every reasonable official would have understood that what he is doing violates a clearly established right. (App. 100 (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015).) Instead, this case is more analogous to *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009), in which the Seventh Circuit affirmed summary judgment where a police officer pursuing a fleeing suspect released his canine to assist in apprehending the suspect. Despite the suspect throwing his hands up and saying, "I give up," shortly after the dog release, it bit and held him as the officer caught up to make an arrest. *Id.* at 659. The officer further struck the suspect to subdue him, because he interpreted his continued struggle with the dog as resistance. *Id.* Thus, the Seventh Circuit held that the officer's split-second decision to use force was reasonable to apprehend a suspect in active flight because "not all surrenders are genuine . . . the police are entitled to err on the side of caution when faced with an uncertain or threatening situation." *Id.*

In this case, as in *Johnson*, Mangine faced a situation that was tense, uncertain, and rapidly evolving with a suspect who was known to be threatening, had resisted in the past and was actively resisting up to and after the dog was released (or at least a reasonable officer could objectively believe his actions were resistance) –precisely the context in which the Supreme Court has counseled courts to make allowances for on-the-scene decisions about the amount of force

45

that is necessary, "even if it may later seem unnecessary in the peace of a judge's chambers[.]" *Graham v. O'Connor*, 490 U.S. 386, 396–97 (1989).

Allgood cannot show that his Fourth Amendment right was clearly established where he refused to cooperate and actively resisted throughout the entire encounter, disregarded countless verbal commands, and even attempted to disarm Fayerweather of his taser. Nor has he cited to "a robust consensus of cases of persuasive authority" that have recognized otherwise. *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014). Accordingly, Mangine was entitled to qualified immunity and this Court should affirm the District Court's decision in its entirety.

## IV.  ALLGOOD'S CLAIMS ALLEGING A FAILURE TO INTERVENE FAIL

Even if this Court believes that Allgood adequately presented his claims alleging a failure to intervene while opposing summary judgment, those claims nevertheless fail at the appellate stage. To establish liability under § 1983 for a failure to intervene, a plaintiff must show that 1) the officer had reason to know that excessive force was being used; and 2) the officer had a "realistic opportunity" to intervene. *Doxtator*, 39 F.4th at 864-5. For the reasons set forth above, no officer in the position of Durand, Fayerweather, Johnson, or Benson would have had reason to know that Mangine's use of K-9 Ash was excessive. Therefore, Allgood cannot establish that Durand, Fayerweather, Johnson, or Benson is legally responsible for failing to intervene in any underlying constitutional violation. *See*

*Gill v. City of Milwaukee*, 580 F.3d 335, 342 (7th Cir. 2017). Accordingly, this Court should affirm the District Court's dismissal of the claims alleging a failure to intervene.

## CONCLUSION

For the foregoing reasons, Defendants-Appellees, St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson, respectfully request that this Court affirm the Decision of the District Court granting their Motion for Summary Judgment and dismissing this case.

By: *s/ Sara C. Mills*
    SAMUEL C. HALL, JR.
    State Bar No. 1045476
    SARA C. MILLS
    State Bar No. 1029470
    ZACHARY J. FLOOD
    State Bar No. 1099136
    Attorneys for Defendants-Appellees, St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson
    Crivello, Nichols & Hall, S.C.
    710 N. Plankinton Ave.
    Suite 500
    Milwaukee, WI 53203-2404
    (414) 271-7722
    shall@crivellolaw.com
    smills@crivellolaw.com
    zflood@crivellolaw.com

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g), FRAP RULE 32(c)

The undersigned, counsel of record for Defendants-Appellees, St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson, furnishes the following in compliance F.R.A.P Rule 32(a)(7) and C.R. 32(c):

I hereby certify that this brief conforms to the type-volume rules contained in F.R.A.P Rule 32(a)(7) for a brief produced with a proportionally spaced 12-point (or larger) type-face font. The length of this brief is 10,767 words, excluding portions of the brief exempted by Fed. R. App. P. 32(a)(7)(F).

Dated this 5th day of November, 2025.

By: *s/ Sara C. Mills*
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
ZACHARY J. FLOOD
State Bar No. 1099136
Attorneys for Defendants-Appellees, St. Croix County, St. Croix County Sheriff's Office, Chase Durand, Scott Knudson, Bryce Fayerweather, Frederick Mangine, Eric Johnson, and Joel Benson
Crivello, Nichols & Hall, S.C.
710 N. Plankinton Ave., Suite 500
Milwaukee, WI 53203-2404
(414) 271-7722
shall@crivellolaw.com
smills@crivellolaw.com
zflood@crivellolaw.com